**ORAL ARGUMENT SCHEDULED FOR FEBRUARY 17, 2023**

**Nos. 21-1243 and 21-1245**
**(Consolidated with No. 21-1244)**

---

IN THE

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NATIONAL RELIGIOUS BROADCASTERS
NONCOMMERCIAL MUSIC LICENSE COMMITTEE, ET AL.,
*Appellants*,

v.

COPYRIGHT ROYALTY BOARD, ET AL.,
*Appellees*,

SOUNDEXCHANGE, INC, ET AL.,
*Intervenors*.

---

On Appeal from an Order of
The Copyright Royalty Board

---

**FINAL BRIEF OF INTERVENOR SOUNDEXCHANGE, INC.
IN SUPPORT OF APPELLEES**

---

TIM DADSON
*General Counsel*
BRAD PRENDERGAST
*Assistant General Counsel*
SOUNDEXCHANGE, INC.
733 10th Street, NW
10th Floor
Washington, D.C. 20001
Tel: (202) 640-5858

MATTHEW S. HELLMAN
ERIC E. PETRY
VICTORIA HALL-PALERM
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
Fax: (202) 639-6066
MHellman@jenner.com

*Counsel for SoundExchange, Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellant SoundExchange, Inc. ("SoundExchange") certifies as follows:

**A.    Parties and Amici.** All parties, intervenors, and amici appearing before the Copyright Royalty Judges and in this Court are listed in the opening brief of appellees the Copyright Royalty Board ("CRB") and the Librarian of Congress.

**B.    Rulings Under Review.** The ruling under review is the *Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Those Performances (Web V)*, 86 Fed. Reg. 59,452 (Oct. 27, 2021) (codified at 37 C.F.R. Part 380). Because the ruling as published in the *Federal Register* redacts certain confidential and competitively sensitive information provided by the parties to the Copyright Royalty Judges constituting the CRB, and because it is necessary for this Court to consider that information in deciding certain issues in this appeal, this brief cites the unredacted version of the ruling issued by the CRB. J.A.1113 - 1423. A redacted public version of that ruling, paginated in the same manner as the unredacted version, was released by the CRB. J.A. 66 - 207.

i

**C.    Related Cases.** This case has not previously come before this Court, or any other court. SoundExchange is unaware of any other related cases besides the other petitions from the Determination, which the Court has consolidated with this case.

**D.    Deferred Appendix.** A deferred appendix was used, pursuant to this Court's Order of April 28, 2022.


January 12, 2023                                          /s/ Matthew S. Hellman
                                                         Matthew S. Hellman

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and D.C. Circuit Rules 26.1 and 28(a)(1), SoundExchange submits the following corporate disclosure statement:

SoundExchange is a non-profit collective management organization representing the owners of sound recording copyrights and the artists who created those recordings. SoundExchange collects royalties paid pursuant to statutory licenses under Sections 112 and 114 of the Copyright Act, 17 U.S.C. §§ 112, 114, which allow the public performance of sound recordings by means of certain digital audio transmissions, along with related reproductions. SoundExchange distributes these royalties to the artists who created the sound recordings and the copyright owners of the sound recordings. SoundExchange has not issued any shares or debt securities to the public, and SoundExchange has no parent companies. SoundExchange has no subsidiaries or affiliates that have issued any shares or debt securities to the public. No publicly-held company has any ownership interest in SoundExchange. Because SoundExchange is a trade association as defined in D.C. Circuit Rule 26.l(b), it is not required to disclose the names of its members.

Because SoundExchange distributes statutory royalties to the artists who created the sound recordings and the owners of the copyrights in the sound recordings, those artists and owners may have an interest in the royalty rates at issue in this appeal. Certain publicly-traded companies receive, directly or indirectly through a subsidiary, royalties distributed by SoundExchange.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................. i

CORPORATE DISCLOSURE STATEMENT .......................................... iii

TABLE OF AUTHORITIES .................................................................... vii

GLOSSARY ................................................................................................ ix

STATEMENT OF ISSUES.......................................................................... 1

STATUTES AND REGULATIONS .......................................................... 1

STATEMENT OF THE CASE ................................................................... 1

    A.    Statutory and Regulatory Background ................................... 3

        1.    Statutory Licenses ........................................................ 3

        2.    Copyright Royalty Board ............................................. 4

        3.    Willing Buyer/Willing Seller Standard ......................... 6

        4.    Distinguishing Among Services when Setting Royalties and Minimum Fees ....................................... 7

    B.    Determination Below ............................................................... 8

SUMMARY OF ARGUMENT ................................................................... 8

ARGUMENT ............................................................................................. 10

I.    The CRB's Decision to Reject a Distinct Rate for Simulcasters Was Neither Contrary to Law nor Arbitrary and Capricious ....... 10

II.    The Rates the CRB Set for Noncommercial Broadcasters Were Neither Contrary to Law nor Arbitrary and Capricious .............. 13

III.    The CRB's Decision to Increase the Minimum Fee Was Neither Contrary to Law nor Arbitrary and Capricious .............. 17

CONCLUSION ........................................................................... 21

# TABLE OF AUTHORITIES*

CASES

*Beethoven.com LLC v. Library of Congress*, 394 F.3d 939 (D.C. Cir. 2005) .................................................................... 5, 11, 12

**Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board**, 574 F.3d 748 (D.C. Cir. 2009) ............................................ 7, 15

**Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board**, 796 F.3d 111 (D.C. Cir. 2015) ............................................ 6, 15

STATUTES

5 U.S.C. § 556(d) ................................................................ 13

17 U.S.C. § 106 .................................................................. 3

17 U.S.C. § 106(1) ............................................................... 3

17 U.S.C. § 106(6) ............................................................... 3

17 U.S.C. § 112(e) ............................................................... 3

17 U.S.C. § 114(d)(2) ............................................................ 3

17 U.S.C. § 114(d)(2)(A)(i) ...................................................... 4

17 U.S.C. § 114(f) ............................................................... 3

17 U.S.C. § 114(f)(1)(B) ................................................... 7, 12, 16

17 U.S.C. § 114(f)(1)(B)(i) ...................................................... 6

17 U.S.C. § 114(f)(1)(B)(i)(I) ................................................... 7

17 U.S.C. § 114(f)(1)(B)(i)(II) .................................................. 7

17 U.S.C. § 114(j)(6) ............................................................ 4

---

* Authorities upon which we chiefly rely are marked with an asterisk.

17 U.S.C. § 114(j)(7) ........................................................................ 4

17 U.S.C. § 114(j)(8) ........................................................................ 4

17 U.S.C. § 801 ................................................................................ 4

17 U.S.C. § 803(a)(1) ........................................................................ 6

17 U.S.C. § 804(b)(3)(A) .............................................................. 4, 5

## OTHER AUTHORITIES

*Determination of Reasonable Rates and Terms for the Digital
  Performance of Sound Recordings and Ephemeral Recordings
  (Web I), 67 Fed. Reg. 45,240 (July 8, 2002), aff'd sub nom.
  Beethoven.com LLC v. Library of Congress, 394 F.3d 939 (D.C.
  Cir. 2005) ............................................................................. 5, 11, 12

*Determination of Royalty Rates and Terms for Ephemeral
  Recording and Webcasting Digital Performance of Sound
  Recordings (Web IV), 81 Fed. Reg. 26,316 (May 2,
  2016) .............................................................. 5, 6, 11, 12, 15, 18, 20

*Determination of Royalty Rates for Digital Performance Right in
  Sound Recordings and Ephemeral Recordings, 79 Fed. Reg.
  23,102 (Apr. 25, 2014) ....................................................... 5, 15, 20

*Digital Performance Right in Sound Recordings and Ephemeral
  Recordings, 72 Fed. Reg. 24,084 (May 1, 2007) ....... 5, 6, 11, 14, 15, 18

Digital Performance Right in Sound Recordings and Ephemeral
  Recordings, 75 Fed. Reg. 56,873 (Sept. 17, 2010) ...................... 18, 20

Digital Performance Right in Sound Recordings and Ephemeral
  Recordings, 79 Fed. Reg. 64,669 (Oct. 31, 2014) ......................... 18, 20

# GLOSSARY

The following abbreviations or terms are used in this brief.

| CRB | Copyright Royalty Board |
|---|---|
| *Web I* | *Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings*, 67 Fed. Reg. 45,240 (July 8, 2002) |
| *Web II* | *Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 72 Fed. Reg. 24,084 (May 1, 2007) |
| *Web III* | *Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23,102 (Apr. 25, 2014) |
| *Web IV* | *Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV)*, 81 Fed. Reg. 26,316 (May 2, 2016) |
| *Web V* | *Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Those Performances (Web V)*, 86 Fed. Reg. 59,452 (Oct. 27, 2021) |

## STATEMENT OF ISSUES

1.     Whether the Judges reasonably declined to set a separate rate for certain entities whose internet broadcasts are simultaneously broadcast over terrestrial radio.

2.     Whether the Judges reasonably retained the rate structure for noncommercial broadcasters that has been in use since the Judges' first ratesetting proceeding.

3.     Whether the Judges reasonably increased the minimum fee charged to webcasters in light of evidence regarding an increase in administrative costs.

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the addendum to SoundExchange's opening brief.

## STATEMENT OF THE CASE

This is an appeal from the CRB's final determination setting the statutory royalty rates that commercial and noncommercial webcasters must pay copyright owners and performing artists for the performance of music and other sound recordings over the five-year rate period from 2021-2025. The CRB published its final determination in the *Federal Register* on October 27, 2021, and the consolidated appeals followed.

The National Association of Broadcasters (NAB), representing a group of ad-based commercial services, argues that the CRB should have set a separate, lower royalty rate for simulcasters—that is, webcast services that transmit over the internet simultaneously with over-the-air radio broadcasts. The National Religious Broadcasters Noncommercial Music License Committee (NRBNMLC), representing a group of noncommercial services, argues that the CRB set rates for noncommercial webcasters too high. Both NAB and NRBNMLC, (collectively, the Services), also challenge the CRB's decision to increase the minimum fee that webcasters must pay.[1] The government, on behalf of the CRB and other government appellees, has filed a response brief opposing the Services' arguments.

Intervenor SoundExchange, Inc. (SoundExchange) is a non-profit collective management organization representing the owners of sound recording copyrights and the artists who created those recordings. SoundExchange has been authorized by the CRB to collect and distribute

---

[1] SoundExchange, representing artists and copyright owners, filed its own appeal, Case No. 21-1244, challenging the CRB's determination of the rate for ad-supported noninteractive services as arbitrary and capricious.

the royalties and fees at issue in this appeal to copyright owners and artists. For the reasons stated herein, the Services' challenges to the Determination are meritless.

### A.    Statutory and Regulatory Background

#### 1.    Statutory Licenses

The Copyright Act grants copyright owners certain exclusive rights to their works. 17 U.S.C. § 106. In the case of sound recordings, the type of work at issue here, those rights include the exclusive rights to reproduce their recordings and perform them publicly "by means of . . . digital audio transmission[s]." 17 U.S.C. § 106(1), (6). These rights are subject to statutory licenses, meaning that eligible digital music services that comply with statutory license requirements, including payment of royalties, may reproduce and publicly perform sound recordings in certain ways without the copyright owner's authorization. *See, e.g.*, 17 U.S.C. §§ 112(e), 114(d)(2), (f).

Sound recording statutory licenses are available to digital services like internet webcasters that are "noninteractive"—that is, services that, among other things, do not transmit a specific sound recording in response to a user's request. In contrast to these radio-like services,

"interactive" services like Spotify provide "on demand" functionality and are therefore ineligible for a statutory license. They must, therefore, reach negotiated agreements with copyright owners to perform recordings lawfully. *See* 17 U.S.C. § 114(d)(2)(A)(i), (j)(7).

The statutory provisions distinguish among different types of services. As relevant here, the proceeding below was to set rates for (i) services that are free to consumers and generate revenue through advertisements ("ad-supported" services, or in the words of the statute, services making "eligible nonsubscription transmissions") and (ii) services that require a consumer to pay a subscription fee ("new subscription services"). *See* 17 U.S.C. §§ 114(j)(6), (8), 804(b)(3)(A).

## 2. Copyright Royalty Board

The Copyright Act does not itself prescribe royalty rates for the sound recording statutory licenses, instead assigning that task to the Copyright Royalty Judges constituting the CRB, an administrative body that is part of the Library of Congress. 17 U.S.C. § 801. Every five years, the CRB holds proceedings to set statutory royalty rates and terms for the upcoming five-year period for performances by webcasters and

reproduction of so-called "ephemeral" copies used to facilitate those performances. 17 U.S.C. § 804(b)(3)(A).

The proceeding below—*Web V*—was the fifth webcasting proceeding, covering the 2021-2025 period. The *Web V* Determination drew on the analysis from the prior four webcasting decisions: *Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings*, 67 Fed. Reg. 45,240 (July 8, 2002) ("*Web I*"), *aff'd sub nom. Beethoven.com LLC v. Libr. of Cong.*, 394 F.3d 939 (D.C. Cir. 2005); *Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 72 Fed. Reg. 24,084 (May 1, 2007) ("*Web II*"); *Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23,102 (Apr. 25, 2014) ("*Web III*") (on remand from this Court); and *Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV)*, 81 Fed. Reg. 26,316 (May 2, 2016) ("*Web IV*").

Although the CRB is not subject to plenary review by any superior official in the Executive Branch, it is generally subject to principles of administrative law and bound by its own decisions and by "prior

determinations and interpretations of," *inter alia*, the Librarian of Congress and the Register of Copyrights. 17 U.S.C. § 803(a)(1).

### 3.   Willing Buyer/Willing Seller Standard

"[T]he Copyright Act directs the [CRB] to 'establish rates and terms that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller' if the webcasting statutory license did not exist." *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 131 (D.C. Cir. 2015) (quoting a provision since redesignated as 17 U.S.C. § 114(f)(1)(B)). In doing so, the CRB looks to a hypothetical marketplace "free of the influence of compulsory, statutory licenses," *Web IV*, 81 Fed. Reg. at 26,316, where the sellers are the record companies and the product being sold is a "blanket license for each . . . record company's complete repertoire of sound recordings." *Web II*, 72 Fed. Reg. at 24,091 (quoting *Web I*, 67 Fed. Reg. at 45,244).

In establishing rates and terms that satisfy the willing buyer/willing seller standard, the CRB considers "economic, competitive, and programming information presented by the parties." 17 U.S.C. § 114(f)(1)(B)(i). It "may consider the rates and terms for comparable

6

types of digital audio transmission services and comparable circumstances under voluntary license agreements." *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 753-54 (D.C. Cir. 2009) (quoting redesignated provision 17 U.S.C. § 114(f)(1)(B)(ii)). And it may consider how webcasting may affect "copyright owner[s'] other streams of revenue" and the "relative roles" of copyright owners and webcasters. 17 U.S.C. § 114(f)(1)(B)(i)(I), (II).

### 4. Distinguishing Among Services when Setting Royalties and Minimum Fees

Using the willing buyer/willing seller standard, the CRB "distinguish[es] among the different types" of services to set reasonable royalty rates and "a minimum fee for each . . . type of service" covered by the statutory license. 17 U.S.C. § 114(f)(1)(B). To determine whether a sufficient distinction exists between different services to justify a separate royalty rate—that is, whether willing buyers and willing sellers would agree to different rates for the different types of services—the CRB considers "criteria including the quantity and nature of the use of sound recordings and the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers." *Id.*

7

**B.     Determination Below**

As relevant here, the CRB's Determination below (1) rejected NAB's proposal to set a separate statutory rate for simulcasters, J.A. 1361 (slip op. 249); (2) maintained the longstanding rate structure for noncommercial webcasters, J.A. 1391-92 (slip op. 279-80); and (3) increased the annual minimum fee for webcasters from $500 to $1000.

## SUMMARY OF ARGUMENT

The Services' arguments largely retrace contentions that the CRB and this Court have previously rejected, and they should be rejected again. The government's response brief explains in detail why these arguments are meritless. SoundExchange writes separately to emphasize a handful of additional reasons why the Services' arguments are unavailing:

I.     First, NAB failed to satisfy its evidentiary burden to justify its request for a separate, lower rate applicable to simulcasters. Since *Web I*, the burden of proof has fallen squarely on the party seeking to establish a new rate. The CRB applied this same rule in *Web II* and *Web IV*, and this Court has repeatedly affirmed the CRB's determinations. This rule embodies the general principle that the proponent of a deviation

from the status quo has the burden of demonstrating why a change is warranted. NAB failed to carry its burden, and the CRB did not act unreasonably in declining again to set a separate rate for simulcasters. This Court should affirm that aspect of the determination.

**II.** Second, NRBNMLC's arguments in this proceeding regurgitate versions of arguments that have been repeatedly rejected in prior proceedings. The rate structure the CRB adopted for noncommercial webcasters has been in place since *Web II*, and NRBNMLC offers no persuasive reason to deviate from it now. To the extent NRBNMLC raises anything new, it is its argument concerning the First Amendment and Religious Freedom Restoration Act. But nothing in the First Amendment or Religious Freedom Restoration Act requires that religious organizations should be entitled to pay below-market rates for sound recordings, and nothing requires the CRB to deviate even further below the already significantly discounted rates (relative to commercial services) provided in the Determination. Therefore, this Court should uphold the CRB's noncommercial royalty rate determination.

**III.**    Finally, the CRB reasonably increased the minimum fee for webcasters. Prior to these proceedings, the fee had remained unchanged since 2006, requiring webcasters to pay $500 per station or channel, up to an aggregate cap for commercial webcasters of $50,000. SoundExchange repeatedly agreed to this fee in the past to avoid litigation over this issue, even though the minimum fee was insufficient to cover SoundExchange's per-channel or per-station administrative costs in operating the statutory licenses. The CRB was well-justified in adopting SoundExchange's proposal to increase the minimum fee to $1000 per station or channel in light of record evidence demonstrating (1) that market participants had willingly adopted a higher fee, (2) the effects of inflation, and (3) SoundExchange's increased administrative costs, among other evidence. That determination should be affirmed.

## ARGUMENT

### I.    The CRB's Decision to Reject a Distinct Rate for Simulcasters Was Neither Contrary to Law nor Arbitrary and Capricious

As the government correctly explains, Gov. Br. 48-64, the CRB's decision to reject NAB's proposal to set a distinct rate for simulcasters was neither contrary to law nor arbitrary and capricious.

10

NAB's proposal raises arguments that have consistently been rejected in the past. *See Web I*, 67 Fed. Reg. at 45,254-55, *aff'd Beethoven.com LLC*, 394 F.3d at 953-54; *Web II*, 72 Fed. Reg. at 24,095; *Web IV*, 81 Fed. Reg. at 26,323. Indeed, NAB raised this same proposal to set a separate rate for simulcasters in *Web IV*. After careful consideration, the CRB declined to do so because the record evidence showed that simulcasters and other commercial webcasters were competitors that operate in the same submarket. *Web IV*, 81 Fed. Reg. at 26,323; *see also* Gov. Br. 49-51. NAB asked the CRB to revisit that decision in the proceedings below, and the CRB correctly declined that invitation on much the same logic as the *Web IV* Determination. Specifically, after weighing NAB's evidence, the CRB found that the record did not show sufficient market segmentation to support a separate rate for simulcasters. J.A. 1361 (slip op. 249).

This Court should again affirm the CRB's decision to set the same rate for simulcasters as other ad-based commercial webcasters for the reasons stated in the government's brief. SoundExchange writes to emphasize that the CRB's Determination below was further correct

because NAB, as the proponent of a separate rate for simulcasters, had the burden to justify its proposal, which it failed to do.

NAB's attempts to shirk its evidentiary burden, NAB Br. 29-30, are unavailing. The Copyright Act requires the Judges to "distinguish among the different types" of eligible services when various considerations lead the Judges to believe that willing buyers and willing sellers would agree to different rates for such types of services. 17 U.S.C. § 114(f)(1)(B). Since at least *Web I*, the rule has been that when commercial broadcasters seek to justify a separate rate, the "burden of proof [falls] on the broadcasters to present evidence to distinguish" their services from other services in the market. 67 Fed. Reg. 45,254, *aff'd Beethoven.com LLC*, 394 F.3d at 953-54; *see also Web IV*, 81 Fed. Reg. at 26,320 (holding that, because NAB is "the proponent of a rate structure that treats simulcasters as a separate class of webcasters, the NAB bears the burden of demonstrating not only that simulcasting differs from other forms of commercial webcasting, but also that it differs in ways that would cause willing buyers and willing sellers to agree to a lower royalty rate in the hypothetical market."). This rule follows from the APA's command that the burden to justify a deviation from the status quo falls on the

proponent of the change. *See, e.g.*, 5 U.S.C. § 556(d) ("[T]he proponent of a rule or order has the burden of proof.").

Put another way, NAB's contention was that simulcasters are economically distinct from other ad-supported commercial webcasters for ratesetting purposes. That proposition was NAB's to demonstrate in the first instance, and the CRB certainly did not act arbitrarily and capriciously by declining to create a separate rate where NAB failed to establish that a separate rate was warranted. NAB's failure to meet its burden further justifies affirming the CRB's decision not to set a separate rate for simulcasters.

## II. The Rates the CRB Set for Noncommercial Broadcasters Were Neither Contrary to Law nor Arbitrary and Capricious

As the government correctly explains, Gov. Br. 64-86, the royalty rates the CRB set for noncommercial broadcasters was neither contrary to law nor arbitrary and capricious. NRBNMLC raises a litany of arguments why religious broadcasters and other noncommercial webcasters should be entitled to pay statutory royalties even lower than the significantly discounted rates (relative to commercial services) provided in the Determination. Those arguments are meritless.

To be clear, noncommercial webcasters pay very little in the way of statutory royalties. In 2018, there were over 900 noncommercial webcasters. J.A. 275 (SXPFOF ¶ 1437). About 97% of those paid only the minimum fee, and thereby received a discount of up to about 99% off of commercial rates. J.A. 271-73 (SXPFOF ¶¶ 1369-1371, 1420). Of the 20 noncommercial webcasters that paid more than the minimum fee, just two account for the vast majority of statutory royalty payments. J.A. 271 (SXPFOF ¶ 1370). Yet these services paid an effective rate that is far below the rate paid by commercial services. J.A. 272, 274 (SXPFOF ¶¶ 1373, 1426).

NRBNMLC's main arguments in this proceeding are nothing more than warmed-over versions of arguments that have been repeatedly rejected in prior proceedings. In *Web II*, the Judges used a 2001 settlement agreement covering public radio broadcasters as part of an analysis to generate a royalty rate *structure* for noncommercial webcasters that has applied ever since. 72 Fed. Reg. at 24,099-100. At that time, the Judges rejected a proposal by NRBNMLC and other representatives of noncommercial webcasters to use that public radio settlement as a benchmark to set the actual royalty *rate* for

noncommercial webcasters, finding that the lump sum royalty rate structure used in that agreement could not readily be transposed to a statutory royalty rate structure. *Id.* at 24,098-99. This Court affirmed that rejection. *Intercollegiate Broad. Sys., Inc.*, 574 F.3d at 763-66 (noting the "huge discount" provided relative to commercial rates).

NRBNMLC settled out of *Web III*, but when SoundExchange litigated noncommercial webcaster rates with a representative of college broadcasters, the Judges adopted the same rate structure they adopted in *Web II*. *Web III*, 79 Fed. Reg. at 23,122-24. This Court affirmed that determination despite arguments that certain small noncommercial webcasters should receive deeper discounts. *Intercollegiate Broad. Sys., Inc.*, 796 F.3d at 127-29.

NRBNMLC returned to participate in *Web IV*, and there attempted to justify its rate proposal with reliance on a public radio settlement similar to the one at issue in *Web II*. The CRB again rejected reliance on the public radio settlement, finding that it "differs so fundamentally in so many ways from what the NRBNMLC is proposing that it cannot serve as a support for that proposal." *Web IV*, 81 Fed. Reg. at 26,394.

Perhaps hoping that the third time is the charm, NRBNMLC offered a similar public radio benchmark in *Web V*. As the government's brief explains, the Judges carefully considered all of NRBNMLC's arguments, but ultimately rejected them (properly) for reasons similar to those given in *Web IV*. *See* Gov. Br. 66-77. This Court should uphold the Judges' noncommercial royalty rate determination.

NRBNMLC's one novel argument concerns the First Amendment and Religious Freedom Restoration Act. Religious organizations pay market-rate prices to acquire other things they use, from sheet music to webcasting technology, and candles to buildings. Congress was clear that they should pay market-rate royalties for their use of sound recordings, too. 17 U.S.C. § 114(f)(1)(B). The First Amendment and Religious Freedom Restoration Act do not require that they be entitled to pay below-market rates for sound recordings.

In addressing NRBNMLC's First Amendment argument, the government's brief asserts "That the rates established by the Judges were higher than the rates agreed to by the settling noncommercial services does not show that the Judges' determination was discriminatory. Instead, it reflects the Judges' reasoned conclusion that

the rates agreed to by the settling parties are different than the rates that willing buyers and willing sellers would agree to in an unregulated marketplace." Gov. Br. at 85.

The government's statement on this score is incorrect and understates the degree to which NRBNMLC's arguments are meritless. The Judges made no finding that SoundExchange's settlement with public radio was at a non-market rate or a lower rate than set in the Determination. Rather, they found that NRBNMLC provided insufficient evidence to compare its rate structure and terms with the very different statutory royalty rate structure. J.A. 1378-80 (slip op. 266-68); Gov. Br. at 18-22, 29, 66-77. That the CRB did not set a rate higher than the rates agreed to by the settling services provides all the more reason to reject NRBNMLC's First Amendment and Religious Freedom Restoration Act arguments.

## III. The CRB's Decision to Increase the Minimum Fee Was Neither Contrary to Law nor Arbitrary and Capricious

As the government correctly states, Gov. Br. 86-97, the CRB's decision to increase the statutory minimum fee that webcasters must pay was neither contrary to law nor arbitrary and capricious. Since 2006, the minimum fee for all webcasting services has been $500 for each station

or channel, with an aggregate cap for each commercial webcaster of $50,000. Recognizing that the cost of administering a statutory license has increased significantly over the past two decades, the CRB increased the minimum fee to $1,000 per channel, with an aggregate cap of $100,000. This Court should affirm the CRB's minimum fee determination for the reasons stated in the government's brief.

SoundExchange writes to emphasize the breadth of evidentiary support for the minimum fee of $1,000 per channel. When the $500 per channel or station minimum was originally adopted, the CRB observed that it was "low." *Web II*, 72 Fed. Reg. at 24,096. The CRB reaffirmed the $500 minimum fee twice following appeals of the *Web II* determination. *Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 75 Fed. Reg. 56,873, 56,874 (Sept. 17, 2010); *Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 64,669, 64,672-73 (Oct. 31, 2014). In subsequent webcasting proceedings, SoundExchange agreed to the $500 minimum fee even though it was not sufficient to cover the cost of administering statutory licenses for webcasting channels or stations. J.A. 276-79 (SXPFOF ¶¶ 1533-1544); *Web IV*, 81 Fed. Reg. at 26,396-97 ("SoundExchange's

average administrative cost per licensee is substantially higher than the minimum fee it proposes."). SoundExchange agreed to a minimum fee below its costs in part to avoid, or at least minimize, litigation over this issue such as the two appeals in *Web II*. J.A. 279 (SXPFOF ¶ 1544).

The CRB was amply justified in raising the minimum fee to $1000 on the record before it. For one thing, there was market evidence that $500 was too low from SoundExchange's settlement with the college broadcasters, in which the broadcasters agreed to increase the minimum fee 50%, up from $500 to $750. That settlement showed that willing buyers and willing sellers were already coalescing around a higher minimum fee. J.A. 283 (SXPFOF ¶ 1554). Moreover, inflationary pressures have pushed costs up and eroded purchasing power since 2006. Between January 2006 and December 2020, there was a 31.35% increase in the Consumer Price Index, which means the original $500 minimum fee needed to be at least $656.77 to keep pace with inflation. J.A. 1401 (slip op. 289); *see also* J.A. 284-85 (SXPFOF ¶¶ 1558-1559). The CRB credited these factors in its Determination, finding that they provided evidence to support increasing the minimum fee. J.A. 1400-01 (slip op. 288-89).

The CRB also rested its increase on evidence of increased administrative costs. While the Services question SoundExchange's calculation of its administrative costs, SoundExchange provided evidence of the same calculations in *Web II*, *Web III* and *Web IV*, and the CRB accepted and relied on that evidence each time. 75 Fed. Reg. at 56,874; 79 Fed. Reg. at 64,671-72; *Web III*, 79 Fed. Reg. at 23,124; *Web IV*, 81 Fed. Reg. at 26,396-97. By that familiar methodology, SoundExchange's per-channel administrative costs doubled since *Web IV*. In 2013, SoundExchange's average cost per channel or station was approximately $1,900. J.A. 279 (SXPFOF ¶ 1544). By 2018, that figure had grown to approximately $4,448 per channel due to a dramatic increase in the number of webcaster licenses. J.A. 281 (SXPFOF ¶ 1549). Most of this growth came from smaller webcasters that provide only a small number of channels or stations, which caused a corresponding decrease in the average number of channels per webcaster and therefore an increase in SoundExchange's per-channel and per-station administrative costs. J.A. 279-81 (SXPFOF ¶¶ 1545-1549).

SoundExchange has never tried to recoup *all* of its administrative costs from minimum fee payments. But to account for the increase in its

costs from 2013 to 2018, SoundExchange urged the CRB to increase the minimum fee to at least maintain parity with the pre-*Web IV* status quo. J.A. 282-83 (SXPFOF ¶ 1553). The CRB adopted SoundExchange's proposal, emphasizing that there was ample evidence in the record to support SoundExchange's administrative cost calculations and finding that the updated minimum fee of $1,000 "fell comfortably within" the "zone of reasonable minimum fees ranging from $656.77 to $1,170 per channel." Gov. Br. 87; *see also* J.A. 1399-1402 (slip op. 287-90).

## CONCLUSION

For the foregoing reasons, this Court should affirm those parts of the CRB's Determination challenged by the Services.


Dated: January 12, 2023                    Respectfully submitted,

                                           /s/ Matthew S. Hellman

21

TIM DADSON
General Counsel
BRAD PRENDERGAST
Assistant General Counsel
SoundExchange, Inc.
733 10th Street, N.W.
10th Floor
Washington, D.C. 20001
Tel: (202) 640-5858

Matthew S. Hellman
Eric E. Petry
Victoria Hall-Palerm
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
Fax: (202) 639-6066
MHellman@jenner.com

*Counsel for SoundExchange, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,860 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font for the main text and 14-point Century Schoolbook font for footnotes.

January 12, 2023                                     /s/ Matthew S. Hellman
                                                    Matthew S. Hellman

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of January, 2023, I caused to be electronically filed the foregoing **Final Brief of Intervenor SoundExchange, Inc. in Support of Appellees** with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

January 12, 2023                              /s/ Matthew S. Hellman
                                             Matthew S. Hellman

24