**ORAL ARGUMENT SCHEDULED FOR FEBRUARY 17, 2023**
**No. 21-1245**
**(Consolidated with Nos. 21-1243, 21-1244)**

# United States Court of Appeals
# for the District of Columbia Circuit

NATIONAL ASSOCIATION OF BROADCASTERS,

*Appellant*,

v.

COPYRIGHT ROYALTY BOARD; LIBRARIAN OF CONGRESS,

*Appellees.*

———

GOOGLE LLC, ET AL.,

*Intervenors.*

On Appeal from a Final Determination of the Copyright Royalty Board
Docket No. 19-CRB-0005-WR (2021-2025)

## FINAL OPENING BRIEF FOR APPELLANT
## NATIONAL ASSOCIATION OF BROADCASTERS
## PUBLIC COPY—SEALED MATERIAL DELETED

Joseph R. Wetzel
Andrew M. Gass
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 391-0600

Sarang V. Damle
Blake E. Stafford
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
sy.damle@lw.com

Samir Deger-Sen
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for National Association of Broadcasters*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), National Association of Broadcasters (NAB) submits this certificate as to parties, rulings and related cases.

## A.     Parties and Amici

NAB is a nonprofit incorporated association of radio and television stations. NAB represents commercial radio broadcasters nationwide, hundreds of which stream their broadcasts over the Internet.  NAB "fully participated in the proceeding" before the Copyright Royalty Board on behalf of its commercial broadcaster members, who will be "bound by the [D]etermination."   17 U.S.C. § 803(d)(1). NAB has no parent company, and has not issued any shares or debt securities to the public; thus no publicly held company owns ten percent or more of its stock.  As a continuing association of numerous organizations operated for the purpose of promoting the interests of its membership, NAB constitutes a trade association as defined in D.C. Circuit Rule 26.1.

In addition to NAB, the parties, intervenors, and amici who appeared in the proceedings before the Board in this case are as follows:

- AccuRadio, LLC[*]

- The American Association of Independent Music (A2IM)

---

[*]   Parties marked with an asterisk withdrew from the Board proceedings, settled, or were dismissed.

- The American Federation of Musicians of the United States and Canada

- College Broadcasters, Inc.*

- Corporation for Public Broadcasting*

- Dash Radio Inc.*

- Educational Media Foundation

- Feed Media, Inc.*

- Google Inc.

- ICON Health & Fitness, Inc.*

- iHeartMedia, Inc.*

- Jagjaguwar Inc.

- La Raza Media Group, LLC*

- Live365 Broadcaster, LLC*

- National Public Radio, Inc.*

- National Religious Broadcasters Noncommercial Music License Committee

- Pandora Media, LLC

- Powell, David*

- Radio Coalition, Inc.*

- Radio Paradise Inc.*

- Screen Actors Guild - American Federation of Television and Radio Artists (SAG-AFTRA)

- Sirius XM Radio Inc.

- Sony Music Entertainment

- SoundExchange, Inc.

- TuneIn, Inc.[*]

- Universal Music Group (UMG)

- Warner Music Group Corp.

In addition to NAB, the parties, intervenors, and amici appearing in this Court in this case and in the consolidated cases are as follows:

- Copyright Royalty Board

- Google LLC

- National Religious Broadcasters Noncommercial Music License Committee

- Pandora Media, LLC

- Sirius XM Radio Inc.

- SoundExchange, Inc.

## B.    Ruling Under Review

The ruling at issue in this Court is *Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Those Performances (Web V)*, Docket No. 19-CRB-0005-WR (2021-2025), issued by the Board on September 20, 2021, and published in the Federal Register at 86 Fed. Reg. 59,452 on October 27, 2021.

## C.    Related Cases

The case on review has not been previously before this Court or any other court.  This Court consolidated the appeals in Nos. 21-1243, 21-1244, and 21-1245. No other related cases known to counsel are pending before this Court or any other court.

# RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, National Association of Broadcasters (NAB) states as follows:

NAB is a nonprofit incorporated association of radio and television stations. NAB represents commercial radio broadcasters nationwide, hundreds of which stream their broadcasts over the Internet. NAB has no parent company, and has not issued any shares or debt securities to the public; thus no publicly held company owns ten percent or more of its stock. As a continuing association of numerous organizations operated for the purpose of promoting the interests of its membership, NAB constitutes a trade association as defined in D.C. Circuit Rule 26.1.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

RULE 26.1 DISCLOSURE STATEMENT...............................................v

TABLE OF AUTHORITIES ................................................................ viii

GLOSSARY ....................................................................................... xii

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION........................................................4

STATEMENT OF ISSUES ...................................................................5

STATUTES AND REGULATIONS........................................................5

STATEMENT OF THE CASE...............................................................5

      A.    Copyright Licensing For The Digital Performance Of Sound Recordings........................................................................5

      B.    The Board's *Web V* Determination .................................11

SUMMARY OF ARGUMENT .............................................................18

STANDING ......................................................................................21

STANDARD OF REVIEW ..................................................................21

ARGUMENT ....................................................................................22

I.    THE BOARD'S DECISION TO SUBJECT SIMULCASTERS TO THE SAME RATES THAT APPLY TO CUSTOM RADIO MUST BE SET ASIDE ...............................................................................22

      A.    The Board's Refusal To Set Different Rates Despite Identifying "Different Types" Of Services Contravenes The Plain Text Of Section 114(f)(1)(B) ..........................................................22

      B.    The Board's Analysis Is Arbitrary And Capricious...........................28

            1.    The Board Arbitrarily Contrived And Applied An Unexplained Presumption In Favor Of Uniform Rates ...........29

**Page**

2.      The Board's Analysis Impermissibly Rests On An Absence Of Contrary Evidence, Rather Than Substantial Evidence ................................................................................... 34

3.      The Board's Generalized Discussion Of Competition Does Not Reflect Reasoned Decisionmaking ........................... 37

II.    THE BOARD'S DECISION TO DOUBLE THE MINIMUM FEE MUST BE SET ASIDE ................................................................. 40

CONCLUSION ......................................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ALLTEL Corp. v. FCC,*
    838 F.2d 551 (D.C. Cir. 1988)............................................................32

*ANR Storage Co. v. FERC,*
    904 F.3d 1020 (D.C. Cir. 2018)....................................................34, 40

*Arista Records, LLC v. Launch Media, Inc.,*
    578 F.3d 148 (2d Cir. 2009) .................................................6, 8, 9, 10

*Chemical Manufacturers Association v. Department of
    Transportation,*
    105 F.3d 702 (D.C. Cir. 1997)............................................................30

*City of Vernon v. FERC,*
    845 F.2d 1042 (D.C. Cir. 1988)....................................................20, 33

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009)............................................................................44

*Henson v. Santander Consumer USA Inc.,*
    137 S. Ct. 1718 (2017).......................................................................42

*Intercollegiate Broadcast System v. Copyright Royalty Board,*
    574 F.3d 748 (D.C. Cir. 2009).....................................................35, 42

*Johnson v. Copyright Royalty Board,*
    969 F.3d 363 (D.C. Cir. 2020).................................................3, 21, 33

*Motor Vehicle Manufacturers Associaton of United States, Inc. v.
    State Farm Mutual Automobile Insurance Co.,*
    463 U.S. 29 (1983).............................................................................28

*Music Choice v. Copyright Royalty Board,*
    774 F.3d 1000 (D.C. Cir. 2014)...........................................................5

*Music Choice v. Copyright Royalty Board,*
    970 F.3d 418 (D.C. Cir. 2020).............................................4, 20, 28, 35, 37

**Page(s)**

*Natural Resources Defense Council v. EPA*,
    755 F.3d 1010 (D.C. Cir. 2014) ........................................................22

*In re Pandora Media, Inc.*,
    6 F. Supp. 3d 317 (S.D.N.Y. 2014), *aff'd sub nom. Pandora*
    *Media, Inc. v. American Society of Composers, Authors &*
    *Publishers*, 785 F.3d 73 (2d Cir. 2015) ............................................10

*Pearson v. Shalala*,
    164 F.3d 650 (D.C. Cir. 1999)..........................................................33

*PPL Wallingford Energy LLC v. FERC*,
    419 F.3d 1194 (D.C. Cir. 2005)........................................................39

*Recording Industry Association of America, Inc. v. Librarian of*
    *Congress*,
    608 F.3d 861 (D.C. Cir. 2010) ...........................................................6

*SAS Institute, Inc. v. Iancu*,
    138 S. Ct. 1348 (2018)........................................................26, 27, 42

*Settling Devotional Claimants v. Copyright Royalty Board*,
    797 F.3d 1106 (D.C. Cir. 2015)........................................................35

*SoundExchange, Inc. v. Copyright Royalty Board*,
    904 F.3d 41 (D.C. Cir. 2018)..........................................6, 8, 9, 12, 30

*United States v. Byfield*,
    391 F.3d 277 (D.C. Cir. 2004)..........................................................30

*United States Telecom Association v. FCC*,
    295 F.3d 1326 (D.C. Cir. 2002)........................................................21

## STATUTES AND REGULATIONS

5 U.S.C. § 706 .........................................................................................21

5 U.S.C. § 706(2)(A)................................................................................22

5 U.S.C. § 706(2)(C)................................................................................22

5 U.S.C. § 706(2)(E)................................................................................22

**Page(s)**

17 U.S.C. § 101 *et seq.*...........................................................................5

17 U.S.C. § 106 ......................................................................................5

17 U.S.C. § 106(4) .................................................................................6

17 U.S.C. § 112(e) .................................................................................4

17 U.S.C. § 114(d)(1)(A) .......................................................................7

17 U.S.C. § 114(d)(2) .............................................................................9

17 U.S.C. § 114(f) ...............................................................................4, 9

17 U.S.C. § 114(f)(1)(B) ............................ 2, 12, 18, 19, 22, 23, 25, 26, 27, 30, 31

17 U.S.C. § 114(g) ..................................................................................9

17 U.S.C. § 114(g)(2) ............................................................................41

17 U.S.C. § 114(g)(3) ............................................................................41

17 U.S.C. § 114(j)(3) ...............................................................................7

17 U.S.C. § 114(j)(7) ..........................................................................8, 10

17 U.S.C. § 115(d)(7) ...........................................................................42

17 U.S.C. § 801 .....................................................................................12

17 U.S.C. § 801(b)(1) ..............................................................................4

17 U.S.C. § 803(a)(1) ............................................................................43

17 U.S.C. § 803(d)(1) .........................................................................5, 21

17 U.S.C. § 803(d)(3) ............................................................................21

47 U.S.C. § 153(6) ..................................................................................7

Pub. L. No. 104-39, 109 Stat. 336 (1995) (codified at 17 U.S.C. § 106(6))..........................................................................................7

37 C.F.R. § 382.5(d) ...............................................................................9

**Page(s)**

## OTHER AUTHORITIES

67 Fed. Reg. 45,240 (July 8, 2002) .......................................................41, 43

72 Fed. Reg. 24,084 (May 1, 2007) ...........................................................44

79 Fed. Reg. 23,102 (Apr. 25, 2014) ..........................................................44

81 Fed. Reg. 26,316 (May 2, 2016) ............................................................44

H.R. Rep. No. 104-274 (1995)................................................7, 8, 9, 11, 24

Report of the Copyright Arbitration Royalty Panel,
   Docket No. 2000-9 CARP DTRA 1&2 (Feb. 20, 2002),
   https://bit.ly/3OJKOTT ...................................................................43, 45

# GLOSSARY

| | |
|---|---|
| Board or CRB | Copyright Royalty Board |
| Ex. | CRB Hearing Exhibit |
| Final Determination | *Determination of Rates and Terms for the Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Those Performances (Web V)*, CRB No. 19-CRB-0005-WR (2021-2015) (July 22, 2021), redacted version published at 86 Fed. Reg. 59,452 (Oct. 27, 2021) |
| NAB | National Association of Broadcasters |
| PFFCL | Proposed Findings of Fact and Conclusions of Law |
| Tr. | CRB Hearing Transcript |

# INTRODUCTION

This is an appeal from a determination by the Copyright Royalty Board (Board or CRB), an agency charged with setting the rates and terms of compulsory music licenses under the Copyright Act.[1]  The compulsory license here is for so-called "non-interactive" services to publicly play a sound recording by means of a digital audio transmission (principally, the playing of music over the internet).  "Non-interactive" is something of a misnomer, however, because while it excludes services that allow the listener to choose exactly what they hear on-demand, like Spotify, it includes a wide variety of services along the spectrum of "interactivity." This ranges from "custom radio," like Pandora, which allows listeners significant influence over what they hear, to brick-and-mortar radio stations that simply "simulcast" their over-the-air signal to internet users.

Recognizing that this license may apply to vastly different types of services, Congress directed the Board to account for those differences with correspondingly different royalty rates.  Section 114 of the Copyright Act specifically directs that the "rates and terms" set by the agency "*shall* distinguish among the different types of service then in operation," with "such differences to be based on criteria" including,

---

[1]    *Determination of Rates and Terms for the Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Those Performances (Web V)*, Docket No. 19-CRB-0005-WR (2021-2015) (July 22, 2021) (JA1113-423) (*Final Determination*), redacted version published at 86 Fed. Reg. 59,452 (Oct. 27, 2021).

most importantly, "the degree to which use of the service may substitute for or may promote the purchase of" traditional records. 17 U.S.C. § 114(f)(1)(B) (emphasis added). All agree that Congress's goal with this provision was to distinguish—within the universe of "non-interactive" services that qualify for the license—those that were more likely to cannibalize sales of traditional records, and ensure that they accordingly paid a higher rate to copyright owners for eroding that source of revenue. And all agree that Congress understood traditional radio to actually *promote* traditional record sales, and thus exempted traditional over-the-air radio from having to pay sound recording royalties at all.

In the decision now on appeal, the Board contravened Congress's clear instruction that it properly "distinguish" the rates between the different types of service before it. The Board found that radio stations that do no more than "simulcast" their over-the-air content on the internet should be subject to the identical rate as "custom radio" providers—even though the content of a simulcast is the very same traditional radio content that Congress deemed to be *promotional* of record sales, and thus was entirely exempted from paying royalties. The Board reached this counter-intuitive result by fashioning its own novel and atextual test for whether a different rate was warranted. In the Board's telling, a party seeking a different rate must satisfy the "burden" of "establish[ing]" that their service is "*as a rule*, . . . materially [different] . . . than *the full scope of noninteractive webcasting*."

*Final Determination* 219, 226-27 (JA1331, 1338-39) (second emphasis added).  On that basis, the Board dismissed the stark evidentiary "contrast[s]" between simulcasting and custom radio services" because simulcasters were unable to prove a "material[]" differentiation from some "other," unnamed "subset" of "eligible nonsubscription transmissions"—services that did not even participate in the proceeding.  *Id.* at 224-27 (JA1336-39).

The Board's creation of an unjustified presumption in favor of webcasters all receiving the same rate is precisely the *opposite* of what the statute contemplates. The plain text of 17 U.S.C. § 114(f)(1)(B) mandates that "different types" of webcasters must receive different rates.  Nothing in the statute remotely implies a "burden" on those seeking rate-differentiation to show they are "as a rule" different from every conceivable webcasting service.  And the Board did not even *try* to explain the source of this presumption.  Thus, even if there were some way of squaring the Board's decision with the statutory text, its "failure to adequately explain itself" represents an "[un]reasoned" analysis that must, at a minimum, be vacated as arbitrary and capricious.  *Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 387 (D.C. Cir. 2020).

To top it off, substantial evidence did not support the Board's decision.  Quite the opposite, the Board used its unwarranted presumption to rely on a supposed *absence* of contrary evidence for its holding—a form of reasoning this Court has

time and again deemed to be arbitrary and capricious. *See Music Choice v. Copyright Royalty Bd.*, 970 F.3d 418, 429-30 (D.C. Cir. 2020). For any of these reasons, the Board's decision to subject different types of services to identical rates cannot stand.

The Board also separately erred in doubling the minimum fee that webcasters must pay (from $500 per station or channel to $1000 per station or channel), based on the rationale that these heightened fees were required to fund the *total* costs of SoundExchange, the "nonprofit collective" that collects and distributes royalties. But as the Board's own precedent acknowledges, the narrow purpose of the minimum fee is to ensure that the *incremental* cost of administering an additional license does not exceed the royalties paid by a licensee. There is no statutory basis whatsoever to require webcasters to fund costs beyond that incremental cost, let alone costs that are wholly "unrelated to license administration," as the Board found. *Final Determination* 287 (JA1399). And, just as with its simulcasting rate determination, the Board offered no reasoned explanation for its decision. The Board's minimum fee determination too must be reversed.

## STATEMENT OF JURISDICTION

The Board had jurisdiction under 17 U.S.C. §§ 112(e), 114(f), and 801(b)(1). The Board's Determination was published on October 27, 2021. 86 Fed. Reg. 59,452. National Association of Broadcasters (NAB) timely filed its petition for

review on November 26, 2021. This Court has jurisdiction under 17 U.S.C. § 803(d)(1).

## STATEMENT OF ISSUES

1.     Whether the Board's decision to subject internet simulcasts of over-the-air radio to the same rates that apply to "custom radio" was arbitrary, capricious or otherwise not in accordance with law.

2.     Whether the Board's decision to double the minimum fee that licensees must pay was arbitrary, capricious or otherwise not in accordance with law.

## STATUTES AND REGULATIONS

Pertinent statutory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Copyright Licensing For The Digital Performance Of Sound Recordings

1.     The Copyright Act, 17 U.S.C. § 101 *et seq.*, provides owners of musical works and sound recordings with the exclusive rights to reproduce, distribute, and publicly perform their works. *Id.* § 106. A "musical work" refers to the underlying composition and lyrics created by the songwriter or composer, whereas a "sound recording" is a particular artist's performance of "the musical work as preserved in a recording medium." *Music Choice v. Copyright Royalty Bd.*, 774 F.3d 1000, 1004 (D.C. Cir. 2014). "Although almost always intermingled in a single song," the copyrights for musical works and sound recordings "are legally distinct and may be

5

owned and licensed separately." *Recording Indus. Ass'n of Am., Inc. v. Librarian of Congress*, 608 F.3d 861, 863 (D.C. Cir. 2010).

This case concerns the right of public performance for sound recordings. Unlike owners of musical works, which have long enjoyed the exclusive right to publicly perform those works, 17 U.S.C. § 106(4), owners of sound recordings historically lacked an exclusive right to public performance, *SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 46 (D.C. Cir. 2018).  As a result, the owners of sound recordings would not collect licensing fees from radio stations and other broadcasters whose programming included their recordings.  This regime codified the "symbiotic relationship" between "the recording industry and [radio] broadcasters," under which "the recording industry recognized that radio airplay was free advertising that lured consumers to retail stores where they would purchase recordings." *Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d 148, 152 (2d Cir. 2009) (alteration in original) (citation omitted).

The landscape began to change, however, with the advent of the internet and digital audio transmissions in the early 1990s. *Id.* at 153.  If an internet user could simply listen to or digitally record any song on the internet, "the recording industry worried that the user would stop purchasing music." *Id.*  To ensure that record labels would receive compensation from digital services that threatened to displace their traditional source of revenue, Congress granted owners of copyrighted "sound

recordings" the exclusive right to "perform the copyrighted work publicly by means of a digital audio transmission." Digital Performance Right in Sound Records Act of 1995, Pub. L. No. 104-39, § 2, 109 Stat. 336, 336 (codified at 17 U.S.C. § 106(6)). This right, however, was "narrowly crafted" to target the "certain types" of audio services that had the greatest potential to "adversely affect sales of sound recordings and erode copyright owners' ability to control and be paid for use of their work." H.R. Rep. No. 104-274, at 13 (1995).

Specifically, the new public performance right narrowly encompassed only "*digital* audio transmissions," and so did not apply to analog radio at all. *Id.* at 14 (emphasis added). And, even with respect to their digital transmissions, Congress ensured that traditional, over-the-air radio stations would not be subject to the new royalty scheme by exempting any "nonsubscription broadcast transmission," 17 U.S.C. § 114(d)(1)(A), which is defined as a "transmission made by a terrestrial broadcast station licensed as such by the Federal Communications Commission," *id.* § 114(j)(3); *see also* 47 U.S.C. § 153(6) (defining a "broadcast station," in turn, as "a radio station equipped to engage in broadcasting").

Congress deemed the exclusion of "radio . . . stations" to be "[p]robably [the] most important" exception from the grant of the new digital public performance right in the 1995 legislation. H.R. Rep. No. 104-274, at 14. It recognized that, far from diminishing record sales, "[t]he sale of many sound recordings and the careers of

many performers have benefitted considerably from airplay and other promotional activities provided by both noncommercial and advertiser-supported, free over-the-air broadcasting." *Id*. at 13.  Moreover, because "free over-the-air broadcasts . . . do not rely on interactive delivery" and are required by the FCC to "provide a mix of entertainment and non-entertainment programming and other public interest activities to local communities," Congress found that they "pose no threat to[] the distribution of sound recordings." *Id.* at 13-14.  Congress accordingly refused to "impos[e] new and unreasonable burdens" on radio stations that would result from the newly granted digital public performance right in sound recordings.  *Id.* at 14.

Congress took the opposite approach with respect to "interactive services"— *i.e.*, services that "allow[] each listener to pick particular songs to hear on demand," *SoundExchange*, 904 F.3d at 47; *see* 17 U.S.C. § 114(j)(7), which today includes on-demand streaming platforms like Spotify and Apple Music.  "[I]nteractive services," Congress recognized, "are most likely to have a significant impact on traditional record sales, and therefore pose the greatest threat to the livelihoods of those whose income depends upon revenues derived from traditional record sales." H.R. Rep. No. 104-274, at 14.  Specifically, "interactive services were likely to have an impact on record sales 'because the more *advance* information the user has about the digital transmission, the more the transmission . . . enable[d] the user to substitute listening to the targeted performance for purchasing a copy of it.'"  *Arista Records*,

578 F.3d at 154 (alteration in original) (citation omitted). Congress thus gave sound recording copyright owners "the exclusive right to control the performance of their works as part of an interactive service," H.R. Rep. No. 104-274, at 14, meaning that interactive services must individually "negotiate" performance licenses with those copyright owners "on the open market," *SoundExchange*, 904 F.3d at 47.

Between those two poles are "'noninteractive' webcasting services," which digitally stream music over the internet without providing the on-demand functionality of interactive services. *Id.* at 45-47; *see* CRB Hearing Exhibit (Ex.) 2091 at 21 (JA1575). Because they lack the functionality to allow listeners to hear precisely what they want, when they want it, these webcasting services do not pose the same threat to traditional record sales as fully interactive services. *See Arista Records*, 578 F.3d at 161-62; *see also* CRB Hearing Transcript (Tr.) 1505-10 (JA1440-45). For these services, Congress charted a middle path by creating a compulsory statutory license, designed to balance the need to compensate rights-holders with facilitating public access to digital music. 17 U.S.C. § 114(d)(2). That license allows webcasters to publicly perform a sound recording without securing individual copyright owners' authorization, as long as they meet certain requirements and pay a predetermined royalty rate to a "nonprofit collective," SoundExchange, Inc., which distributes the royalties to the artists and labels, *see id.* § 114(f)-(g); 37 C.F.R. § 382.5(d).

2.    In establishing this compulsory license, Congress recognized that there was significant variation between eligible webcasting services—with some more closely resembling interactive services, and others bearing closer resemblance to traditional radio, which Congress had fully exempted.  At one end of the spectrum are freestanding "custom radio" services, of which Pandora is the paradigm.  Although custom radio services are not fully "interactive" insofar as they do not allow a user to play "a particular song on demand," *Arista Records*, 578 F.3d at 160-61, custom radio still provides listeners with a "curate[d]" "listening experience" through personalized stations that reflect individual users' preferences.  *Final Determination* 218 (JA1330).  Listeners can, for example, seed stations with particular artists or genres, skip and pause songs, and provide feedback to the station by "thumbing up or down."  *Id.*; *see, e.g.*, Ex. 2150 ¶¶ 35, 49 (JA1583, 1590-91); Tr. 4321 (JA811); *In re Pandora Media, Inc.*, 6 F. Supp. 3d 317, 327 (S.D.N.Y. 2014), *aff'd sub nom. Pandora Media, Inc. v. Am. Soc'y of Composers, Authors & Publishers*, 785 F.3d 73 (2d Cir. 2015).  Because of these attributes, custom radio stations can closely reflect the preferences of the individual listener, and can come right up to the line of what counts as an interactive service.  *See* 17 U.S.C. § 114(j)(7) (defining "interactive service" to include "one that enables a member of the public to receive a transmission of a program specially created for the recipient").

**MATERIAL UNDER SEAL DELETED**

At the other extreme are simulcasts.  A "simulcast" is simply a simultaneous internet transmission of a radio station's over-the-air terrestrial broadcast.  *Final Determination* 218 (JA1330); *see, e.g.*, Ex. 2150 ¶ 32 (JA1582).  The programming on a simulcast is, by definition, *identical* to the over-the-air radio broadcast—the same content is played in exactly the same order at exactly the same time.  *See* Ex. 2150 ¶¶ 32, 49 (JA1582, 1590); Tr. 3403 (JA723).

Simulcasts thus share essentially all of the core attributes that motivated Congress to exclude radio broadcasts from the statutory license.  Like the over-the-air broadcast to which they are tethered, simulcasts do not permit "interactive delivery" of sound recordings to listeners.  H.R. Rep. No. 104-274, at 13; *see* Ex. 2150 ¶ 49 (JA1590-91); Tr. 1819 (JA1457) (SoundExchange's expert agreeing that ██████████████████████████████████████████████████████████).  And simulcasts give artists and labels the same "promotional" advantages provided by over-the-air radio.  H.R. Rep. No. 104-274, at 13; *see* Tr. 5734-35 (JA1522-23) (explaining that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ██).

## B.  The Board's *Web V* Determination

1.  The rates and terms for the statutory license for webcasters are periodically determined by the Copyright Royalty Board, a group of three Copyright

11

Royalty Judges appointed by the Librarian of Congress.  17 U.S.C. § 801.  The Copyright Act instructs the Board to "establish rates and terms" for the webcaster license "that most clearly represent" what "would have been negotiated in the marketplace between a willing buyer and a willing seller."  *Id.* § 114(f)(1)(B).

Recognizing the potential variety among webcasters, Congress provided that the "rates and terms" set by the Board "*shall distinguish* among the different types of services" subject to the license, with those differences "based on criteria" including "the quantity and nature of the use of sound recordings and the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers."  *Id.* (emphasis added).  The statute thus "specifically contemplates" the adoption of "different rates for distinct market segments in the provision of webcasting services."  *SoundExchange*, 904 F.3d at 57.

The statute also mandates that the Board "shall include a minimum fee for each type of service."  17 U.S.C. § 114(f)(1)(B).  This fee establishes the lowest amount any webcaster can pay, but royalties owed are credited against the minimum fee, so additional royalties will only be paid once the minimum fee is exceeded.  *See Final Determination* 286 (JA1398).

2.    This case arises out of the Board's Final Determination in *Web V*, which is the fifth ratemaking proceeding for the statutory webcasting license.  *See id.* at 4-6 (JA1116-18) (discussing prior determinations in *Web I* through *Web IV*).  As in

12

prior proceedings, NAB—a nonprofit incorporated association of radio and television stations—participated on behalf of its members who operate commercial radio stations that simulcast their over-the-air broadcasts on the internet. Among its members are large broadcasters like iHeartMedia, Inc., which operates nearly 850 radio stations, and smaller broadcasters like Mel Wheeler, which operates seven stations. *See* Ex. 2152 ¶ 8 (JA1613); Tr. 4997 (JA847).

Two aspects of the Final Determination are relevant to NAB's appeal: (1) the conclusion regarding the rates for simulcasters, and (2) the conclusion regarding the minimum fee.

a.    To account for the differences between simulcasters and other statutory webcasters, NAB proposed that the Board adopt a lower per-play rate for simulcast transmission than the rate applicable for other qualifying webcast transmissions. *See Final Determination* 218 (JA1330). NAB supported that position with extensive evidence showing differences between simulcasts and other webcasts, like Pandora's, along the relevant statutory criteria, including in terms of interactivity, promotional value, and non-music content. *See* NAB Proposed Findings of Fact and Conclusions of Law (PFFCL) ¶¶ 146-78 (JA1059-75). NAB introduced evidence of license agreements showing that in the real world, music rights licensors charge different royalty rates for custom radio services like Pandora, on one hand, and digital simulcasters, on the other. *See id.* ¶¶ 87-111 (JA1039-51). And NAB also

introduced extensive survey evidence showing that consumers did not view simulcast as a substitute for other digital music offerings. *See id.* ¶¶ 112-26 (JA1051-58). As NAB explained, this evidence demonstrated that simulcast differs from other webcasting services in economically meaningful ways that, taken together, require a lower per-play rate than that charged to custom radio services like Pandora.

The Board, however, concluded that simulcasts should be subject to the same rate as all other nonsubscription commercial webcasters. *Final Determination* 218-49 (JA1330-61). The Board acknowledged without dispute that simulcasts and custom radio webcasts are not identical in terms of the degree of interactivity, the promotional value to copyright owners, and the use of non-music content. *Id.* at 225-27 (JA1337-39). But, despite these differences, the Board found that simulcast and custom radio warrant identical rates because NAB purportedly failed to satisfy a "burden of demonstrating" that "simulcasting differs from other forms of commercial webcasting . . . in ways that would cause willing buyers and willing sellers to agree to a lower royalty rate in the hypothetical market." *Id.* at 219 (JA1331).

This "burden," the Board reasoned, required NAB to "establish[] that simulcasting, *as a rule*, is materially [different] than *the full scope of noninteractive webcasting*." *Id.* at 226-27 (JA1338-39) (second emphasis added). In other words, the Board dismissed the evidentiary "contrast[s] between simulcasting and custom radio services"—which are the only two types of webcasting services that

14

participated in this proceeding—because some "other," unnamed "subset" of "eligible nonsubscription transmissions" may be similar to simulcast. *Id.* at 224-27 (JA1336-39). Although it is not clear what this "subset" consists of, the Board appeared to have in mind standalone digital radio providers, like AccuRadio, that declined to participate in this proceeding, *id.* at 2 n.1 (JA1114), and "are not a significant part of the streaming market," *id.* at 248-49 (JA1360-61). The Board also disregarded NAB's direct evidence of music rights licensors agreeing to lower per-play royalty rates for simulcasts than for Pandora. *Id.* at 225 (JA1337).

The only affirmative basis the Board supplied in favor of an identical rate was its suggestion that "simulcasters and other commercial webcasters" "compete for listeners and revenue" and thus "operate in the same, not separate submarkets." *Id.* at 227-28 (JA1339-40); *see id.* at 249 (JA1361). To justify that assertion, the Board pointed to a handful of "statements" in documents such as SEC and FCC acknowledging that simulcasters have "myriad competitors," including other webcasters. *Id.* at 227 (JA1339). The Board did not address NAB's arguments that these documents do not discuss "competition" in any sense relevant to determining market segmentation for purposes of the webcaster license, because they also count as competitors services that operate in entirely separate *markets*, such as interactive services like Spotify, subscription-based services like SiriusXM, and entirely

15

different media services like YouTube. *See* NAB PFFCL ¶¶ 174-75 (JA1073-74); Joint Corrected Reply to SoundExchange's PFFCL ¶¶ 1067-70 (JA1100-03).

Although the Board rejected NAB's request for different rates applicable to simulcasters, the Board *did* set different rates for other types of services. For instance, the Board concluded that "noncommercial webcasters" are entitled to a "substantial discount." *Final Determination* 269 (JA1381). The Board reasoned that "noncommercial webcasters constitute a distinct submarket in which they have a lower willingness to pay for licenses than commercial webcasters." *Id.* at 270 (JA1382). And within the category of commercial webcasters, the Board prescribed different rates for subscription-based services and nonsubscription (or "ad-supported") services. *See id.* at 1, 94 (JA1113, 1206). Notably, the Board did not require proof that noncommercial or subscription commercial webcasters were different from all other webcasters.

Finally, the Board arrived at the rates for all commercial webcasters based on benchmark agreements paid by fully interactive on-demand services like Spotify. *Id.* at 123-26 (JA1235-38) (subscription); *id.* at 157-59 (JA1269-71) (nonsubscription). That is, it started with the unregulated deals that Spotify had entered with record labels; calculated what the effective price-per-play must have been under those agreements; performed a few marginal upward and downward adjustments; and deemed the resulting number the prevailing royalty rate for *all* non-

**MATERIAL UNDER SEAL DELETED**

interactive services. *See id.* The Board never suggested that licenses between record labels and interactive services would be appropriate benchmarks for simulcasters specifically. But, in light of the Board's insistence that simulcasters must pay the same rates as other commercial webcasters, the ultimate result of the Board's decision is that the rates paid by simulcasters for merely retransmitting over-the-air radio broadcasts are ███████████ than rates paid by *fully interactive* on-demand services. *See id.* at 159 (JA1271) (finding effective per-play rates for Spotify ranging from $████ to $████, depending on the licensee).

 b. The Board also doubled the minimum fee, from $500 per station or channel with a cap of $50,000 per licensee, to $1000 per station or channel with a $100,000 cap per licensee. *Final Determination* 280-90 (JA1392-1402). Its principal justification for that drastic change was a supposed increase in "SoundExchange's average administrative costs" as calculated in 2013 and 2018. *Id.* at 287-89 (JA1399-1401).[2] But in computing this average administrative cost, the Board did not limit its consideration to SoundExchange's "incremental cost of administering the [webcasting] license." *Id.* at 285 (JA1397). Instead, it began with

---

[2] The Board cited two other justifications for increasing the minimum fee—the existence of a settlement with College Broadcasters Inc. that never exceeded $750 per station, and general inflation since 2006—but found "the increase in SoundExchange's average administrative cost to be the most compelling" justification, and the only one that would support the full amount of the increase. *Final Determination* 288-89 (JA1400-01).

SoundExchange's *total* costs—a sum that included not only the incremental cost of administering the webcasting license but also costs wholly "unrelated to license administration, such as property and equipment depreciation, interest and tax expenses, and amortization of the cost of participating in rate-setting proceedings," as well as costs concerning "licenses other than the webcasting license." *Id.* at 287 (JA1399).  The Board then divided that sum by a supposed estimate of the total number of stations or channels, although it artificially capped the number of stations and channels per licensee at 100 even though services like Pandora have millions of channels. *See id.*  Applying these inputs to 2013 and 2018 data provided by Sound-Exchange, the Board concluded that SoundExchange's "average administrative cost" increased by 134%.  *Id.* at 287-88 (JA1399-400).  As a result, the Board concluded that a 134% increase in the minimum fee would represent "an upper limit on a reasonable minimum fee," and that SoundExchange's proposed 100% increase fell "comfortably within the zone of reasonable minimum fees." *Id.* at 290 (JA1402).

## SUMMARY OF ARGUMENT

I.    The Board's decision to subject simulcast to the same rates that apply to custom radio flouts the statutory scheme and reflects arbitrary and capricious decisionmaking.

Under the Copyright Act, the rates established by the Board "*shall* distinguish among the different types of service" subject to the webcasting license.  17 U.S.C.

§ 114(f)(1)(B).  The statute also provides the criteria for determining "such differences"—the degree to which the webcasting service substitutes for or promotes record sales, and the quantity and nature of the service's use of sound recordings. *Id.*  Although the Board agreed that simulcast and custom radio differ along these statutory metrics, the Board refused to distinguish between them, insisting that different rates are not available absent evidence showing that simulcasters are "as a rule" different from *all* types of webcasting services.  That reasoning contravenes the statute's mandatory language requiring differentiation, and it undermines Congress's recognition that different rates are appropriate for different types of services based on a prescribed set of considerations.  The Board's disregard of the plain text of Section 114(f)(1)(B) requires that its decision be reversed, and the Board directed to properly differentiate between simulcast and custom radio, as the statute requires.

At a minimum, the decision below must be vacated, because the Board's rationale is arbitrary and capricious.  The Board's reasoning rests on a misguided presumption in favor of uniform rates—specifically, that simulcast must be subject to the same rate as other commercial webcasts unless NAB can prove that simulcast is "as a rule" different from all other types of webcast.  That virtually insurmountable burden has no basis in the statutory text or common sense, and the Board remarkably did not even try to explain it.  Moreover, not only did the Board fail to justify that

requirement, it also failed to provide any explanation as to *how* this burden could be satisfied.  The Board thus applied precisely the kind of arbitrary "'know-it-when-we-see-it' approach" that this Court has long rejected.  *City of Vernon v. FERC*, 845 F.2d 1042, 1048 (D.C. Cir. 1988).

Furthermore, by relying on this presumption, the Board's decision ultimately rests not on substantial evidence but on an absence of contrary evidence—another form of decisionmaking that this Court has repeatedly deemed arbitrary and capricious.  *See Music Choice*, 970 F.3d at 429-30.  Indeed, the Board's *only* affirmative evidence to support an identical rate were certain documents describing simulcasters and other webcasters as "competing" with one another.  But those documents used the term "competition" at a high level of generality, encompassing services, like YouTube, that do not even operate in the same market.  The fact that simulcast and custom radio could be described as competitors in this broad sense cannot alone justify the conclusion that a willing buyer and willing seller would negotiate an *identical* rate for the two types of service—especially in the face of direct evidence from NAB to the contrary.  And the fact that this was the best evidence the Board could muster only underscores how threadbare the affirmative support for its conclusion was.

The Board's decision to subject simulcast and custom radio to identical rates is fundamentally flawed, and must be set aside.

II.    The Board's decision to double the minimum fee based on purported increases in SoundExchange's total operating costs is likewise erroneous. The minimum fee is designed to cover the incremental cost of administering the webcasting license—nothing more. The Board's contrary conclusion is totally unmoored from the statutory scheme, prior precedent, and common sense, and should be reversed.

## STANDING

NAB "fully participated in the proceeding" before the Copyright Royalty Board on behalf of its commercial broadcaster members, who will be "bound by the [D]etermination" and subject to the rates and terms established therein. 17 U.S.C. § 803(d)(1). NAB has associational standing to assert its members' interests in challenging the Board's decision. *See U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1330-31 (D.C. Cir. 2002).

## STANDARD OF REVIEW

This Court reviews the Board's Determination according to "the same standards set forth in the Administrative Procedure Act." *Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 375 (D.C. Cir. 2020); *see* 17 U.S.C. § 803(d)(3) (cross-referencing 5 U.S.C. § 706). Under those standards, the Court must "set aside" agency action that is "arbitrary [and] capricious," an "abuse of discretion," "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations,

21

or short of statutory right," or "unsupported by substantial evidence."  5 U.S.C. § 706(2)(A), (C), (E).

## ARGUMENT

## I.    THE BOARD'S DECISION TO SUBJECT SIMULCASTERS TO THE SAME RATES THAT APPLY TO CUSTOM RADIO MUST BE SET ASIDE

Despite overwhelming and uncontroverted evidence showing crucial differences between the only two types of commercial webcasters participating in this proceeding—simulcasters and custom radio providers—the Board concluded that they "should be subject to the same rate."  *Final Determination* 249 (JA1361). That conclusion is flawed and must be set aside for two separate and independent reasons:  first, it contravenes the statutory text; and second, it is not supported by reasoned decisionmaking or substantial evidence.

### A.    The Board's Refusal To Set Different Rates Despite Identifying "Different Types" Of Services Contravenes The Plain Text Of Section 114(f)(1)(B)

1.    Section 114(f)(1)(B) mandates that the "rates" set by the Board "*shall distinguish* among the different types of services."   17 U.S.C. § 114(f)(1)(B) (emphasis added).  The Board is thus *required* to establish different rates for services that are of "different types."  *See Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1019 (D.C. Cir. 2014) (use of "shall" makes a provision "mandatory").  The statute also provides "criteria" for the Board to use in identifying "such differences":

(1) "the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers"; and (2) "the quantity and nature of the use of sound recordings." 17 U.S.C. § 114(f)(1)(B). Finally, for each "type" of service, the statute provides that the rates and terms established by the Board should "represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller," based on essentially identical criteria to those the Board must use to determine the "different types of service[]." *Id.*

Accordingly, Section 114(f)(1) requires the Board to undertake a two-step inquiry: *first*, it must determine whether services are of "different types" based on the enumerated criteria; *second*, if services are of "different types," the rates *shall* "distinguish" between them, through an assessment of what a willing buyer and a willing seller would pay for each *particular type* of service. In other words, once the Board identifies "different types of services," the Board cannot simply ignore those differences and subject the different types of services to the same rate.

Here, as the Board acknowledged, the record is uncontroverted that simulcast and custom radio are "different types of services" according to the statutorily enumerated criteria.

a.    First, simulcast and custom radio significantly "differ[]" as to "the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers." 17 U.S.C. § 114(f)(1)(B); *see Final Determination*

23

225-26 (JA1337-38). A simulcast is identical to over-the-air radio, which Congress itself recognized does not materially substitute for—and actually promotes—the sale of phonorecords. *See supra* at 7-8. That is because simulcast and over-the-air radio provide an entirely different listening experience from buying a record. The essence of buying a traditional record or music download is the ability of the user to select the exact song they want to hear—an "interactive delivery." H.R. Rep. No. 104-274, at 13-14 (1995). Thus, "a service's interactivity is a good proxy for its ability to substitute" for the purchase of records. *Final Determination* 225 (JA1337).

A radio broadcast offers virtually no interactivity; listeners can only passively receive whatever happens to be playing on the selected radio station. *See supra* at 11. A listener who is in the mood for Taylor Swift will likely listen to their Taylor Swift album, not whatever may be playing on a pop or country music station. On the other hand, a curated "Taylor Swift radio" playlist on Pandora is much more likely to substitute for the purchase of a Taylor Swift album, because the station is specifically designed to either play Taylor Swift songs or something similar. *See, e.g.*, Ex. 5609 ¶¶ 6-7 (JA1836-37). Simulcasting is undoubtedly "less interactive" than custom radio. *Final Determination* 226 (JA1338).

Moreover, the Board itself found "persuasive" evidence showing that record "labels perceive a *distinct* promotional value in over the air radio play of their recordings." *Id.* (emphasis added). Over-the-air broadcasts repeatedly expose

24

listeners to tight playlists featuring new artists and songs, which promotes the purchase of those songs by listeners. *See* Tr. 4538-39, 5734 (JA824-25, 1522). The promotional value of plays on services like Pandora, by contrast, is significantly diminished because listeners have more control over what they hear, and there is thus less of the repetition and reinforcement that contributes to making a song into a hit. This is borne out by evidence showing that labels devote significantly less resources to custom radio like Pandora and other webcasters than to over-the-air radio and simulcast. *See* Tr. 3435-36 (JA736-37); Ex. 2056 at 13-14 (JA1559-60).

There is thus no serious dispute that simulcast and custom radio are "different" in terms of "the degree to which [they] may substitute for or may promote the purchase of phonorecords by consumers," 17 U.S.C. § 114(f)(1)(B)—and the Board did not find otherwise. *See Final Determination* 225-26 (JA1337-38).

b.     Second, simulcast and custom radio are also "different" in terms of the other statutory factor: "the quantity and nature of the use of sound recordings." 17 U.S.C. § 114(f)(1)(B). As the Board acknowledged, "simulcasts and custom radio" are "different[]" with respect to their "use of music versus non-music content." *Final Determination* 227 (JA1339). Over-the-air radio simulcasts "play relatively few songs," while "'a custom radio station is basically 100 percent music.'" *Id.* (citation omitted). Simulcasts also have tighter playlists, and thus less variety in the songs played. This limited "shelf space" means that record labels compete fiercely to get

songs on the radio, driving down the rate to which a willing buyer and seller would agree.  *See* Tr. 4538-39, 5734 (JA824-25, 1522).  Again, the Board acknowledged all of this evidence without disagreement.  *See Final Determination* 227 (JA1339).

The Board's own decision thus acknowledges the undisputed evidence that, as to the statutory "criteria," simulcast and custom radio are "different types of services."  17 U.S.C. § 114(f)(1)(B).  Indeed, nowhere does the Board suggest that they are the *same* "types of service[]" along either criterion.[3]  Under the plain language of Section 114, the Board was thus *required* to adopt rates that "distinguish" between the two types of service.  *Id.*; *see SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018) ("mandatory" statutory language "imposes a nondiscretionary duty" on the agency).

2.    Instead, however, the Board concluded that simulcast and custom radio should be subject to the same rate *even if* they were "different types" of services. The same rate applies, the Board reasoned, unless simulcasters could show that they were *also* different "*as a rule*" from *other* types of webcasting services aside from

---

[3]    The only similarity the Board identified was one that did *not* correspond to the statutory criteria—i.e. that  "simulcasters and other commercial webcasters" purportedly "compete for listeners and revenue in the same submarket."  *Final Determination* 227 (JA1339).  As explained further below, that finding was unreasoned.  *See infra* at 37-40*.*  But, in any event, the Board was not permitted to rely solely on this "competition" factor and disregard the enumerated criteria in Section 114.

custom radio. *Final Determination* 224-27 (JA1336-39). The Board thus dismissed the undisputed differences between "simulcasts and custom radio," because of the existence of some unnamed "subset of other eligible nonsubscription transmissions," *id.*—none of which participated in the proceeding below, *see id.* at 2 n.1 (JA1114).

That reasoning is flawed for many reasons, *see infra* at 29-37, but most fundamentally, it contravenes the plain text of the statute. Having identified two "different types of services" (simulcast and custom radio), the statute's mandatory language required the Board's rates to "distinguish" among them. 17 U.S.C. § 114(f)(1)(B). Instead, the Board subjected two concededly different types of services to an identical rate. But "the duty of an administrative agency is to follow [the statute's] commands as written, not to supplant those commands with others it may prefer." *SAS Inst.*, 138 S. Ct. at 1355.

What is more, the Board's decision defies Congress's purpose. As explained above, Congress took a deliberately targeted approach in the 1995 amendments, ensuring that copyright owners are compensated more by the types of services that threaten traditional record sales, while taking care not to impose disruptive effects on services that do not threaten, and may in fact promote, other streams of record label revenue. *See supra* at 6-9. It was for precisely this reason that Congress mandated rate differentiation among the diverse array of webcasters based on

**MATERIAL UNDER SEAL DELETED**

whether their content would threaten the sale of traditional records. It is inconceivable that Congress would have wished the Board to *presume* identical rates between customizable content like Pandora and services that simply retransmit traditional radio content that Congress exempted entirely.

Indeed, that error is thrown into sharp relief by the ultimate result that the Board reached: the rates for simulcasts playing the same over-the-air content that Congress exempted altogether are ████████ as rates paid by *fully interactive* services that Congress identified as a specific threat to album sales. *Compare Final Determination* 1 (JA1113), *with id.* at 159 (JA1271). That result is in open conflict with Congress's intended purpose.

In short, the Board's failure to "distinguish" in "rates and terms" between undeniably different types of services "ignored the text" of the statue and must be set aside. *Music Choice v. Copyright Royalty Bd.*, 970 F.3d 418, 426-27 (D.C. Cir. 2020).

### B.    The Board's Analysis Is Arbitrary And Capricious

At a minimum, the Board's decision must be vacated as arbitrary and capricious because it is not "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 52 (1983).

### 1.    The Board Arbitrarily Contrived And Applied An Unexplained Presumption In Favor Of Uniform Rates

The Board's analysis principally rests on one core rationale:  that "[a]s the proponent of a rate structure that treats simulcasters as a separate class of webcasters, the NAB bears the burden of demonstrating" that "simulcasting differs from other forms of commercial webcasting," and NAB failed to meet to this burden because it could not show that simulcasters were "*as a rule*" different from *all* other webcasters.  *Final Determination* 219, 226-27 (JA1331, 1338-39).  Every link in that chain of reasoning was flawed.  There was no basis to impose a burden to prove differentiation on NAB, without any equivalent burden to prove similarity placed on SoundExchange.  And, even if NAB had such a burden, the Board failed to explain why NAB needed to show that simulcasters were "as a rule" different from *all* other webcasters—when the statutory text plainly contemplates rate differentiation between *any two* services that are of "different types."  Nor did the Board explain how NAB could even make that showing.  And the Board did not even apply this "rule" consistently.  All told, the Board's decision was the height of arbitrary and capricious decisionmaking.

a.    The Board's reasoning that simulcast could receive a different rate from other commercial webcasters only if NAB satisfied the "burden" of proving that simulcast was "as a rule" different effectively created a presumption that all

29

commercial webcasters should be subject to the same rate. But that presumption makes no sense, and the Board made no attempt to even explain it.

As this Court has made clear, "agency presumptions" must reflect "consistency with their governing statutes." *Chem. Mfrs. Ass'n v. Dep't of Transp.*, 105 F.3d 702, 705 (D.C. Cir. 1997). The governing statute here requires that the rates the Board chooses "*shall distinguish* among the different types of services" for webcasting. 17 U.S.C. § 114(f)(1)(B) (emphasis added). The statute thus "specifically contemplates" "distinct[ion]," not uniformity. *SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 57 (D.C. Cir. 2018).

The Board's presumption inexplicably inverts that statutory directive. The Board saddled NAB with the "burden" not only to introduce affirmative evidence demonstrating relevant differences between simulcasts and other webcasters (which all agree NAB did), but to "establish"—with some unspecified amount of "sufficiently" "persuasive" evidence—that simulcasters should *not* "be subject to the same rate" as other webcasters. *Final Determination* 225, 249 (JA1337, 1361). That creates an impermissible anchor toward identical rates, while, at the same time, relieving SoundExchange of the burden of having to introduce *any* evidence regarding the statutory criteria to justify a uniform rate. And, in fact, SoundExchange put on no such evidence. *Cf. United States v. Byfield*, 391 F.3d 277, 280 (D.C. Cir. 2004) ("The record in fact pits some evidence against nothing; as

we've said in another context, 'something outweighs nothing every time.'" (citation omitted)).  The Board's imposition of an unwarranted presumption in favor of similarity was arbitrary and capricious, and cannot be upheld.

b.    Having created a misguided presumption, the Board compounded its error by insisting on evidence showing that "simulcasting, *as a rule*, is materially [different] . . . than the *full scope of noninteractive webcasting*."  *Final Determination* 226-27 (JA1338-39) (second emphasis added).  In other words, the Board required NAB to prove differences between simulcasting and "*all other* eligible nonsubscription transmissions"—even services that were not parties to the proceeding—in *all* circumstances.  *Id.* at 227 (JA1339).

The imposition of that extraordinary requirement was arbitrary and capricious.  The statutory language requires different rates for "different types" of services—i.e., if *any* services are of "different types," their rates must be "distinguish[ed]."  17 U.S.C. § 114(f)(1)(B).  Nothing in the statute remotely suggests that *all* services must be different from one another in order for the Board to distinguish between any of them.  But that is exactly what the Board's "as a rule" requirement dictates—that NAB prove differentiation with respect to every other service (including non-parties), even after having established difference with respect to another service (custom radio).  And, under the Board's reasoning, NAB's purported failure to establish differentiation from those non-parties results in

31

simulcast receiving the same rate, even as to a service *proven* to be "different."  That result defies common sense, and flatly contradicts the statutory language.

Moreover, the net effect of this "as a rule" requirement is to transform the already unwarranted presumption into an insurmountable obstacle to rate-differentiation.  The only way for NAB to establish differentiation on that standard would be to introduce evidence that, under all conceivable circumstances, no other webcaster could be similar—including webcasters NAB might not even be aware of.  That ratchets up the presumption to a point where it would be virtually impossible to establish a different rate.

And just like the presumption itself, the Board did not even try to explain how the "as a rule" component is a "relevant criterion" grounded in the statutory scheme.  *ALLTEL Corp. v. FCC*, 838 F.2d 551, 558 (D.C. Cir. 1988).  For example, with respect to interactivity, the Board acknowledged that simulcast is less interactive than custom radio, but nonetheless found that the two services should have the same rate because NAB failed to prove that "simulcasting, *as a rule*, is materially less interactive than the full scope of noninteractive webcasting"—without ever explaining why NAB needed to make that showing.  *Final Determination* 226 (JA1338).  The Board's failure to adequately "explain why" this condition "is a prerequisite" to a different rate demonstrates that the Board's decision is not rooted

32

in reasoned decisionmaking. *Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 387 (D.C. Cir. 2020).

To make matters even worse, the Board also failed to explain *how* this requirement could be satisfied—i.e., what evidence could "establish, as a rule," that simulcast is "materially less interactive" or "materially less music intensive" than "*all other* eligible nonsubscription transmissions." *Final Determination* 226-27 (JA1338-39). But, as this Court has explained, an agency cannot rest its decision on a finding that a regulated party has failed to satisfy a certain standard unless the agency "describe[s] a showing that would meet [the] standard," by identifying "what elements are necessary *and sufficient*." *City of Vernon v. FERC*, 845 F.2d 1042, 1048 (D.C. Cir. 1988). A "'know-it-when-we-see-it' approach"—in which the agency "merely not[es] the absence of particular elements that may or may not be" dispositive—"does not provide a reasoned explanation of [the] agency decision." *Id.*; *see Pearson v. Shalala*, 164 F.3d 650, 660 (D.C. Cir. 1999) ("To refuse to define the criteria [the agency] is applying is equivalent to simply saying no without explanation.").

That is exactly what the Board did here. Despite acknowledging that "a variety of factors *may* support a separate rate," *Final Determination* 226 (JA1338), the Board never explained what a sufficient showing would look like. Nor did the Board explain what it means to be "*materially* less interactive" or "*materially* less

music intensive." *Id.* at 226-27 (JA1338-39) (emphasis added). And nowhere did the Board explain what it means to satisfy those criteria "*as a rule*." *Id.* Particularly because the requirements imposed by the Board are entirely divorced from any statutory or regulatory text, it is impossible to discern what the Board was looking for or why it would be relevant. And the Board's efforts to pick apart NAB's evidence and unhelpfully dismiss it as not "sufficient[]" or "adequate[]" to meet this indeterminate standard, *id.*, simply confirm that its decision is not the product of reasoned decisionmaking.

Finally, not only did the Board fail to explain its "as a rule" requirement, it did not even consistently apply it. The Board found that noncommercial webcasters and commercial subscription webcasters, for instance, *did* warrant a different rate, without even *assessing* whether they were "as a rule" different to all other webcasters. Such an unexplained difference in treatment of similarly situated parties is arbitrary and capricious. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024-25 (D.C. Cir. 2018).

### 2.    The Board's Analysis Impermissibly Rests On An Absence Of Contrary Evidence, Rather Than Substantial Evidence

The Board's reliance on this unwarranted presumption also led it to reach a result that cannot be supported by substantial evidence in the record. The Board acknowledged that NAB introduced concrete evidence showing licensors' willingness to accept different (and lower) rates for less interactive services like

simulcasts—including testimony from record label and radio executives, as well as analogous licensing agreements. *See Final Determination* 222-27 (JA1334-39). Yet, instead of identifying substantial evidence to support its contrary conclusion, the Board faulted NAB for not providing *enough* evidence to meet its "as a rule" requirement. In other words, the Board relied solely on the purported absence of evidence. But, as this Court has repeatedly admonished, "reasoned decisionmaking . . . 'requires more than an absence of contrary evidence; it requires substantial evidence to support a decision.'" *Music Choice*, 970 F.3d at 429 (citation omitted). This Court has overturned multiple Board decisions for failing to heed this basic principle of administrative law—and it should do so again here. *See id.*; *Settling Devotional Claimants v. Copyright Royalty Bd.*, 797 F.3d 1106, 1121 (D.C. Cir. 2015); *Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 574 F.3d 748, 767 (D.C. Cir. 2009).

Critically, the Board's analysis was devoid of affirmative evidence to support its decision to subject simulcasts and other webcasts to the same rate. For example, the Board cited no affirmative evidence showing the same level of interactivity among webcasting services. Nor could it, given the obvious and undisputed differences in interactivity between simulcasts and custom radio. *See supra* at 11, 23-25. Instead, the Board simply relied on the purported absence of "[]sufficient"

**MATERIAL UNDER SEAL DELETED**

evidence showing a "materially" different level of interactivity from all other conceivable kinds of webcasting. *Final Determination* 226 (JA1338).

Similarly, the Board did not rely on evidence showing that the promotional effects of custom radio and simulcast were the same. And the record indicated the opposite: simulcast has the identical content that all agree makes over-the-air radio more promotional than custom radio, including ████████████████████ ██. Tr. 5734-35 (JA1522-23). The Board offered no explanation as to why that same content would no longer be promotional, just because it was heard over the internet. Rather, the Board just pointed to a purported absence of sufficiently "persuasive" evidence showing simulcast was more promotional than other forms of webcasting. *Final Determination* 226 (JA1338).[4]

In short, the Board's use of its unwarranted presumption fundamentally shaped its view of the evidence, and led it to a conclusion devoid of affirmative support. It is an agency's unflagging obligation to identify "substantial evidence to

---

[4]  In particular, the Board faulted NAB for not providing evidence that could separate out the promotional value of simulcast from the promotional value of over-the-air radio. *Final Determination* 226 (JA1338). But the Board had already acknowledged that the labels do not appear to "distinguish [between] terrestrial radio [and] simulcasting in terms of promotional benefit." *Id.* Thus, if anything, the absence of evidence separating simulcasting from terrestrial radio should have *supported* NAB's position.

support a decision." *Music Choice*, 970 F.3d at 429.  The Board failed to do so here, and its decision should be reversed for this reason too.

> ### 3. The Board's Generalized Discussion Of Competition Does Not Reflect Reasoned Decisionmaking

In what reflected the only affirmative basis for setting the same rate in Board's decision, the Board declared that "simulcasters and other commercial webcasters" "operate in the same, not separate submarkets" merely because they "compete for listeners and revenue." *Final Determination* 227-28 (JA1339-40).  That reasoning is flawed several times over.

To begin with, the Board's understanding of "competition" was far too generalized to have any relevance to the statutory question at issue.  The Board relied solely on statements in unrelated contexts—like FCC and SEC filings and internal Board minutes—indicating that simulcasters and other webcasters sometimes describe one another as "competitors."  *See id.* (citing Ex. 5472 at 4 (JA1020) (FCC comments); Ex. 3042 at 8 (JA953) (Form 10-K filed with the SEC); Ex. 5196 at 3 (JA1782) (NAB Board minutes)).  But none of these documents discusses competition in any sense relevant to determining distinct submarkets within the category of eligible non-interactive webcasters for purposes of Section 114 royalty rates.  To the contrary, in every single one of the cited documents, the discussion of competitors encompasses services that undisputedly operate not just in "separate submarkets" but in entirely separate *markets*.

**MATERIAL UNDER SEAL DELETED**

For example, the cited comments to the FCC describe the relevant "audio marketplace" as encompassing all "terrestrial radio broadcasters, satellite radio providers and entities providing audio programming over the internet and to mobile devices," identifying as "competitor[s]" services such as "SiriusXM," "YouTube, Pandora and Spotify." Ex. 5472 at 4, 11-12 (JA1020, 1022-23). The internal NAB Board minutes merely discuss—in the context of ████████████████ ████████████████████████—the fact that ████████████████ ████████████████████████████████████████ ██████████ Ex. 5196 at 2-3 (JA1781-82). And the Form 10-K filed with the SEC by Cumulus Media says only that radio broadcasters "compete with various digital platforms and services, including streaming music *and other entertainment services* for both listeners and advertisers." Ex. 3042 at 8 (JA953) (emphasis added). This latter category broadly sweeps in other media services that are plainly not competitors in the narrow webcasting market. The Form 10-K even states that, for purposes of advertising, "[r]adio stations compete" with entirely different forms of "media, including newspapers, broadcast television, cable television, magazines, direct mail, and outdoor advertising." *Id.* at 7 (JA952).

The references to "competition" in these documents reflect, at most, the unremarkable proposition that *all* media is to some degree competing for "people's time" and attention. Tr. 5996 (JA897); *see* Tr. 4475-78 (JA813-16). Indeed, reliance

on "competition" so broadly defined would effectively write out the statute's key requirement that different types of webcaster services receive different rates and terms. By definition, *all* webcasters "compete" with one another in the broad sense of the term that the Board used; they are all digital audio services that play music without being fully interactive. Ending the inquiry there would thus mean that all webcasters would receive the same rate, which is the opposite of what the statute contemplates. The Board's uncritical reliance on such a broad notion of "competition" does not reflect reasoned decisionmaking.

To make matters worse, NAB raised these precise objections to the Board— and the Board completely ignored them. *See supra* at 15-16. As this Court has often "stressed," "[a]n agency's 'failure to respond meaningfully' to objections raised by a party renders its decision arbitrary and capricious." *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (citation omitted). Here, the Board simply recited what "SoundExchange argue[d]" and found those arguments "compelling" without so much as mentioning NAB's arguments to the contrary. *Final Determination* 227-28 (JA1339-40).

Finally, like much of the decision, the Board's reliance on generalized competition evidence was internally inconsistent. The Board's reasoning as to competition should apply equally to, for example, noncommercial services. Indeed, the Board specifically identified evidence of "noncommercial webcasters that are in

direct competition with commercial webcasters for listeners." *Id.* at 272 (JA1384). And yet, the Board still concluded that "noncommercial webcasters occupy a distinct submarket within the webcasting market"—so "distinct," in fact, that they are entitled to "a substantial discount." *Id.* at 269 (JA1381); *see id.* at 279-80 (JA1391-92). The same goes for subscription services—they are competitors with nonsubscription services in some sense, and yet receive a different rate. The Board's competition-based rationale was thus not even consistently applied. That internal inconsistency further demonstrates that the Board's decision "is arbitrary and capricious." *ANR Storage*, 904 F.3d at 1028.

## II.    THE BOARD'S DECISION TO DOUBLE THE MINIMUM FEE MUST BE SET ASIDE

The Board also erred in doubling the minimum fee, based on a fundamental misunderstanding of the fee's purpose. The Board's decision contravenes both the statutory text and the Board's own settled precedent, and should be set aside.

1.    To justify the increase in minimum fee, the Board primarily relied on a supposed "increase in SoundExchange's [total] average administrative cost." *Final Determination* 289 (JA1401). And the Board included within this total "administrative cost" the costs of "the administration of licenses *other than* the webcasting license," as well as costs wholly "unrelated to license administration, such as property and equipment depreciation, interest and tax expenses, and amortization of the cost of participating in rate-setting proceedings." *Id.* at 287

(JA1399) (emphasis added).  In other words, the Board concluded that the surplus amounts provided by the smallest licensees exist to subsidize SoundExchange's *total* operational costs.  *Id.* at 286 (JA1398).

The Copyright Act does not contemplate this sort of total-cost subsidization. To the contrary, the statute makes clear that the SoundExchange's operating costs are to be borne by royalties from copyright owners, not payments by *licensees*.  The Act gives SoundExchange authority to deduct its "reasonable costs" from "*receipts from licensing of transmissions*, . . . prior to the distribution of such receipts to any person or entity entitled thereto."   17 U.S.C. § 114(g)(3) (emphasis added). "[R]eceipts," in this provision, refers to royalty payments made to copyright owners. *See id.* § 114(g)(2).  And the "reasonable costs" SoundExchange is entitled to deduct are all tethered to the administration of the webcasting license.  *Id.* § 114(g)(3).

The minimum fee exists to avert the possibility that the royalties a small broadcaster pays are so low that they are less than the cost of administering that webcaster's license.  *See* 67 Fed. Reg. 45,240, 45,262-63 (July 8, 2002) (*Web I*). That purpose is fulfilled by setting the minimum fee at the *marginal* cost of administering a webcaster's license.  Any higher fee would improperly burden the smallest webcasters with funding administrative expenses *beyond* what is required to administer their license.  Nothing in the statutory scheme supports such excess payments.  And certainly no statutory language contemplates a minimum fee that

will fund SoundExchange's total costs, including costs that have *nothing to do* with administering the webcasting license at all, such as costs of administering "licenses other than the webcasting license" and costs wholly "unrelated to license administration." *Final Determination* 287 (JA1399); *see Intercollegiate Broad. Sys.*, 574 F.3d at 761 (explaining that the minimum fee "cover[s]" the costs of "administering the [webcasting] license").

That understanding is confirmed by comparison to the statutory scheme for mechanical licensing under Section 115. There, Congress expressly stated that the "total costs" of the "collective" under that statutory license (the Mechanical Licensing Collective) are to be borne by licens*ees*. 17 U.S.C. § 115(d)(7). Had Congress intended for SoundExchange to be similarly funded, it easily could have drafted language to that effect. But it did not, and such "differences in language . . . convey differences in meaning." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017); *see SAS Inst.*, 138 S. Ct. at 1355 ("Congress's choice to depart from the model of a closely related statute is a choice neither we nor the agency may disregard.").

Binding precedent from the agency confirms what the statutory text requires—the minimum fee covers only the *incremental* cost of administering each additional webcasting license. In *Web I*, the webcasters argued before the Copyright Arbitration Royalty Panel (CARP)—the Board's predecessor—that, because the

minimum fee is designed "to protect against a situation in which the licensee's performances are such that it costs the license administrator more to administer the license than it would receive in royalties," the "appropriate calibration for the minimum fee is the incremental costs to the license administrator of adding another license to the system regardless of how many performances they make."  Report of the Copyright Arbitration Royalty Panel 32, Docket No. 2000-9 CARP DTRA 1&2 (Feb. 20, 2002), https://bit.ly/3OJKOTT (*Web I CARP Report*).   The CARP "concur[red] with the [webcasters]" on this point.  *Id.* at 95.  The Librarian of Congress, in reviewing the CARP decision, agreed that the minimum fee was intended to cover "the *incremental* cost of licensing."  *Web I*, 67 Fed. Reg. at 45,263 (emphasis added).  These prior interpretations of the minimum fee were binding on the Board in this case.  *See* 17 U.S.C. § 803(a)(1).

2.    The Board's explanation for why the minimum fee should be used to subsidize SoundExchange's total costs was facially deficient.  For starters, the Board made no effort to ground its position in the statute.   Instead, it dismissed the "statutory language" as unhelpful, claiming it is "silent as to the purpose of the minimum fee."  *Final Determination* 286 (JA1398).  But the Board agreed that the purpose of the minimum fee is to "cover SoundExchange's administrative cost[s]," *id.* at 281 (JA1393 (citation omitted), and as explained above, the statute is quite clear about which administrative costs SoundExchange is entitled to recover—only

costs associated with the webcasting license. Nothing in the statute permitted the Board to consider costs beyond those associated with administering the webcasting license.

The Board also offered no affirmative justification for *why* the minimum fee should cover SoundExchange's *total* costs, and its attempts to evade its own binding precedent in *Web I* are incoherent. The Board's principal rationale was that, in later proceedings, the Board referred in passing to "the minimum fee as covering SoundExchange's 'administrative cost' or 'average administrative cost,' rather than SoundExchange's incremental cost of administering the license." *Id.* at 285-86 (JA1397-98) (citing 72 Fed. Reg. 24,084, 24,096 (May 1, 2007) (*Web II*); 79 Fed. Reg. 23,102, 23,124 (Apr. 25, 2014) (*Web III*); 81 Fed. Reg. 26,316, 26,396-97 (May 2, 2016) (*Web IV*)). But the Board had no occasion in those proceedings to consider whether total or incremental cost was the appropriate metric, because the point was not in dispute. It is absurd to think that, merely by using the shorthand of "administrative cost," those opinions silently overturned the Board's prior precedent recognizing that the purpose of the fee was to cover the cost of administering an additional webcasting license. Indeed, that sort of "*sub silentio*" and unreasoned departure from prior precedent would undoubtedly be "arbitrary and capricious." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). It cannot sustain the Board's reasoning here.

The Board also asserted that covering incremental costs is only "one element" of the minimum fee, but it is "not the only element." *Final Determination* 286 (JA1398). Specifically, the Board seized on a statement from the *Web I CARP Report* that "[a]nother arguable purpose [of the minimum fee] is to capture the intrinsic value of a service's *access* to the full blanket license, irrespective of whether the service actually transmits any performances." *Id.* at 285 (JA1397) (quoting *Web I CARP Report* 95). From this, the Board reasoned that *Web I* did not limit the minimum fee to incremental cost, and so could encompass total cost. But that is a non-sequitur. The fact that *Web I* envisioned "access value" as a possible secondary justification for the minimum fee has nothing to do with whether SoundExchange's total costs may *also* be covered by that fee. Access value is simply irrelevant to this case: It is undisputed that SoundExchange provided no evidence quantifying the "access value" of the statutory license, and the Board did not suggest otherwise. The Board's reasoning at most shows that marginal cost might not be the only justification for a minimum fee; but that provides no affirmative support for the conclusion the Board reached, which is that the minimum fee may cover total costs (including those that have nothing to do with administering the webcasting license at all).

In short, the Board's decision to saddle smaller webcasters with the burden of subsidizing the total costs of operating SoundExchange by paying amounts in excess of royalties contravened the statutory framework, basic principles of reasoned

decisionmaking, and even the Board's own precedent. Like the Board's simulcasting rate determination, the Board's minimum fee determination must be set aside.

## CONCLUSION

For the foregoing reasons, the Board's Determination as to the royalty rates for simulcasters and as to the minimum fee should be reversed. Alternatively, those aspects of the Board's Determination should be vacated and the case remanded to the Board for further proceedings.

Dated: January 12, 2023                    Respectfully submitted,

                                           */s/ Sarang V. Damle*
Joseph R. Wetzel                           Sarang V. Damle
Andrew M. Gass                             Blake E. Stafford
LATHAM & WATKINS LLP                       LATHAM & WATKINS LLP
505 Montgomery Street                      555 Eleventh Street, NW
Suite 2000                                 Suite 1000
San Francisco, CA 94111                    Washington, DC 20004
(415) 391-0600                             (202) 637-2200
                                           sy.damle@lw.com

                                           Samir Deger-Sen
                                           LATHAM & WATKINS LLP
                                           1271 Avenue of the Americas
                                           New York, NY 10020
                                           (212) 906-1200

        *Counsel for National Association of Broadcasters*

46

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's order dated April 28, 2022, because it contains 10,517 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: January 12, 2023

*/s/ Sarang V. Damle*
Sarang V. Damle

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2023, I electronically filed the foregoing brief with the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the CM/ECF system.

I further certify that the confidential version of the foregoing brief was also served on counsel for all parties by electronic transfer.

*/s/ Sarang V. Damle*
Sarang V. Damle

# ADDENDUM
**Pursuant to D.C. Cir. R. 28(a)(5)**

## TABLE OF CONTENTS

**Page**

5 U.S.C. § 706 ................................................................................................Add. 1

17 U.S.C. § 106 ..............................................................................................Add. 2

17 U.S.C. § 114 ..............................................................................................Add. 3

17 U.S.C. § 803 ............................................................................................Add. 10

## 5 U.S.C. § 706

### § 706.  Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

(1)   compel agency action unlawfully withheld or unreasonably delayed; and

(2)   hold unlawful and set aside agency action, findings, and conclusions found to be—

(A)   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)   contrary to constitutional right, power, privilege, or immunity;

(C)   in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)   without observance of procedure required by law;

(E)   unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)   unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 17 U.S.C. § 106

### § 106.  Exclusive rights in copyrighted works

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1)  to reproduce the copyrighted work in copies or phonorecords;

(2)  to prepare derivative works based upon the copyrighted work;

(3)  to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4)  in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5)  in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6)  in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

## 17 U.S.C. § 114

### § 114.  Scope of exclusive rights in sound recordings

(a)   The exclusive rights of the owner of copyright in a sound recording are limited to the rights specified by clauses (1), (2),(3) and (6) of section 106, and do not include any right of performance under section 106(4).

(b)   The exclusive right of the owner of copyright in a sound recording under clause (1) of section 106 is limited to the right to duplicate the sound recording in the form of phonorecords or copies that directly or indirectly recapture the actual sounds fixed in the recording.  The exclusive right of the owner of copyright in a sound recording under clause (2) of section 106 is limited to the right to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality.  The exclusive rights of the owner of copyright in a sound recording under clauses (1) and (2) of section 106 do not extend to the making or duplication of another sound recording that consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording.  The exclusive rights of the owner of copyright in a sound recording under clauses (1), (2), and (3) of section 106 do not apply to sound recordings included in educational television and radio programs (as defined in section 397 of title 47) distributed or transmitted by or through public broadcasting entities (as defined by section 118(f)): *Provided*, That copies or phonorecords of said programs are not commercially distributed by or through public broadcasting entities to the general public.

(c)   This section does not limit or impair the exclusive right to perform publicly, by means of a phonorecord, any of the works specified by section 106(4).

(d)   LIMITATIONS ON EXCLUSIVE RIGHT.—Notwithstanding the provisions of section 106(6)—

(1)   EXEMPT TRANSMISSIONS AND RETRANSMISSIONS.—The performance of a sound recording publicly by means of a digital audio transmission, other than as a part of an interactive service, is not an infringement of section 106(6) if the performance is part of—

(A)  a nonsubscription broadcast transmission;

(B)  a retransmission of a nonsubscription broadcast transmission: *Provided*, That, in the case of a retransmission of a radio station's broadcast transmission—

Add. 3

(i)    the radio station's broadcast transmission is not willfully or repeatedly retransmitted more than a radius of 150 miles from the site of the radio broadcast transmitter, however—

(I)    the 150 mile limitation under this clause shall not apply when a nonsubscription broadcast transmission by a radio station licensed by the Federal Communications Commission is retransmitted on a nonsubscription basis by a terrestrial broadcast station, terrestrial translator, or terrestrial repeater licensed by the Federal Communications Commission; and

(II) in the case of a subscription retransmission of a nonsubscription broadcast retransmission covered by subclause (I), the 150 mile radius shall be measured from the transmitter site of such broadcast retransmitter;

(ii) the retransmission is of radio station broadcast transmissions that are—

(I)    obtained by the retransmitter over the air;

(II) not electronically processed by the retransmitter to deliver separate and discrete signals; and

(III) retransmitted only within the local communities served by the retransmitter;

(iii) the radio station's broadcast transmission was being retransmitted to cable systems (as defined in section 111(f)) by a satellite carrier on January 1, 1995, and that retransmission was being retransmitted by cable systems as a separate and discrete signal, and the satellite carrier obtains the radio station's broadcast transmission in an analog format: *Provided*, That the broadcast transmission being retransmitted may embody the programming of no more than one radio station; or

(iv) the radio station's broadcast transmission is made by a noncommercial educational broadcast station funded on or after January 1, 1995, under section 396(k) of the Communications Act of 1934 (47 U.S.C. 396(k)), consists solely of noncommercial educational and cultural radio programs, and the retransmission, whether or not simultaneous, is a nonsubscription terrestrial broadcast retransmission; or

(C) a transmission that comes within any of the following categories—

(i)   a prior or simultaneous transmission incidental to an exempt transmission, such as a feed received by and then retransmitted by an exempt transmitter: *Provided*, That such incidental transmissions do not include any subscription transmission directly for reception by members of the public;

(ii)  a transmission within a business establishment, confined to its premises or the immediately surrounding vicinity;

(iii) a retransmission by any retransmitter, including a multichannel video programming distributor as defined in section 602(12)[1] of the Communications Act of 1934 (47 U.S.C. 522(12)), of a transmission by a transmitter licensed to publicly perform the sound recording as a part of that transmission, if the retransmission is simultaneous with the licensed transmission and authorized by the transmitter; or

(iv) a transmission to a business establishment for use in the ordinary course of its business: *Provided*, That the business recipient does not retransmit the transmission outside of its premises or the immediately surrounding vicinity, and that the transmission does not exceed the sound recording performance complement. Nothing in this clause shall limit the scope of the exemption in clause (ii).

(2) STATUTORY LICENSING OF CERTAIN TRANSMISSIONS.—The performance of a sound recording publicly by means of a subscription digital audio transmission not exempt under paragraph (1), an eligible nonsubscription transmission, or a transmission not exempt under paragraph (1) that is made by a preexisting satellite digital audio radio service shall be subject to statutory licensing, in accordance with subsection (f) if—

(A)(i) the transmission is not part of an interactive service;

(ii)  except in the case of a transmission to a business establishment, the transmitting entity does not automatically and intentionally cause any device receiving the transmission to switch from one program channel to another; and

(iii) except as provided in section 1002(e), the transmission of the sound recording is accompanied, if technically feasible, by the information

---

[1]    See References in Text note below.

encoded in that sound recording, if any, by or under the authority of the copyright owner of that sound recording, that identifies the title of the sound recording, the featured recording artist who performs on the sound recording, and related information, including information concerning the underlying musical work and its writer;

\*       \*       \*

(f)   LICENSES FOR CERTAIN NONEXEMPT TRANSMISSIONS.—

(1)(A) Proceedings under chapter 8 shall determine reasonable rates and terms of royalty payments for transmissions subject to statutory licensing under subsection (d)(2) during the 5-year period beginning on January 1 of the second year following the year in which the proceedings are to be commenced pursuant to subparagraph (A) or (B) of section 804(b)(3), as the case may be, or such other period as the parties may agree.  The parties to each proceeding shall bear their own costs.

(B) The schedule of reasonable rates and terms determined by the Copyright Royalty Judges shall, subject to paragraph (2), be binding on all copyright owners of sound recordings and entities performing sound recordings affected by this paragraph during the 5-year period specified in subparagraph (A), or such other period as the parties may agree.  Such rates and terms shall distinguish among the different types of services then in operation and shall include a minimum fee for each such type of service, such differences to be based on criteria including the quantity and nature of the use of sound recordings and the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers.  The Copyright Royalty Judges shall establish rates and terms that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller.  In determining such rates and terms, the Copyright Royalty Judges—

(i)    shall base their decision on economic, competitive, and programming information presented by the parties, including—

(I)   whether use of the service may substitute for or may promote the sales of phonorecords or otherwise may interfere with or may enhance the sound recording copyright owner's other streams of revenue from the copyright owner's sound recordings; and

(II)   the relative roles of the copyright owner and the transmitting entity in the copyrighted work and the service made available to the

Add. 6

public with respect to relative creative contribution, technological contribution, capital investment, cost, and risk; and

(ii)  may consider the rates and terms for comparable types of audio transmission services and comparable circumstances under voluntary license agreements.

*     *     *

(g)  PROCEEDS FROM LICENSING OF TRANSMISSIONS.—

*     *     *

(2)  Except as provided for in paragraph (6), a nonprofit collective designated by the Copyright Royalty Judges to distribute receipts from the licensing of transmissions in accordance with subsection (f) shall distribute such receipts as follows:

(A)  50 percent of the receipts shall be paid to the copyright owner of the exclusive right under section 106(6) of this title to publicly perform a sound recording by means of a digital audio transmission.

(B)  $2^1/_2$ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Musicians (or any successor entity) to be distributed to nonfeatured musicians (whether or not members of the American Federation of Musicians) who have performed on sound recordings.

(C)  $2^1/_2$ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Television and Radio Artists (or any successor entity) to be distributed to nonfeatured vocalists (whether or not members of the American Federation of Television and Radio Artists) who have performed on sound recordings.

(D)  45 percent of the receipts shall be paid, on a per sound recording basis, to the recording artist or artists featured on such sound recording (or the persons conveying rights in the artists' performance in the sound recordings).

(3)  A nonprofit collective designated by the Copyright Royalty Judges to distribute receipts from the licensing of transmissions in accordance with subsection (f) may deduct from any of its receipts, prior to the distribution of such receipts to any person or entity entitled thereto other than copyright owners and performers who have elected to receive royalties from another designated

Add. 7

nonprofit collective and have notified such nonprofit collective in writing of such election, the reasonable costs of such collective incurred after November 1, 1995, in—

    (A) the administration of the collection, distribution, and calculation of the royalties;

    (B) the settlement of disputes relating to the collection and calculation of the royalties; and

    (C) the licensing and enforcement of rights with respect to the making of ephemeral recordings and performances subject to licensing under section 112 and this section, including those incurred in participating in negotiations or arbitration proceedings under section 112 and this section, except that all costs incurred relating to the section 112 ephemeral recordings right may only be deducted from the royalties received pursuant to section 112.

    (4) Notwithstanding paragraph (3), any nonprofit collective designated to distribute receipts from the licensing of transmissions in accordance with subsection (f) may deduct from any of its receipts, prior to the distribution of such receipts, the reasonable costs identified in paragraph (3) of such collective incurred after November 1, 1995, with respect to such copyright owners and performers who have entered with such collective a contractual relationship that specifies that such costs may be deducted from such royalty receipts.

*    *    *

    (j) DEFINITIONS.—As used in this section, the following terms have the following meanings:

*    *    *

    (3) A "broadcast" transmission is a transmission made by a terrestrial broadcast station licensed as such by the Federal Communications Commission.

*    *    *

    (5) A "digital audio transmission" is a digital transmission as defined in section 101, that embodies the transmission of a sound recording. This term does not include the transmission of any audiovisual work.

    (6) An "eligible nonsubscription transmission" is a noninteractive nonsubscription digital audio transmission not exempt under subsection (d)(1) that is made as part of a service that provides audio programming consisting, in whole or in part, of performances of sound recordings, including retransmissions of broadcast transmissions, if the primary purpose of the

Add. 8

service is to provide to the public such audio or other entertainment programming, and the primary purpose of the service is not to sell, advertise, or promote particular products or services other than sound recordings, live concerts, or other music-related events.

(7)  An "interactive service" is one that enables a member of the public to receive a transmission of a program specially created for the recipient, or on request, a transmission of a particular sound recording, whether or not as part of a program, which is selected by or on behalf of the recipient.  The ability of individuals to request that particular sound recordings be performed for reception by the public at large, or in the case of a subscription service, by all subscribers of the service, does not make a service interactive, if the programming on each channel of the service does not substantially consist of sound recordings that are performed within 1 hour of the request or at a time designated by either the transmitting entity or the individual making such request.  If an entity offers both interactive and noninteractive services (either concurrently or at different times), the noninteractive component shall not be treated as part of an interactive service.

\*      \*      \*

(9)  A "nonsubscription" transmission is any transmission that is not a subscription transmission.

\*      \*      \*

(12) A "retransmission" is a further transmission of an initial transmission, and includes any further retransmission of the same transmission. Except as provided in this section, a transmission qualifies as a "retransmission" only if it is simultaneous with the initial transmission.  Nothing in this definition shall be construed to exempt a transmission that fails to satisfy a separate element required to qualify for an exemption under section 114(d)(1).

\*      \*      \*

(14) A "subscription" transmission is a transmission that is controlled and limited to particular recipients, and for which consideration is required to be paid or otherwise given by or on behalf of the recipient to receive the transmission or a package of transmissions including the transmission.

(15) A "transmission" is either an initial transmission or a retransmission.

## 17 U.S.C. § 803

### § 803.  Proceedings of Copyright Royalty Judges

(a)  PROCEEDINGS.—

(1)  IN GENERAL.—The Copyright Royalty Judges shall act in accordance with this title, and to the extent not inconsistent with this title, in accordance with subchapter II of chapter 5 of title 5, in carrying out the purposes set forth in section 801.  The Copyright Royalty Judges shall act in accordance with regulations issued by the Copyright Royalty Judges and the Librarian of Congress, and on the basis of a written record, prior determinations and interpretations of the Copyright Royalty Tribunal, Librarian of Congress, the Register of Copyrights, copyright arbitration royalty panels (to the extent those determinations are not inconsistent with a decision of the Librarian of Congress or the Register of Copyrights), and the Copyright Royalty Judges (to the extent those determinations are not inconsistent with a decision of the Register of Copyrights that was timely delivered to the Copyright Royalty Judges pursuant to section 802(f)(1)(A) or (B), or with a decision of the Register of Copyrights pursuant to section 802(f)(1)(D)), under this chapter, and decisions of the court of appeals under this chapter before, on, or after the effective date of the Copyright Royalty and Distribution Reform Act of 2004.

\*       \*       \*

(c)  DETERMINATION OF COPYRIGHT ROYALTY JUDGES.—

\*       \*       \*

(3)  CONTENTS OF DETERMINATION.—A determination of the Copyright Royalty Judges shall be supported by the written record and shall set forth the findings of fact relied on by the Copyright Royalty Judges.  Among other terms adopted in a determination, the Copyright Royalty Judges may specify notice and recordkeeping requirements of users of the copyrights at issue that apply in lieu of those that would otherwise apply under regulations.

\*       \*       \*

(d)  JUDICIAL REVIEW.—

(1)  APPEAL.—Any determination of the Copyright Royalty Judges under subsection (c) may, within 30 days after the publication of the determination in the Federal Register, be appealed, to the United States Court of Appeals for the District of Columbia Circuit, by any aggrieved participant in the proceeding under subsection (b)(2) who fully participated in the proceeding and who would

be bound by the determination. Any participant that did not participate in a rehearing may not raise any issue that was the subject of that rehearing at any stage of judicial review of the hearing determination. If no appeal is brought within that 30-day period, the determination of the Copyright Royalty Judges shall be final, and the royalty fee or determination with respect to the distribution of fees, as the case may be, shall take effect as set forth in paragraph (2).

\*        \*        \*

(3) JURISDICTION OF COURT.—Section 706 of title 5 shall apply with respect to review by the court of appeals under this subsection. If the court modifies or vacates a determination of the Copyright Royalty Judges, the court may enter its own determination with respect to the amount or distribution of royalty fees and costs, and order the repayment of any excess fees, the payment of any underpaid fees, and the payment of interest pertaining respectively thereto, in accordance with its final judgment. The court may also vacate the determination of the Copyright Royalty Judges and remand the case to the Copyright Royalty Judges for further proceedings in accordance with subsection (a).