**ORAL ARGUMENT SCHEDULED FOR FEBRUARY 17, 2023**
**No. 21-1245**
**(Consolidated with Nos. 21-1243, 21-1244)**

# United States Court of Appeals
# for the District of Columbia Circuit

---

NATIONAL ASSOCIATION OF BROADCASTERS,

*Appellant*,

v.

COPYRIGHT ROYALTY BOARD; LIBRARIAN OF CONGRESS,

*Appellees*.

———

GOOGLE LLC, ET AL.,

*Intervenors*.

---

On Appeal from a Final Determination of the Copyright Royalty Board
Docket No. 19-CRB-0005-WR (2021-2025)

---

**FINAL REPLY BRIEF FOR APPELLANT**
**NATIONAL ASSOCIATION OF BROADCASTERS**
**PUBLIC COPY—SEALED MATERIAL DELETED**

---

Joseph R. Wetzel
Andrew M. Gass
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 391-0600

Sarang V. Damle
Blake E. Stafford
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
sy.damle@lw.com

Samir Deger-Sen
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for National Association of Broadcasters*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................... ii

GLOSSARY ........................................................................... iv

INTRODUCTION ........................................................................ 1

ARGUMENT ............................................................................ 3

I.    THE BOARD'S DECISION TO SUBJECT SIMULCASTERS TO
      THE SAME RATES THAT APPLY TO CUSTOM RADIO MUST BE
      SET ASIDE ..................................................................... 3

      A.    The Board's Analysis Contravenes The Statutory Text ..................... 3

      B.    The Board's Analysis Rests On An Arbitrary Presumption In
            Favor Of Uniform Rates ............................................... 11

      C.    The Board's Analysis Impermissibly Relies On An Absence Of
            Contrary Evidence Instead Of The Presence Of Substantial
            Evidence .............................................................. 14

      D.    The Board's Reliance On Generalized Competition Evidence
            Does Not Reflect Reasoned Decisionmaking ............................. 19

II.   THE BOARD'S DECISION TO DOUBLE THE MINIMUM FEE
      MUST BE SET ASIDE ............................................................ 21

CONCLUSION ......................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*City of Vernon v. FERC,*
  845 F.2d 1042 (D.C. Cir. 1988) ................................................................. 12

*Farrell v. Blinken,*
  4 F.4th 124 (D.C. Cir. 2021) .................................................................... 18

*Johnson v. Copyright Royalty Board,*
  969 F.3d 363 (D.C. Cir. 2020) ............................................... 12, 17, 22, 23

*Judulang v. Holder,*
  565 U.S. 42 (2011) ........................................................................... 13, 14

*Loughrin v. United States,*
  573 U.S. 351 (2014) ................................................................................. 9

*Music Choice v. Copyright Royalty Board,*
  970 F.3d 418 (D.C. Cir. 2020) ................................................................ 15

*PPL Wallingford Energy LLC v. FERC,*
  419 F.3d 1194 (D.C. Cir. 2005) .............................................................. 19

*Public Citizen v. Federal Motor Carrier Safety Administration,*
  374 F.3d 1209 (D.C. Cir. 2004) ................................................................ 8

*SAS Institute, Inc. v. Iancu,*
  138 S. Ct. 1348 (2018) ............................................................................. 4

*SoundExchange, Inc. v. Copyright Royalty Board,*
  904 F.3d 41 (D.C. Cir. 2018) ........................................................... 10, 12

*United States v. Byfield,*
  391 F.3d 277 (D.C. Cir. 2004) ................................................................ 15

## STATUTES

5 U.S.C. § 556(d) ....................................................................... 12, 13

17 U.S.C. § 114(f)(1)(B) ..................................................... 1, 3, 4, 8, 9

**Page(s)**

17 U.S.C. § 114(f)(1)(B)(i) ............................................................9

17 U.S.C. § 114(g)(2) ...................................................................22

17 U.S.C. § 114(g)(3) ...................................................................22

**OTHER AUTHORITIES**

67 Fed. Reg. 45,240 (July 8, 2002) ...............................................14

81 Fed. Reg. 26,316 (May 2, 2016) .........................................13, 17

U.S. Copyright Office, *Copyright and the Music Marketplace* (2015),
   https://www.copyright.gov/policy/musiclicensingstudy/copyright-
   and-the-music-marketplace.pdf ................................................6

# GLOSSARY

| | |
|---|---|
| Board or CRB | Copyright Royalty Board |
| Ex. | CRB Hearing Exhibit |
| Final Determination | *Determination of Rates and Terms for the Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Those Performances (Web V)*, CRB No. 19-CRB-0005-WR (2021-2015) (July 22, 2021), redacted version published at 86 Fed. Reg. 59,452 (Oct. 27, 2021) |
| NAB | National Association of Broadcasters |
| PFFCL | Proposed Findings of Fact and Conclusions of Law |
| Tr. | CRB Hearing Transcript |

## INTRODUCTION

The government's response is notable principally for its refusal to engage with the arguments in NAB's brief. The government ignores virtually all of NAB's statutory and arbitrary-and-capricious arguments, choosing instead to litigate as if this appeal were solely about the "evidentiary weight" assigned by the Board to certain pieces of evidence. Gov't Br. 63. And in the few instances where the government does attempt to address NAB's arguments, it does so by reimagining the statutory text and the Board's decision. That the government resorts to such distortions simply confirms that the Board's decision to set an identical rate for custom radio and simulcasts of over-the-air radio must be set aside.

The government does not dispute that—despite a statute clearly commanding that the "rates" set by the Board "shall distinguish among the different types of [statutorily eligible webcasting] services," 17 U.S.C. § 114(f)(1)(B)—the Board adopted a rate structure that fails to distinguish among two undeniably "different" types of such services: simulcasts and custom radio platforms. The government tries to argue that those identical rates can be justified by the record. That is wrong—but, even if the government were correct, that alone cannot save the Board's decision. The Copyright Act and the Administrative Procedure Act require more than that the Board reach a result that the government can contrive reasons to defend in litigation. Those statutes impose important substantive and procedural requirements that must

be respected, but were ignored here.  Instead of adhering to the plain text of the Copyright Act requiring different rates for different "types" of services, the Board did the opposite: it deployed an effectively insurmountable presumption in favor of *uniform* rates for commercial nonsubscription webcasting services.  And it did so without explaining the basis for this presumption, or why it applies only in the context of simulcasters.  And the Board compounded this error by concluding that its unexplained presumption could be overcome only by demonstrating that simulcasters were "as a rule" distinct from every conceivable kind of webcasting service, even those that are tiny players in the market.

Yet, one can search the government's brief in vain for any defense of the Board's decision on these fronts.  Instead, the government tries to portray this appeal as involving only evidentiary disputes.  Even in that respect, the government's arguments are meritless.  But the government's effort to shift the focus away from NAB's challenges to the Board's reasoning only underscores that the Board's decision is indefensible on its own terms.

Equally unpersuasive is the government's attempt to justify the Board's decision to double the minimum fee that webcasters must pay to SoundExchange. The government offers a handful of responses that ignore the statutory scheme in favor of a cost-subsidization regime that the government has devised out of whole

cloth, supported with reasoning that is nowhere to be found in the Board's decision. The Board's minimum fee determination must also be set aside.

## ARGUMENT

### I.    THE BOARD'S DECISION TO SUBJECT SIMULCASTERS TO THE SAME RATES THAT APPLY TO CUSTOM RADIO MUST BE SET ASIDE

#### A.    The Board's Analysis Contravenes The Statutory Text

The statutory text is clear:  the "rates and terms" set by the Board "shall distinguish among the different types of services," with the "differences to be based on criteria including the quantity and nature of the use of sound recordings and the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers."  17 U.S.C. § 114(f)(1)(B).  Simulcast and custom radio are undisputedly "different types of services" according to the statutorily enumerated "criteria," so Section 114(f)(1)(B) required the Board to "distinguish among" them.  The Board's refusal to do so contravenes that statutory command. *See* NAB Br. 22-28.  In response, the government simply rewrites both the statute and the Board's decision.

1.    The government mischaracterizes the statute from the outset when it claims that Section 114(f)(1)(B) "*permits*" the Board to "'distinguish among the different types'" of services in the Board's "discretion."  Gov't Br. 48, 60 (emphasis added).  But the statute does not merely "permit" the Board to distinguish among

different types of services; it *requires* the Board to do so based on the statutory criteria.  17 U.S.C. § 114(f)(1)(B) (requiring that the Board "*shall* distinguish among the different types of services" (emphasis added)).    Congress's use of that "mandatory" language "imposes a nondiscretionary duty" that the Board must carry out and cannot ignore.  *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1354-55 (2018); *see* NAB Br. 22, 26.

The government does not seriously deny that simulcast and custom radio are "different types of services" according to the statutorily enumerated criteria: they differ in terms of  (1) "the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers," and (2) "the quantity and nature of the use of sound recordings."  17 U.S.C. § 114(f)(1)(B); *see* NAB Br. 23-26.  The government does not mention the second criterion at all.  And while the government at least mentions the first one, *see* Gov't Br. 59-62, it does not actually dispute that simulcast and custom radio differ on this dimension as well.

To the contrary, the government admits that simulcast and custom radio occupy different spots on the "continuum" of interactivity, Gov't Br. 60, and does not seriously dispute that, as NAB explained and the Board recognized, a webcasting service's "interactivity is a good proxy for its ability to substitute" for the purchase of records, *Final Determination* 225-26 (JA1337-38).    In fact, it was precisely

**MATERIAL UNDER SEAL DELETED**

because over-the-air radio was not interactive that Congress deemed it unthreatening as a substitute for, and indeed promotional of, record sales. *See* NAB Br. 7-10.[1]

The government briefly suggests that, in recognizing the connection between the degree of interactivity and substitutability, the Board was "actually merely recit[ing] NAB's own view of the subject." Gov't Br. 59. But the Board did not reject that view; instead, it *accepted* the NAB's premise that substitutability is a function of the degree of interactivity, but concluded that NAB had failed to establish that "simulcasting, as a rule, is materially less interactive than the full scope of noninteractive webcasting." *Final Determination* 225-26 (JA1337-38). Indeed, the Board expressly noted that there was "evidence" that "record companies ███████

███████████████████████████████████████████████████████ because those services are less likely to displace sales of sound recordings." *Id.* at 226 (JA1338)

---

[1]    The government seems to suggest that the only kind of "interactivity" relevant to a service's "ability to substitute for the purchase of records" is the ability to select particular songs "on demand." Gov't Br. 59-60. That is post hoc rationalization; the government points to nothing in the Board's opinion to support that premise. Nor does it make any sense: there is no reason to assume that fully "on demand" services have a significant substitutional effect because of their interactivity, while services that are *almost* "on demand" and those that have no interactivity whatsoever somehow have an *identical* (and minimal) substitutional effect. Indeed, the government's own premise that interactivity exists on a "continuum" (Gov't Br. 60) contradicts that hard dichotomy. And in declining to apply *any* "interactivity adjustment" between ad-supported Spotify and ad-supported custom radio, *see Final Determination* 143, 159 (JA1255, 1271), the Board implicitly rejected the notion that selecting songs "on demand" constitutes a unique category of "interactivity."

**MATERIAL UNDER SEAL DELETED**

(quoting testimony of UMG executive that "typically ███████████████

███████████████████████"); *see also, e.g.*, U.S. Copyright Office,

*Copyright and the Music Marketplace* 178 (2015), https://www.copyright.gov/

policy/musiclicensingstudy/copyright-and-the-music-marketplace.pdf    (observing

that, among "custom and noncustom" webcasting services, "the substitutional effect

of personalized radio . . . may be greater than that of services offering a completely

noncustomized experience").  Ultimately, the government provides no basis to doubt

the common-sense conclusion that internet transmissions of over-the-air radio are

less substitutable for record sales (or other record company revenue streams, like

royalties from on-demand services) than highly interactive custom radio services

like Pandora.

Similarly, with respect to the promotional effects component of the first

statutory criterion, the government does not dispute that, just like terrestrial radio

broadcasts, simulcasts possess the "characteristics that enhance promotional value"

recognized by the Board—"tight playlists with limited recordings and repeated plays

of recordings on those playlists." *Final Determination* 226 (JA1338); *see also* Gov't

Br. 60-61.  The government responds by merely repeating (at 61-62) the Board's

flawed fixation on comparing the "promotional value of simulcasts" with "the

promotional value [of] terrestrial radio plays." *Final Determination* 226 (JA1338).

But even if simulcast were less promotional than traditional radio, that does not mean

**MATERIAL UNDER SEAL DELETED**

it is *as* promotional as *custom radio*.  The government's reasoning on this point, like the Board's, is just a non sequitur.  And, in any event, neither the Board nor the government offers any explanation as to why the promotional effect of programming would differ based on whether it was transmitted over the internet or over the airwaves.[2]  To the contrary, the features found by the Board that make radio programming distinctly promotional—"tight playlists" and "repeated plays," *id.*—are entirely unrelated to the means of transmission.[3]

Thus, like the Board, the government does not actually identify any affirmative basis for how simulcast and custom radio are the same along the statutory criteria.  That gaping hole in the government's defense—and the Board's reasoning—should be dispositive.  As a straightforward matter of statutory interpretation, if custom radio and simulcast are "different types of services," then

---

[2]  Indeed, even the government treats simulcast and terrestrial radio together when it suits its argument.  *See* Gov't Br. 51-52 (suggesting that "simulcasters" compete with "other streaming services" based on ███████████████ ███████████████████████████████████████████████ (emphasis added)).

[3]  Although terrestrial radio may have greater overall listenership than simulcasts, the Board did not justify its decision on that basis, for good reason.  The rates set in this proceeding are per-stream (i.e., per-play per-listener).  Thus, as the Board appreciated, the relevant question is the promotional effect on an individual simulcast listener—and there is no reason to think the promotional effect on a listener would differ based on the medium on which they were listening.

the Board was required to "distinguish" among them.  17 U.S.C. § 114(f)(1)(B).  It did not do so.  And that failure alone warrants vacatur of the Board's decision.

2.    Faced with this straightforward statutory argument, the government tries to shift the focus.  It principally fixates on the existence of a *third* type of service—non-custom, non-simulcast "internet radio."  Gov't Br. 58-59.  That argument fails on its own terms.  *See infra* at 16-18.  But more fundamentally, comparing simulcast to internet radio is another non sequitur.  The existence of internet radio does not vitiate the Board's statutory obligation to "distinguish among the different types of services" that participated in this proceeding—simulcast and custom radio.  17 U.S.C. § 114(f)(1)(B); *see* NAB Br. 26-27.  And while the government suggests that uncertainty about internet radio might make the Board's obligation to differentiate among different types of services more "complex[]," Gov't Br. 59, that does not justify ignoring mandatory statutory language.  *See Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1221 (D.C. Cir. 2004).

The government also tries to evade the statute's differentiation requirement by claiming that all the statute demands is a general inquiry into whether "willing buyers and willing sellers would agree to a different rate" for two services.  Gov't Br. 51.  But that argument collapses two parts of the statute—effectively reading out half of the relevant statutory language.  *See* NAB Br. 23.  Section 114(f)(1)(B) requires the Board to first "distinguish" among services that are of "different types"

"based" on the enumerated "criteria."  17 U.S.C. § 114(f)(1)(B).  Having identified the different types of services, the Board *then* must assess the rates "a willing buyer and a willing seller" would pay for each "type of service" based on specified "economic, competitive, and programming information." *Id.* § 114(f)(1)(B)(i).  The government's suggestion that all that is required is just a free-standing willing buyer/willing seller analysis gives the first half of the provision no work to do.  *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) (noting "the 'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute'" (citation omitted)).

In any event, the government's argument does not explain the Board's actual decision.  The Board did not conduct any analysis of what rate willing buyers and willing sellers would agree to for simulcast streams of radio programming, and thus had no basis to conclude that the rate would be the same for custom radio streams. *See Final Determination* 249 (JA1361) (stating that because NAB "ha[d] not sustained its case for a separate rate for simulcasters," the Board would not "proceed through an unnecessary analysis of the NAB's requested royalty rates").  Nor could it, given the evidence introduced by NAB showing that willing buyers and sellers had, in fact, agreed to materially different rates for simulcasters. *See, e.g.*, Ex. 2150 ¶¶ 63-75  (JA1596-1608)  (detailing  numerous  willing  buyer-willing  seller agreements that include distinct rates for custom radio and simulcasts); Ex. 2013 at

8 (JA1542) (example of agreement distinguishing between simulcasts and custom radio).

Finally, the government attempts (at 49-50) to justify its gloss on the statute by pointing to this Court's decision in *SoundExchange, Inc. v. Copyright Royalty Board*, 904 F.3d 41 (D.C. Cir. 2018), which affirmed the Board's decision in *Web IV* to "set different statutory rates for ad-based and subscription-based noninteractive webcasters." *Id.* at 57-59. But nothing in this Court's affirmance of the Board's decision in *Web IV* to *distinguish* among different types of services lends support to the Board's present decision, on a different record, to depart from the statutory mandate. Indeed, neither the Board nor this Court addressed the statutorily enumerated criteria for rate differentiation in *Web IV*. Instead, the Board's decision was premised on a different rationale, that "ad-based services make up 'a different segment of the market' than subscription-based services." *Id.* at 58 (citation omitted). Nothing in this Court's decision suggests that the Board is free to determine the propriety of rate differentiation based *only* on market segmentation, to the exclusion of the criteria set forth in the statute. And nothing in this Court's

decision remotely suggests an implicit rejection of the statutory argument that was not even relevant to the *Web IV* appeal.[4]

## B.     The Board's Analysis Rests On An Arbitrary Presumption In Favor Of Uniform Rates

In any event, even if the Board's decision had conformed with the Copyright Act's requirements, the Board's reasoning was arbitrary and capricious. The Board's core rationale was that NAB failed to surmount a "burden of demonstrating" that simulcasting "materially" differs "*as a rule*" from "*all other*" conceivable forms of commercial nonsubscription webcasting. *Final Determination* 219, 225-27 (JA1331, 1337-39). As NAB explained, this reasoning creates a presumption in favor of uniform rates for all commercial nonsubscription webcasters that has no basis in the statute, rests on a set of undefined and seemingly insurmountable criteria, and is inconsistently applied by the Board. NAB Br. 29-34.

The government completely ignores this fundamental flaw in the Board's reasoning. Indeed, even though it was a central focus of NAB's brief, the government remarkably does not even *mention* the Board's "as a rule" test, or the Board's imposition of a "burden" on NAB to show that rate-differentiation is warranted. As a result, the government does not attempt to connect the presumption

---

[4]     While the Board in *Web IV* "declined to differentiate between simulcasters and other ad-based commercial services," Gov't Br. 50, that aspect of the Board's decision was not addressed by this Court.

of uniform rates to the statute, which (as explained above) "specifically contemplates" "distinct[ion]" among "webcasting services." *SoundExchange*, 904 F.3d at 57; *see* NAB Br. 29-31. Nor does the government address the undefined and seemingly insurmountable aspects of the presumption—such as the extraordinary "as a rule" requirement—which are completely unexplained in the Board's decision. NAB Br. 31-34. The government's brief simply confirms that the Board's analysis reflects the kind of vague, "'know-it-when-we-see-it' approach" to agency decisionmaking that this Court has long rejected. *City of Vernon v. FERC*, 845 F.2d 1042, 1048 (D.C. Cir. 1988).

Seeking to fill the gap, SoundExchange points (Intervenor Br. 12-13) to a provision in the APA, which provides: "Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d). The government does not advance this argument, and for good reason: The Board did not rely on that provision to explain its reasoning, so the Court "cannot rely on [it] to sustain [the Board's] decision." *Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 387 (D.C. Cir. 2020); *see id.* at 390 ("We cannot accept appellate counsel's post hoc rationalizations for agency action; for an agency's order must be upheld, if at all, on the same basis articulated in the order by the agency itself." (citation omitted)). In any event, even if the Court could consider it, SoundExchange's argument wrongly assumes that Section 556(d) is a one-way requirement that applies only to NAB.

SoundExchange, however, was the "proponent" of an "order" prescribing uniform rates for all commercial webcasters, including simulcasters, and thus should have "ha[d] the burden" to support that order. 5 U.S.C. § 556(d). But the Board relieved SoundExchange of that burden entirely. *See* NAB Br. 30-31. And, of course, nothing in the APA remotely supports the "as a rule" aspect of the Board's presumption.

SoundExchange also points to prior Board decisions. Intervenor Br. 11-12. But simply citing prior instances of unreasoned decisionmaking by the same agency, on different records, does not justify an arbitrary and capricious decision. If it could, the absence of an appeal in a prior proceeding could effectively lock in an arbitrary and capricious decision in perpetuity. That is not the law. *See, e.g.*, *Judulang v. Holder*, 565 U.S. 42, 61 (2011) ("Arbitrary agency action becomes no less so by simple dint of repetition. . . . And longstanding capriciousness receives no special exemption from the APA.").

In any event, the Board's insurmountable "as a rule" requirement—which was the crux of the flawed reasoning here—did not fully emerge until this proceeding. In *Web IV*, the Board largely relied on an absence of certain evidence that it believed was necessary to warrant a different rate for simulcasters. *See* 81 Fed. Reg. 26,316,

26,319-23 (May 2, 2016).[5]  When NAB endeavored to supply that evidence in this proceeding, the Board simply moved the goalposts, coming up with new or different reasons for rejecting NAB's evidence—including a repeated emphasis on its vague "as a rule" requirement.  Indeed, it was only by ratcheting up the presumption into the insurmountable "as a rule" requirement that NAB's new and significant evidence could be disregarded.  That shifting presumption only compounds the Board's arbitrary and capricious decisionmaking, not absolves it.

SoundExchange, for its part, also fails to acknowledge the "as a rule" aspect of the Board's decision.  The fact that neither the government nor SoundExchange even addresses—let alone defends—that aspect simply underscores that it is indefensible.

### C.    The Board's Analysis Impermissibly Relies On An Absence Of Contrary Evidence Instead Of The Presence Of Substantial Evidence

Rather than meaningfully addressing the flaws described above, the government spends nearly all of its argument on the evidence.  But even as to that,

---

[5]    Although SoundExchange maintains (Intervenor Br. 12) that the burden has been "the rule" since *Web I*, the extraordinary burden imposed by the Board in this case is nothing like the burden imposed in *Web I*.  In *Web I*, there was "*no* record evidence to distinguish the[] services."  67 Fed. Reg. 45,240, 45,255 (July 8, 2002).  In this case, by contrast, the Board simply catalogued the substantial and largely one-sided evidence presented by NAB and declared it not persuasive enough.  In any event, an arbitrary "rule's vintage" does not insulate it from APA review. *Judulang*, 565 U.S. at 61.

the government gets it wrong.  The Board's reasoning rested on NAB's supposed failure to supply enough evidence justifying a different rate, while at the same time failing to point to any evidence affirmatively supporting its decision to adopt a uniform rate.  NAB Br. 34-37.  That reasoning flouts the basic administrative law principle, completely unacknowledged in the government's brief, that "reasoned decisionmaking . . . 'requires more than an absence of contrary evidence; it requires substantial evidence to support a decision.'"  *Music Choice v. Copyright Royalty Bd.*, 970 F.3d 418, 429 (D.C. Cir. 2020) (citation omitted); *cf. also United States v. Byfield*, 391 F.3d 277, 280 (D.C. Cir. 2004) ("The record in fact pits some evidence against nothing; as we've said in another context, 'something . . . outweighs nothing every time.'" (ellipses in original) (citation omitted)).

Instead of addressing this argument, the government largely just recasts the Board's impermissible absence-of-evidence reasoning as "weigh[ing]" the "evidence."  *See* Gov't Br. 54, 56-64.[6]  This effort fails.

---

[6] At times, the government also just makes up evidence of its own—declaring, for example, that "simulcasts offer essentially the same content using the same technology to the same listeners as other ad-supported commercial streaming services."  Gov't Br. 53.  The Board did not say anything close to that in its decision, and it has zero support in the record.  To the contrary, the Board found that simulcasts in fact contain different content—"tight playlists with limited recordings."  *Final Determination* 226 (JA1338).

**MATERIAL UNDER SEAL DELETED**

A prime example of this flaw in the Board's reasoning is the Board's reference to non-custom, non-simulcast "internet radio," which the government touts as the centerpiece of the Board's decision. Gov't Br. 54-59. Such internet radio providers did not participate in this proceeding. *See Final Determination* 2 n.1 (JA1114). And the *only* evidence about internet radio's characteristics came from NAB's own expert, who testified that internet radio services "are not a significant part of the streaming market." Ex. 2150 ¶ 35 (JA1583); *see* Tr. 3355 (JA1473) ("███████████ ████████████████████████████████████████████████████"). He also explained that the few internet radio providers in existence offer services that are "more similar to custom radio." Ex. 2150 ¶ 35 (JA1583). Unlike simulcast, internet radio does not "feature much, if any, non-music content," and it often provides "greater user functionality than what is possible with a linear simulcast stream," such as allowing "listeners to pause and skip songs on an internet radio station, which is not available with a simulcast." *Id.* There was *no* evidence contradicting that testimony or otherwise suggesting that internet radio shared the unique features of simulcasts discussed above.

The Board nevertheless claimed that treating internet radio like custom radio "was not adequately supported by the record" because the Board was not *also* given "persuasive evidence of how widely-available such features are on internet radio." *Final Determination* 224, 249 (JA1336, 1361). Thus, as the government reinforces

16

on appeal, the Board's conclusion—that internet radio should not be treated like custom radio—rested entirely on "the absence of [enough contrary] evidence." Gov't Br. 57. The government does not respond to NAB's argument but instead just repeats the Board's reasoning without addressing the flaws identified.

Moreover, the Board's reliance on the absence of evidence about internet radio was particularly improper because it came out of the blue. Internet radio was not once mentioned in the Board's *Web IV* analysis regarding a separate rate for simulcasters, *see* 81 Fed. Reg. at 26,319-23. And SoundExchange did not even argue at the hearing or in its voluminous pre-hearing submissions that the presence of internet radio means that simulcasts and custom radio should be subject to the same rate. Nor did SoundExchange offer any competing evidence about internet radio at all. And the Board did not question NAB's expert about internet radio during the hearing or otherwise suggest that it lacked necessary evidence about it.[7]

NAB thus had no reason to anticipate this internet-radio concern and no reason to supply additional evidence addressing it. *Cf. Johnson*, 969 F.3d at 383 (vacating and remanding rate structure that was "proposed for the very first time *after* the evidentiary record was closed" such that "the other parties never had a chance to submit evidence" addressing it). That the Board had to conjure a novel,

---

[7] This argument first appeared in SoundExchange's post-hearing reply brief. *See* SoundExchange's Corrected Replies to NAB's PFFCL ¶¶ 8, 24 (JA1105-07).

unsubstantiated concern about internet radio simply demonstrates that the Board's decision rests on "haphazard and shape-shifting" criteria—"the very definition of arbitrary and capricious agency action." *Farrell v. Blinken*, 4 F.4th 124, 138 (D.C. Cir. 2021). Instead of defending that approach, the government spends pages just repeating the Board's unsubstantiated concern, without even trying to address the critical flaws in reasoning that NAB identified.

The Board's elevation of the "absence of evidence" over "some evidence" recurred in other places as well. As noted above, *see supra* at 6-7, the government repeats (at 60-62) the Board's canard about the absence of "adequate[]" evidence of the "promotional value of simulcasts in relation to the promotional value labels seek via terrestrial [over-the-air radio] plays." *Final Determination* 226 (JA1338). But as NAB explained, there is no basis in the record or common sense to think that the promotional value of over-the-air radio play diminishes when the exact same programming is retransmitted via simulcast. The Board thus has no reasoned basis for insisting on evidence proving the contrary—that the promotional value of over-the-air radio play does *not* diminish, on a listener-by-listener basis, when it is simulcast. The same is true of the Board's refusal to consider analogous licensing agreements showing licensors' willingness to accept different (and lower) rates for less interactive services; the Board dismissed this unrebutted evidence based on the

absence of *other* evidence showing what hypothetical provisions in the agreements "actually say." *Id.* at 223, 225 (JA1335, 1337).

Yet again, although NAB raised these arguments in its opening brief (NAB Br. 34-37), the government proceeds as if they do not exist. That effort to whistle past the Board's arbitrary and capricious decisionmaking should be rejected.

### D. The Board's Reliance On Generalized Competition Evidence Does Not Reflect Reasoned Decisionmaking

The government also neglects to meaningfully address the problems plaguing the Board's perfunctory "competition" analysis. *Final Determination* 227-28 (JA1339-40). The government acknowledges that this competition evidence is the *only* affirmative evidence of any kind in the Board's decision to support its conclusion to set identical rates for simulcast and custom radio. Gov't Br. 51-52. And as NAB explained, the Board relied on random, high-level mentions of "competition" in a way that is plainly too generalized to have any meaningful connection to the statutory question of differentiating among webcasters—a flaw NAB raised below that the Board completely ignored. NAB Br. 37-40.

Notably, the government does not dispute that the Board failed to address NAB's objections to this evidence. That failure alone "renders its decision arbitrary and capricious." *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005); *see* NAB Br. 39.

Nor does the government dispute the substance of that objection—that the references to "competition" in the cited documents are over-inclusive, as they describe as "competitors" services that operate in entirely separate *markets*. NAB Br. 37-39. Thus, to the extent identification of "distinct submarket[s]" among webcasters is the goal, Gov't Br. 51, such high-altitude references to competition cannot plausibly establish those distinctions.

The government's only response is that, in *other* parts of its decision, the Board *did* differentiate between entities that are competitors in a general sense—such as differentiating among subscription and ad-supported services, which the government says "are not in competition with one another." Gov't Br. 52-53. But that argument only underscores the inconsistency and irrationality in the Board's reasoning as to simulcasters. The same evidence the Board used to conclude that simulcasters and custom radio services are competitors also describes subscription and ad-supported services like SiriusXM, Pandora, and Spotify as "competitor[s]" in the "audio marketplace." Ex. 5472 at 11-12 (JA1022-23). Had the Board applied the same reasoning to subscription services as it did to simulcasters, it would have had to conclude that subscription services and ad-supported services in fact *do* compete, and it should have declined to set different rates for subscription services on that basis. The Board's unreasoned and internally inconsistent reliance on generalized evidence of competition is arbitrary and capricious. NAB 39-40.

*    *    *

In short, the Board's decision as to the rates for simulcasters suffers from a series of errors that contravene the statutory text and basic precepts of reasoned decisionmaking.  Any one of these errors is sufficient to warrant vacatur, and together they reflect a decision that went badly astray.  The government's brief is largely an effort in evasion, and does nothing to salvage the Board's reasoning.  The Board's simulcast decision must be set aside.

## II.    THE BOARD'S DECISION TO DOUBLE THE MINIMUM FEE MUST BE SET ASIDE

To justify the increase in minimum fee, the Board relied on a supposed "increase in SoundExchange's average administrative cost." *Final Determination* 289 (JA1401).[8]   The Board arrived at that conclusion by looking to SoundExchange's "total administrative costs," which included the costs of "the administration of licenses *other than* the webcasting license," as well as costs wholly "unrelated to license administration, such as property and equipment depreciation, interest and tax expenses, and amortization of the cost of participating in rate-setting proceedings." *Id.* at 287 (JA1399).  That analysis flouts the statutory scheme and Board precedent, which contemplate a minimum fee tethered to the incremental cost

---

[8]    Although SoundExchange suggests (Intervenor Br. 19) that other "factors" supported an increase in the minimum fee, those other factors did not support the full amount of the increase.  *See* NAB Br. 17 n.2.

of webcasting license administration.  NAB Br. 40-46.  Rather than defend the Board's reasoning, the government instead substitutes a series of new—but equally meritless—rationales.[9]

The government's basic premise is that covering these additional costs is warranted because *someone* has to pay SoundExchange's administrative costs, and the smallest licensees should not be permitted to "free-rid[e]" by being "excused from shouldering any of the fixed costs associated with [the licensing] scheme." Gov't Br. 89-91.  But that premise makes absolutely no sense.  The statutory scheme specifically contemplates that SoundExchange's operating costs are to be borne by *the copyright owners*, not licensees.  NAB Br. 41 (discussing 17 U.S.C. § 114(g)(2)-(3)).  And although the government pays lip service to the statute, Gov't Br. 90, it makes no effort to reconcile its position that licensees bear the administrative cost with the statutory terms.  In any event, the Board did not rely on this "no free-riding" rationale in its decision, which is reason enough to reject it.  *See Johnson*, 969 F.3d at 390.

---

[9]    At the outset, the government briefly suggests that the Board did *not* consider "costs 'unrelated to license administration'" and that this merely reflected "NAB's own view."  Gov't Br. 90 (quoting *Final Determination* 287 (JA1399)).  But as the government ultimately admits (at 96-97), the Board did not disagree with that view; rather, it believed that consideration of such costs as part of "SoundExchange's average administrative costs" is appropriate.  *Final Determination* 287 (JA1399).

The government also tries to justify the inclusion of the costs that are not associated with administering webcasting licenses as part of the minimum-fee calculation by maintaining that "SoundExchange's administrative costs may not be easily allocated as between webcasting and other licenses." Gov't Br. 96. But that argument too is nowhere to be found in the Board's decision and thus cannot sustain it on appeal. *See Johnson*, 969 F.3d at 390. And, notably, not even SoundExchange's brief suggests that it would be unable to appropriately allocate its administrative costs. Thus, the government's baseless speculation about the "eas[e]" with which SoundExchange could allocate its administrative costs is unavailing.

Finally, the government relies on the Board's decisions in *Web II* and *Web IV*. Gov't Br. 92-94; *accord* Intervenor Br. 20. But as NAB explained, the only Board decision that meaningfully considered this issue is *Web I*, which concluded that the minimum fee covers only the *incremental* cost of administering each additional webcasting license. NAB Br. 42-43. These later decisions did not consider whether total or incremental cost was the appropriate metric because the point was not in dispute. The drive-by references to "average administrative cost" in those decisions (Gov't Br. 93) did not reflect reasoned decisionmaking or a reasoned explanation for departing from *Web I*, and the Board's decision to treat those later decisions as precedent—indeed, as precedent warranting departure from *Web I*—was arbitrary and capricious. NAB Br. 44.

## CONCLUSION

The Board's Determination as to the royalty rates for simulcasters and as to the minimum fee should be reversed or, at a minimum, vacated and remanded for further proceedings.

Dated:  January 12, 2023

Joseph R. Wetzel
Andrew M. Gass
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 391-0600

Respectfully submitted,

*/s/ Sarang V. Damle*
Sarang V. Damle
Blake E. Stafford
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
sy.damle@lw.com

Samir Deger-Sen
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for National Association of Broadcasters*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's order dated April 28, 2022, because it contains 5,470 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: January 12, 2023

*/s/ Sarang V. Damle*
Sarang V. Damle

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2023, I electronically filed the foregoing brief with the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the CM/ECF system.

I further certify that the confidential version of the foregoing brief was also served on counsel for all parties by electronic transfer.

*/s/ Sarang V. Damle*
Sarang V. Damle