PUBLIC COPY—SEALED MATERIAL DELETED
ORAL ARGUMENT SCHEDULED FOR FEBRUARY 17, 2023

No. 21-1243
Consolidated with Nos. 21-1244, 21-1245

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL RELIGIOUS BROADCASTERS
NONCOMMERCIAL MUSIC LICENSE COMMITTEE,

*Appellant,*

v.

COPYRIGHT ROYALTY BOARD; LIBRARIAN OF CONGRESS,

*Appellees,*

GOOGLE LLC; PANDORA MEDIA, LLC;
SIRIUS XM RADIO INC.; SOUNDEXCHANGE, INC.,

*Intervenors for Respondent.*

On Appeal from a Final Determination of the Copyright Royalty Board

**BRIEF OF INTERVENORS GOOGLE LLC,
THE NATIONAL ASSOCIATION OF BROADCASTERS,
AND THE NATIONAL RELIGIOUS BROADCASTERS
NONCOMMERCIAL MUSIC LICENSE COMMITTEE**

Sarang V. Damle
Blake E. Stafford
LATHAM & WATKINS LLP
555 Eleventh Street NW
Washington, DC 20004
(202) 637-2200
Sy.damle@lw.com

*Counsel for Intervenor National
Association of Broadcasters*

Kenneth L. Steinthal
KING & SPALDING LLP
50 California Street
Suite 3300
San Francisco, CA 94111
(415) 318-1200
ksteinthal@kslaw.com

*Counsel for Intervenor
Google LLC*

*(Additional counsel listed on inside cover)*

Final Brief: January 12, 2023

Joseph R. Wetzel
Andrew M. Gass
Brittany N. Lovejoy
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 84111
(415) 391-0600

Samir Deger-Sen
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for Intervenor National
Association of Broadcasters*

Joshua N. Mitchell
David P. Mattern
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500

*Counsel for Intervenor
Google LLC*

Karyn K. Ablin
FLETCHER, HEALD &
HILDRETH, PLC
1300 N. 17th Street
11th Floor
Arlington, VA 22209
(703) 812-0443
ablin@fhhlaw.com

*Counsel for Intervenor
National Religious Broadcasters
Noncommercial Music License
Committee*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with Circuit Rule 28(a)(1) of the Rules of this Court, the undersigned, counsel of record for Google LLC, certifies as follows:

## A.    Parties, Intervenors, *Amici*

The following parties appeared before the Copyright Royalty Judges in the administrative proceedings below: AccuRadio, LLC; College Broadcasters, Inc.; David Powell; Educational Media Foundation; Live365 Broadcaster, LLC; La Raza Media Group, LLC; Pandora Media LLC; Radio Coalition, Inc.; Sirius XM Radio; National Religious Broadcasters Noncommercial Music License Committee; National Association of Broadcasters; Feed Media Inc.; Dash Radio Inc.; TuneIn, Inc.; National Public Radio, Inc.; Radio Paradise Inc.; iHeartMedia, Inc.; ICON Health & Fitness, Inc.; Google LLC; and SoundExchange, Inc., which participated on the joint behalf of The American Federation of Musicians, the United States and Canada, Screen Actors Guild/American Federation of Television and Radio Artists, the American Association of Independent Music, Sony Music Entertainment, UMG Recordings, Inc., Warner Music Group Corp., and Jagjaguwar Inc. No *amici* appeared before the Judges in the proceeding below.

In Case No. 21-1243, the appellant is the National Religious Broadcasters Noncommercial Music License Committee, and the appellees are the Copyright Royalty Board and the Librarian of Congress. The intervenors are Google LLC; Pandora Media, LLC; Sirius XM Radio Inc.; and SoundExchange, Inc.

In Case No. 21-1244, the appellant is SoundExchange, Inc., and the appellees are the Copyright Royalty Board and the Librarian of Congress. The intervenors are the National Religious Broadcasters Noncommercial Music License Committee; Google LLC; the National Association of Broadcasters; Pandora Media, LLC; and Sirius XM Radio, Inc.

In Case No. 21-1245, the appellant is the National Association of Broadcasters, and the appellees are the Copyright Royalty Board and the Librarian of Congress. The intervenors are Google LLC; Pandora Media, LLC; Sirius XM Radio Inc.; and SoundExchange, Inc.

## B.    Rulings Under Review

This case is a direct appeal from a final determination of the Copyright Royalty Judges. Appellants seek review of the Judges' determination establishing royalty rates and terms for the compulsory "webcasting" license for the digital performance of copyrighted sound

recordings between January 1, 2021 and December 31, 2025. *See Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Those Performances* (*Web V*), 86 Fed. Reg. 59,452 (Oct. 27, 2021). This brief generally cites to the public version of the Judges' final determination, JA295–605, which was later published in the Federal Register after review by the Register of Copyrights for legal error. Because that publication redacts certain confidential and competitively sensitive information provided to the parties to the Copyright Royalty Judges, and because it is necessary for this Court to consider that information in deciding certain issues in this appeal, this brief occasionally cites to the restricted, unredacted version of that ruling. JA1113–1423.

## C.    Related Cases

This case has not been reviewed previously by this Court or any other court. Apart from the consolidated cases listed above, undersigned counsel is not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

## CORPORATE DISCLOSURE

In accordance with Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Intervenor Google LLC is a subsidiary of XXVI

Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company. No publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Intervenor National Association of Broadcasters is a nonprofit incorporated association of radio and television stations. National Association of Broadcasters represents commercial radio broadcasters nationwide, hundreds of which stream their broadcasts over the Internet. National Association of Broadcasters has no parent company, and has not issued any shares or debt securities to the public; thus no publicly held company owns ten percent or more of its stock. As a continuing association of numerous organizations operated for the purpose of promoting the interests of its membership, National Association of Broadcasters constitutes a trade association as defined in D.C. Circuit Rule 26.1.

Intervenor the National Religious Broadcasters Noncommercial Music License Committee is the noncommercial arm of the National Religious Broadcasters Music License Committee which, in turn, is a standing committee of the National Religious Broadcasters, a trade association representing more than 1,300 radio and television stations,

program producers, multimedia developers, and related organizations around the world.  The National Religious Broadcasters is a non-profit corporation that has no parent companies, and no publicly held company has a 10% or greater ownership interest in the National Religious Broadcasters.

Date: January 12, 2023

/s/ Kenneth L. Steinthal
Kenneth L. Steinthal

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES,
    RULINGS, AND RELATED CASES ....................................................i

CORPORATE DISCLOSURE .......................................................iii

GLOSSARY ................................................................................x

INTRODUCTION ........................................................................1

STATUTES AND REGULATIONS ...............................................2

STATEMENT OF THE CASE ........................................................2

    A.    Intervening Webcasters and SoundExchange .......................2

    B.    Sound Recording Licenses for Webcasters and the
        Copyright Royalty Board .........................................................4

    C.    Webcasting Proceedings ...........................................................7

    D.    The *Web V* Proceeding .............................................................8

        1.    The Commercial Participants' Cases for Ad-
            Supported Noninteractive Streaming Rates .................9

        2.    Professor Willig's Opportunity-Cost Analysis for
            Ad-Supported Noninteractive Streaming ....................13

    E.    The Board's Determination Setting Rates and Terms .........17

        1.    The Board's Reliance on a Benchmarking
            Approach ....................................................................17

        2.    The Board's Criticisms of Professor Willig's
            Opportunity-Cost Analysis ...........................................19

SUMMARY OF THE ARGUMENT .........................................22

STANDARD OF REVIEW ..........................................................24

ARGUMENT ................................................................................24

The Board's Rejection of Professor Willig's Opportunity-Cost Analysis Is Well Supported And Legally Correct. .......................... 24

    A.    The Board Did Not Adopt Professor Willig's Opportunity Cost Figure—Even as Corrected by Professor Shapiro. .................................................. 24

    B.    The Board Reasonably Relied on a Benchmarking Analysis to Set a Reasonable Rate. ....................................... 28

CONCLUSION ........................................................................ 37

# TABLE OF AUTHORITIES[*]

**Cases**

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
  796 F.3d 111, 127 (D.C. Cir. 2015) ....................................................24

*Johnson v. Copyright Royalty Bd.*,
  969 F.3d 363 (D.C. Cir. 2020) ........................................................4, 7

*NextEra Energy Res., LLC v. FERC*,
  898 F.3d 14 (D.C. Cir. 2018) ..............................................................36

***SoundExchange, Inc. v. Copyright Royalty Bd.**
  (*Web IV Appeal*),
  904 F.3d 41 (D.C. Cir. 2018) ...........................................6, 24, 29, 30, 32

**Statutes**

17 U.S.C. § 106.......................................................................................4

17 U.S.C. § 112.......................................................................................6

17 U.S.C. § 114.........................................................................5, 6, 29, 30

17 U.S.C. § 803....................................................................................7, 8

17 U.S.C. § 804.......................................................................................7

**Regulations**

Determination of Royalty Rates for Digital Performance
  Right in Sound Recordings and Ephemeral Recordings
  (*Web III Remand*),
  79 Fed. Reg. 23,102 (Apr. 25, 2014)....................................................29

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

Determination of Royalty Rates and Terms for
   Ephemeral Recording and Webcasting Digital
   Performance of Sound Recordings (*Web IV*),
   81 Fed. Reg. 26,316 (May 2, 2016)....................................................6, 30

Determination of Royalty Rates and Terms for
   Transmission of Sound Recordings by Satellite Radio
   and "Preexisting" Subscription Services (*SDARS III*),
   83 Fed. Reg. 65,210 (Dec. 19, 2018)......................................................28

# GLOSSARY

| | |
|---|---|
| Board | Copyright Royalty Board |
| Determination | Final Determination |
| NAB | National Association of Broadcasters |
| NRBNMLC | National Religious Broadcasters Noncommercial Music License Committee |

## INTRODUCTION

The Copyright Royalty Board ("Board") in this case adopted a rate for ad-supported noninteractive streaming services based on a benchmarking approach proffered by Google's expert economist, Dr. Steven Peterson. Dr. Peterson calculated a rate for ad-supported services by starting with agreements between record labels and on-demand streaming services, and then adjusted them to account for the record labels' market power and certain differences in functionality between those services and custom radio services.

SoundExchange identifies no error in the Board's adoption of Dr. Peterson's benchmarking approach. Instead, it raises a single issue— that the Board erred by setting a rate that was below the copyright owners' "opportunity cost." But that argument is founded on the false premise that the Board endorsed the opportunity-cost calculations of SoundExchange's expert, Professor Robert Willig, as corrected by Pandora's expert Professor Carl Shapiro. From there, SoundExchange argues that the Board impermissibly adopted a per-play royalty rate that was lower than the per-play opportunity cost of the licensed activity.

But the Board did *not* accept Professor Willig's opportunity-cost figure. Instead, it broadly criticized Professor Willig's opportunity-cost analysis, finding fundamental problems with its design that could not be remedied through mere recalculations. The Board expressly stated that "even as adjusted," the opportunity-cost inputs to Professor Willig's Shapley Value Model produced improperly inflated rates. JA497 & n.279 (Final Determination ("Determination") 203 & n.279). Because, contrary to SoundExchange's representations, the Board *did not* endorse $0.00222 as the correct measure of the opportunity cost of ad-supported noninteractive streaming, this Court should reject SoundExchange's challenge to the rates adopted by the Board.

## STATUTES AND REGULATIONS

The relevant statutes and regulations are reproduced in the addenda to the other parties' briefs.

## STATEMENT OF THE CASE

### A.  Intervening Webcasters and SoundExchange

Intervenors Google and the National Association of Broadcasters ("NAB") operate "webcasting" services that provide ad-supported noninteractive music streaming—internet radio—to their listeners. Intervenor the National Religious Broadcasters Noncommercial Music

License Committee ("NRBNMLC") represents noncommercial religious radio broadcasters that make available noncommercial mission-oriented religious programming to their listeners, including through noninteractive webcasting.

In contrast to "interactive" (or "on-demand") streaming, a listener to a noninteractive stream cannot choose to listen to particular songs. Noninteractive streaming services run the gamut from "simulcasts" of terrestrial AM/FM broadcasters to "custom" radio services that fashion individualized programming based on a user's input, including preferred genre, mood, song, title, or artist. *See* No. 21-1245 NAB Br. 10–11. Ad-supported services, as their name suggests, generate revenue through advertising, not subscriptions. The focus of noncommercial broadcasters represented by NRBNMLC is to advance an educational or religious mission rather than to generate revenue. Those broadcasters do not include advertisements in their simulcast radio programming but rather support their programming through voluntary donations.

SoundExchange is the rights-management organization designated to collect and distribute digital performance royalties for sound recordings for the rights at issue in this proceeding. SoundExchange also

represents the interests of record labels and other interested parties in rate-setting proceedings before the Copyright Royalty Board.

**B.    Sound Recording Licenses for Webcasters and the Copyright Royalty Board**

The Copyright Act grants copyright owners rights in their copyrighted works, including the right to perform the copyrighted work and to allow others to do the same.  *See* 17 U.S.C. § 106.  In the case of music, "[h]ow those copyrighted works get from the songwriters into your ears is rather complicated."  *Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 367 (D.C. Cir. 2020).

To stream a song, a webcaster must obtain two sets of permissions covering two types of copyrighted works:  permission to perform the underlying musical work, and separate permission to perform the sound recording.  The "musical work" is the notes, lyrics, embedded performance directions, and related material composed by the author of a song and owned by the writer or music publisher.  In contrast, a "sound recording" is a performing artist's particular recording of a musical work and is typically owned by a record label.  In the context of noninteractive streaming, webcasters obtain the public performance rights in musical works from American Society of Composers, Authors, and Publishers,

4

Broadcast Music, Inc., and other performance-rights organizations. Permission to transmit sound recordings by noninteractive webcasting is typically obtained through a compulsory license administered by SoundExchange, which administers royalties for *noninteractive* webcasting, but not for interactive webcasting. Instead, interactive webcasters must negotiate directly with record labels for licenses of the rights to engage in that type of webcasting.

Section 114 of the Copyright Act creates a statutory license for noninteractive services. That license is a statutorily conferred authority to perform copyrighted sound recordings through digital audio transmissions, without the actual consent of the copyright holder, subject to limitations on how the recordings are transmitted. SoundExchange administers this license, but the Board sets the applicable royalty rates and terms in the absence of voluntary agreements. *See* 17 U.S.C. § 114(f).

Under the statute, the Board's task is to establish rates and terms to webcast sound recordings that "most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." *Id.* § 114(f)(1)(B). In doing so, the Copyright Royalty Judges must "distinguish among the different types of

services" subject to the license, must "base their decision on economic, competitive, and programming information presented by the parties," and "may consider" the rates and terms "for comparable . . . services and comparable circumstances under voluntary license agreements." *Id.*; *see also* 17 U.S.C. § 112(e)(4) (establishing a willing-buyer, willing-seller standard for ephemeral copies).

The Board has interpreted the willing-buyer, willing-seller standard to require it to set a rate that would prevail in a hypothetical market that is effectively competitive. *See, e.g.*, JA300–01 (Determination 6–7); *SoundExchange, Inc. v. Copyright Royalty Bd. (Web IV Appeal)*, 904 F.3d 41, 57–58 (D.C. Cir. 2018). This framework "allow[s] adjustments to offset the existence of market power" among the record-label sellers, as buyers and sellers cannot be "'willing'" "'if they are coerced to agree to a price through the exercise of overwhelming market power.'" *Web IV Appeal*, 904 F.3d at 56–57 (quoting Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (*Web IV*), 81 Fed. Reg. 26,316, 26,331 (May 2, 2016)).

6

The directive that the rates adopted by the Board offset the existence of market power is important because "the sound recordings market is a complementary oligopoly." *Johnson*, 969 F.3d at 372; *see also* JA301 (Determination 7) (noting that "effective competition" has been employed as a counterweight to the "complementary oligopoly" power of the major record labels). In a complementary oligopoly, each major record label "wield[s] the individual economic power of a monopolist, but the exercise of that power leads to royalty rates that are even greater than those that would be set by a single monopolist." JA301 (Determination 7). In such a market, each oligopolist can command even higher prices than can an individual monopolist that controlled the entire market.

## C.    Webcasting Proceedings

The Board initiates rate-setting proceedings every five years to set webcasters' royalty rates and terms under the statutory license. 17 U.S.C. § 804(b)(3). When the proceedings commence, interested parties first have an opportunity to negotiate royalty rates. *Id.* § 803(b)(3). If they do not reach a settlement, the Board presides over a rate-setting proceeding. *See id.* § 803. Rate-setting proceedings are

adversarial, and the Board receives evidence and testimony, including cross-examinations. Following the hearing, the Board publishes a written opinion summarizing its findings. Any person that the Board determines has a "significant interest in the" proceeding" may participate. *See id.* § 803(a).

### D.    The *Web V* Proceeding

The Board commenced the *Web V* proceeding through notice in the Federal Register in January 2019. JA296 (Determination 2). Google, NAB, NRBNMLC, and SoundExchange, among others, petitioned to participate. JA296 n.1 (Determination 2 n.1). SoundExchange reached settlements with certain public broadcasters and educational webcasters for categories of rates not relevant here, but it did not settle with the intervenors here. JA297 & n.4 (Determination 3 & n.4). Accordingly, the Board presided over a five-week, virtual hearing in August and September 2020. The Board received extensive documentary evidence and heard testimony from dozens of fact witnesses and numerous experts.

### 1.    The Commercial Participants' Cases for Ad-Supported Noninteractive Streaming Rates

As relevant to this brief, one of the key issues at the hearing was the rate for various types of ad-supported noninteractive commercial streaming services.[1]  SoundExchange proposed a rate of $0.0028 (twenty-eight hundredths of one cent) per noninteractive stream. SoundExchange relied on the benchmarking analysis of its expert, Jonathan Orszag, who used agreements between Spotify and the record labels Universal, Sony, and Warner for *on-demand* streaming to propose rates for all noninteractive streaming services.  Along with Mr. Orszag's testimony, SoundExchange offered testimony from each of the major record labels about their negotiations with Spotify.  SoundExchange's expert, Professor Willig, also offered a theoretical "Shapley Value"

---

[1] The Board applied the rates it set for ad-supported noninteractive commercial streaming services to noncommercial streaming services that exceed a monthly threshold of 159,140 aggregate tuning hours (*i.e.*, listener hours).  As set forth in NRBNMLC's July 27, 2022 appeal brief filed in Case No. 21-1243, NRBNMLC has appealed the Board's application of those rates to noninteractive noncommercial services.  It nonetheless joins this brief to oppose SoundExchange's appeal arguing that these rates should be even *higher*.  For the reasons set forth in this brief, SoundExchange's challenge to those rates should be rejected, particularly as applied to noninteractive noncommercial services.

analysis—which, as discussed in greater detail below, included opportunity cost as one of its inputs.

Google proposed a rate of $0.0013 per noninteractive stream, supported principally by economic testimony by Dr. Steven Peterson. Like SoundExchange's Mr. Orszag, Dr. Peterson relied primarily on Spotify's agreements with Universal, Sony, and Warner for Spotify's on-demand streaming service. JA1262 (Determination 150). Dr. Peterson derived lower rates than Mr. Orszag, however, because he adjusted those rates to account for the lack of competition in freely negotiated deals with record labels, as well as for the critical differences in functionalities and markets between on-demand services and ad-supported "custom radio" services, among other adjustments. *See* JA1263 (Determination 151).

As Dr. Peterson observed (and the Board found), "labels have complementary oligopoly power in the benchmark market for licensing of music services, which means those rates do not reflect effective competition, but rather they result in royalty rates set at supracompetitive levels even higher than a single monopolist would charge." JA446 (Determination 152); *see also* JA1480–1481 (8/25/20 Tr. 3652:21–653:2 (Peterson)). In a complementary oligopoly, record

labels can wield their market power to extract excessive royalties from webcasters and other licensees. The expectation of listeners to interactive services is that they can play whatever songs they want whenever they want. JA1486–87 (8/25/20 Tr. 3699:25–3700:8 (Peterson)). Fulfilling this expectation requires all interactive services to have rights to play music from the catalogs of every major record label. When those catalogs are a "must-have" for interactive services, it creates a licensing market where record labels can command supracompetitive rates because they know a service cannot say no. Adjusting those rates is necessary to reflect effective competition.

NAB and Pandora each presented their own economists, who offered alternative benchmarking and game-theory approaches to propose rates for different categories of ad-supported streaming. NAB introduced evidence that supported a differentiated per-play rate structure: $0.0008 per play for simulcast transmissions and $0.0016 per play for custom radio. In support of this proposal, NAB's economist Dr. Greg Leonard agreed that the record label deals must be adjusted to correct for the record labels' market power, noting that a 12 percent adjustment was "'conservative' and 'small' relative to the complementary

MATERIAL UNDER SEAL DELETED

oligopoly effect in the present circumstances." JA364 (Determination 70).[2] And Pandora's expert, Dr. Shapiro, similarly agreed.

SoundExchange acknowledged that in *Web IV*, the Board had found—and this Court affirmed—that the major record labels possessed complementary oligopoly power. And it did not dispute the "'[m]ust [h]ave' status of the [major record labels] in the *interactive* benchmark market." JA302 (Determination 8). Instead, SoundExchange argued that "██████████████████████████████████████████████████ ██████████████████████████████████████" rendering the market competitive. JA302 (Determination 8).

To support this claim, SoundExchange offered testimony from executives at Universal, Sony, and Warner about Spotify's supposed ████████████████████. But the label witnesses could not keep their story straight. One executive from Sony testified that the label no longer had market power in its negotiations with Spotify because if it did not do a deal with Spotify, it "██████████████████████████████████████

---

[2] NAB proposed a lower rate for simulcast streaming, based on differences between custom radio services and simulcast services that Peterson's benchmarking analysis did not account for. JA512 (Determination 218).

MATERIAL UNDER SEAL DELETED

 . JA1506–07 (9/1/20 Tr. 5096:11–5097:3 (Piibe)).  The next day, another executive from Sony said the opposite, testifying that if .  JA1128–29 (Determination 16–17 (citing JA1515–16 (9/2/20 Tr. 5424–25 (J. Fowler)))).  Witnesses from other labels also undercut SoundExchange's position.  Rather than testify that Spotify , they testified that they would .

JA1128–29 (Determination 16–17 (quoting JA1529 (9/9/20 Tr. 5932 (Sherwood)))).

### 2.  Professor Willig's Opportunity-Cost Analysis for Ad-Supported Noninteractive Streaming

As an input to his Shapley Value Model, Professor Willig analyzed the opportunity cost associated with licensing sound recordings to ad-supported noninteractive services—*i.e.*, the royalties a record label "might have earned by licensing to other distribution methods (such as, *e.g.*, interactive services), rather than licensing its sound recordings to noninteractive services."  JA458 (Determination 164).  Professor Willig calculated the opportunity cost associated with diversion from other

13

forms of listening as $0.00273 per performance.    JA1312 (Determination 200); *see also* JA1791 (Willig Corrected Written Direct Testimony at 23 (Figure 6)).  Professor Willig calculated an additional cost of $0.00011 for diversion from subscription noninteractive services. JA1795–96 (*id.* at 27 (Figure 9) & n.32).

The Services mounted several attacks on Professor Willig's opportunity-cost analysis.  For instance, Professor Shapiro contended that Professor Willig had erroneously calculated the opportunity cost associated with diversion from the purchase of CDs, vinyl records, and digital downloads by weighting them by retail revenues instead of unit sales.  Professor Willig admitted this mistake on the stand.  JA614 (8/5/20 Tr. 504 (Willig) ("[Professor Shapiro] pointed out that maybe I wasn't perfectly logical in where I applied my weights, and I think there was some merit to that point that Professor Shapiro made, so I went back and I changed that.")).  Professor Shapiro further argued that Professor Willig overestimated the amount of money that people switching away from a noninteractive streaming service would spend on CDs, vinyl, and digital downloads.    JA1769 (Shapiro Written Rebuttal Testimony at 83). Correcting for these (and other) errors, Professor Shapiro determined

14

that Professor Willig's opportunity cost figure associated with diversion from other forms of listening should be reduced from $0.00273 to $0.00222 per stream.  JA1751 (*id.* at 50 (Figure 8 n.1)).  But that adjustment did not correct for all of the flaws in Professor Willig's analysis.

The Services also criticized Professor Willig's failure to consider the opportunity *benefits* generated by ad-supported noninteractive services *See* JA497 n.279 (Determination 203 n.279).  In particular, Dr. Peterson testified that Professor Willig failed to account for the fact that ad-supported services generate royalties from listeners who might divert their time to non-royalty bearing activities, such as reading.  JA489–90 (Determination 195–96); *see also* JA747–48 (8/25/20 Tr. 3799–3800 (Peterson)).  And Dr. Leonard testified that, in doing a pricing analysis, an economist should consider the ability of a streaming service to convert listeners of commercial terrestrial radio—an activity that supplies no royalty to record labels—to a royalty bearing one.  JA723–26 (8/24/20 Tr. 3403:21–3406:18 (Leonard)); *see also* JA728 (8/24/20 Tr. 3408:1–18 (Leonard) (explaining how incorporating promotional benefit into an opportunity-cost analysis would lower the opportunity cost)).

Finally, and perhaps most critically, the Services challenged Professor Willig's opportunity-cost analysis as inconsistent with the willing-buyer, willing-seller legal standard, which requires the Judges to set rates that would be paid by a willing buyer to a willing seller in an effectively competitive market. JA1310–12 (Determination 198–200). The Services argued that Professor Willig's opportunity-cost analysis used as its input unadjusted rates from the market for licensing interactive services—rates that were supracompetitive because they reflected the complementary oligopoly power that the Board determined the major labels possess. JA492–93 (Determination 198–99). In addition, Professor Willig's model assumed a noninteractive streaming service would cease to exist without a license to a sound recording licensor's works—a situation NAB's Dr. Leonard dubbed the "no license" scenario. *See* JA494 (Determination 200 (citing Leonard)); JA719–721, JA731–33 (8/24/20 Tr. 3399:5–3401:1, 3411:2–3413:9 (Leonard)). That effectively treated the record label licensors as "must haves," thereby embedding complementary oligopoly power into the analysis. *See id.*

Rather than adjust his analysis to account for labels' acknowledged market power, Professor Willig defended the design of his opportunity-

16

cost analysis by arguing that one should take opportunity-cost inputs as they are in the marketplace—his so-called "fork in the road" approach. JA492 (Determination 198); *see also* JA1810–11 ¶ 118 (Willig Written Rebuttal Testimony ¶ 118).   But the Services argued that such an approach was inconsistent with the proceeding's governing legal standard: "to the extent including supracompetitive royalty inputs in an opportunity-cost analysis yields supracompetitive outputs, those outputs are inconsistent with the established *legal* standard requiring the rates set here to reflect effective competition."   JA1310–12 (Determination 198–99, 200).

### E.    The Board's Determination Setting Rates and Terms

In June 2021, the Board issued its Initial Determination.   After review by the Register of Copyrights, it issued the Final Determination on October 27, 2021.   The Board set a rate for all commercial ad-supported webcasting of $0.0021 per stream—roughly the midpoint between competing rate proposals from Google and SoundExchange.

### 1.    The Board's Reliance on a Benchmarking Approach

In reaching its determination, the Board applied a benchmarking analysis based on the Spotify agreements with interactive services, and

**MATERIAL UNDER SEAL DELETED**

on the analysis of Google's expert Dr. Peterson in particular. It concluded that "the more granular, label-specific, analysis and application of adjustments to account for funneling/conversion in Dr. Peterson's benchmark analysis lends greater weight to the $0.0021 per-play rate." JA595 (Determination 301).

Much of the Board's opinion addresses why it considers the major record labels to be complementary oligopolists and why those labels' agreements must be adjusted to account for their market power. For instance, the Board spent more than fifty pages of the Determination carefully dissecting and rejecting the testimony of the labels' fact witnesses about Spotify's ███████████████. And it did not mince words. It dismissed the labels' testimony that ███████████████ ███████████████ as "exaggerated," "over-the-top," and a "fine example of the adage 'the lady doth protest too much.'" JA1157–58 (Determination 45–46). Instead of crediting this testimony, the Board found that in the on-demand market, the major labels still wield "complementary oligopoly" power and charge supracompetitive prices. *See id.*

18

The Board also rejected the testimony of SoundExchange's experts. For Mr. Orszag, SoundExchange's benchmarking expert, the Board found "no sufficient basis to apply the benchmarking approach for the ad-supported noninteractive market that Mr. Orszag proffers." JA429 (Determination 135).

### 2.  The Board's Criticisms of Professor Willig's Opportunity-Cost Analysis

As for Professor Willig, the Board found several significant errors in his opportunity-cost analysis. The Board agreed with Professor Shapiro that Professor Willig had improperly "inflated the opportunity costs attributable to purchases of CDs, vinyl records (vinyl) and digital downloads." JA484, 486 (Determination 190, 192). The Board concluded that Professor Shapiro's recalculations, which reduced Professor Willig's calculation of the opportunity cost associated with diversion from other forms of listening from $0.00273 to $0.00222, were "reasonable and appropriate." JA1304, 1306, 1307 (Determination 192, 194, 195). But the Board did not suggest that the adjustments fully cured the problems in Professor Willig's modeling.

Importantly, the Board found additional faults in Dr. Willig's opportunity-cost analysis, which SoundExchange does not address.

19

*First*, the Board agreed that Professor Willig overstated opportunity costs because he did not account for the "'opportunity benefits' generated by listeners to noninteractive services who would otherwise divert to a non-royalty bearing activity"—such as reading a book or listening to AM/FM radio. JA491 (Determination 197) (footnote omitted); *see also* JA458 (Determination 164 n.221); JA497 n.279 (Determination 203 n.279).

*Second*, the Board agreed that Professor Willig's opportunity-cost analysis did not "address the complementary oligopoly impact of the 'Must Have' nature of the Majors" embedded in Professor Willig's opportunity-cost analysis by virtue of his assumption that a service would cease to exist absent a license to a record label's sound recordings:

> Dr. Leonard, the NAB's economic expert witness, asserts that this "fork in the road" approach does not address the complementary oligopoly impact of the "Must Have" nature of the Majors, which makes a noninteractive service's "no license" negotiating strategy untenable. 8/24/20 Tr. 3411–13 (Leonard).

> The Judges find Dr. Leonard's point to be helpful. Elsewhere in this determination, the Judges make essentially the same point regarding the imbedding of a complementary oligopoly effect in the "arrival orderings" in Professor Willig's Shapley Value Model. Dr. Leonard's testimony in this regard is helpful because it makes clear that the "fork in the road" approach simply does not address this separate inclusion of a

20

> complementary oligopoly effect on the rates derived from Professor Willig's Shapley Value Model.

JA494 (Determination 200); *see also* JA497 n.279 (Determination 203 n.279).  The Board also found "persuasive" NAB's legal argument that the use of supracompetitive inputs to an opportunity cost model is inconsistent with the proceeding's governing legal standard.  JA493 (Determination 199).

The Board concluded that "because the royalty rates derived from Professor Willig's Shapley Value Model reflect complementary oligopoly power (*even as adjusted* []), they must be discounted to reflect effective competition."  JA497 (Determination 203) (emphasis added).  The Board expressly stated that the rates that resulted from Professor Willig's Shapley Value Model were "too high because they do not reflect the 'opportunity benefit' of listeners who would substitute noninteractive listening for non-royalty bearing activities, including listening to AM/FM radio."  JA497 (Determination 203 n.279).  And "given the legal infirmity of the 'fork in the road' approach"—his failure to address the labels' market power—"his proposed rates are further improperly inflated."  *Id.* But the Board found that the record lacked evidence that would allow them to estimate the value of an effective competition adjustment at the

21

various points in Professor Willig's analysis where one was required. JA496 (Determination 202).  The Board therefore held that Professor Willig's Shapley Value Model—to which his opportunity-cost analysis was an input—did not derive effectively competitive rates.  As such, the rates that resulted from it could "serve only as *limited guideposts*, indicating that *effectively competitive* rates generated via a Shapley Value Model would be less than these levels."  JA497 (Determination 203 (footnote omitted)).

SoundExchange appealed.

## SUMMARY OF THE ARGUMENT

**A.** The Board's decision to reject Professor Willig's opportunity-cost calculation and the Shapley Value Model to which it was an input is well supported by substantial record evidence.  SoundExchange's brief offers no reason to reconsider that conclusion.  Its main argument relies on the false premise that the Board endorsed Professor Willig's opportunity-cost analysis.  But the determination explains why the Judges rejected Professor Willig's Shapley Value Model.  The flaws in his model included the use of an opportunity-cost value that was significantly higher than the actual opportunity cost of ad-supported noninteractive streaming

22

performances and was incompatible with the applicable rate-setting standard.

The Board never accepted Professor Willig's opportunity-cost figure—even as adjusted by Professor Shapiro—as an accurate and appropriate measure of opportunity cost associated with ad-supported noninteractive streaming. Rather, it expressly held that Professor Willig's opportunity-cost analysis was improperly and irreparably inflated. Because the Board *did not* endorse $0.00222 as the correct measure of the opportunity cost of ad-supported noninteractive streaming, its decision to set a lower royalty rate of $0.0021 based on Dr. Peterson's benchmarking analysis was neither arbitrary nor capricious.

**B.** Indeed, SoundExchange does not challenge the actual benchmarking approach the Board used. Rather than rely on Professor Willig's Shapley Value Model, the Board opted instead for an established benchmarking approach. It chose a benchmark that SoundExchange concedes was appropriate and applied adjustments to that benchmark— which SoundExchange does not contest—to reach a rate. Those adjustments reflected the evidence and arguments presented by both the Services and SoundExchange for rejecting Professor Willig's analysis.

23

The Board thoroughly explained its reasoning, which offers no basis to conclude that the Board acted arbitrarily or capriciously in this regard.

## STANDARD OF REVIEW

This Court upholds a final determination of the Copyright Royalty Judges against a challenge under the Administrative Procedure Act unless that determination is "arbitrary, capricious, contrary to law, or not supported by substantial evidence." *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 127 (D.C. Cir. 2015) (quotation marks omitted). Review of "administratively determined rates is particularly deferential because of their highly technical nature." *Web IV Appeal*, 904 F.3d at 50 (quotation marks omitted).

## ARGUMENT

**The Board's Rejection of Professor Willig's Opportunity-Cost Analysis Is Well Supported And Legally Correct.**

### A.    The Board Did Not Adopt Professor Willig's Opportunity Cost Figure—Even as Corrected by Professor Shapiro.

SoundExchange's only argument on appeal is that the rate of $0.0021 per play that the Board adopted cannot be squared with the Board's supposed "finding" that the opportunity cost of licensing music to ad-supported services is $0.00222 per performance. *See* SoundExchange Br. 2, 24, 32–33. Specifically, SoundExchange contends that the Board's

determination is internally inconsistent because the Board has "recognized and endorsed the economic principle that no willing seller would sell at a price below its opportunity cost." Not so.

Contrary to SoundExchange's premise, the Board never adopted $0.00222 as an appropriate measure of the opportunity cost associated with ad-supported noninteractive commercial streaming. Instead, the Board found significant faults in Dr. Willig's opportunity-cost analysis—even beyond the errors Professor Shapiro corrected. The Board found that (1) Dr. Willig's opportunity-cost analysis failed to consider the "opportunity benefits" of ad-supported noninteractive streaming, JA491–92 (Determination 197–98); and (2) the analysis was also improperly infected with un-checked complementary oligopoly power, JA1312–15 (Determination 200–03)).

SoundExchange does not address—or even acknowledge—these flaws. It instead suggests that the Board "expressly adopted" Professor Willig's opportunity cost in a single sentence in the Determination. SoundExchange Br. 32. But that sentence cannot bear the weight that SoundExchange places on it. All that the Board said is that "[b]ased on the foregoing adjustments *accepted by the Judges*, Professor Willig's

25

opportunity cost calculation must be adjusted." JA1312 (Determination 200) (emphasis added). The Board then noted that "Professor Shapiro's adjustments reduce the opportunity cost for ad-supported services from $0.00273 (Professor Willig's estimate) to $0.00222 (Professor Shapiro's adjusted estimate)." *Id*. In other words, the Board acknowledged that the downward adjustments Professor Shapiro made were "reasonable and appropriate"—as the Board put it a few pages earlier. JA489 (Determination 195). The Board did *not* hold that Professor Shapiro's recalculations could fix the many other flaws that the Board found plagued Professor Willig's opportunity-cost analysis.

Indeed, the Board was clear that those adjustments were *not* enough. In another passage, the Board expressly stated that "even as adjusted" the opportunity cost inputs to Professor Willig's Shapley Value Model produce rates that are too high. JA497 & n.279 (Determination 203 & n.279); *see also* JA723–26 (8/24/20 Tr. 3403:21–3406:18 (Leonard)). Specifically, the Board stated that "Professor Willig's estimated rates are also too high because they do not reflect the 'opportunity benefit' of listeners who would substitute noninteractive listening for non-royalty bearing activities, including listening to AM/FM radio." JA497 n.279

26

(Determination 203 n.279). The Board also highlighted "the legal infirmity of the 'fork in the road' approach" which "further improperly inflated" Professor Willig's proposed rates. JA497 n.279 (Determination 203 n.279). Any doubt about whether the Board made the finding that SoundExchange claims it made is resolved by the Board's own brief here, which expressly denies making that finding. Board Br. 42–43.

SoundExchange's other arguments also miss the mark. SoundExchange argues that Professor Shapiro's corrections to Professor Willig's analysis failed to include an additional $0.00011 opportunity cost associated with diversion to subscription noninteractive services identified by Professor Willig. SoundExchange Br. 21–22, 37–38. It also contends that the Board improperly rejected Professor Willig's testimony that Professor Shapiro's opportunity-cost analysis needed to be adjusted upwards based on an erroneous conclusion that that testimony was not in the evidentiary record. SoundExchange Br. 22–23, 38–40.

But the Board found Professor Willig's opportunity-cost analysis to be, at best, of limited utility to setting the rates in this case because of fundamental and uncorrectable flaws in its construction. *See* JA491–92,

27

497 & n.279 (Determination 197–98, 203 & n.279).  As such, the Board had no need to further adjust Professor Willig's opportunity cost figures.

Because the Board did not accept $0.0022 as an accurate measurement of the opportunity cost of ad-supported noninteractive streaming, its decision to set a per-stream royalty rate modestly below that figure was not an abuse of discretion.  Nor did the Board "depart[] from [its] prior decisions" in doing so.  *Contra* SoundExchange Br. 32. The Board's precedent endorsing the notion that a willing seller would not sell below its opportunity cost assumes, of course, that the opportunity cost has been correctly calculated.  *See* Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services (*SDARS III*), 83 Fed. Reg. 65,210, 65,230 (Dec. 19, 2018) (observing similar point).

In short, SoundExchange's appeal simply ignores the many reasons the Board gave to reject Professor Willig's opportunity-cost analysis.

## B.  The Board Reasonably Relied on a Benchmarking Analysis to Set a Reasonable Rate.

Tellingly, SoundExchange makes no argument about the method the Board *did* rely on to set a rate.  Instead of relying on Professor Willig's model, the Board used a benchmarking approach: it set a rate by

28

adjusting similar voluntary license agreements, which the Board adjusted to reflect the willing-buyer, willing-seller standard in this proceeding. 17 U.S.C. § 114(f)(1)(B)(ii). The Board has repeatedly used— and this Court routinely endorsed—this benchmarking approach, including in the last Webcasting proceeding. *Web IV Appeal*, 904 F.3d at 47; *see also* Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings (*Web III Remand*), 79 Fed. Reg. 23,102, 23,110 (Apr. 25, 2014).

A benchmarking approach adjusts related marketplace agreements to use sound recordings to the market for noninteractive webcasters. As the first step in the Board's benchmarking process, participants submit "voluntary license agreements" from comparable services and expert testimony regarding those agreements' suitability as benchmarks. 17 U.S.C. § 114(f)(1)(B)(ii). The Board then considers which of those agreements "most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." *Id.* § 114(f)(1)(B). To the extent that the Board determines that none of the submitted rates is fully representative of willing-buyer, willing-seller rates for the appropriate market, it determines whether it

29

can adjust the agreements to render them useful benchmarks. *See Web IV Appeal*, 904 F.3d at 47. Once it has arrived at appropriate benchmarks, the Board uses them to establish a "zone of reasonableness," and it fixes the statutory license rate within that zone. *See id.* A benchmarking approach, in the Board's view, "bake[s] in" various competing considerations, including the potential promotional or substitutional effect of a kind of service. *E.g.*, *Web IV*, 81 Fed. Reg. at 26,326 (concluding that "the promotion and substitution effects on royalty rates are 'baked in' to a negotiated license rate").[3]

Here, the Board considered the analyses of three economists who started with agreements between record labels and the on-demand music service Spotify as the basis for their benchmarks: Google's expert, Dr. Peterson; SoundExchange's expert, Mr. Orszag; and Pandora's expert, Dr. Shapiro. Each of these three economists used different techniques to adjust those initial benchmarks to reflect the differences between the interactive and noninteractive streaming markets. In particular, they

---

[3] NAB reiterates that the statute required the Board to first "distinguish among the different types of [webcasting] services," 17 U.S.C. § 114(f)(1)(B)—a threshold requirement the Board failed to heed with respect to the rates for simulcasters. *See* No. 21-1245 NAB Br. 22–40.

30

focused on differences between interactive services and custom radio products.

Of those approaches, the Board selected Dr. Peterson's—a choice SoundExchange does not challenge.  The Board began with Dr. Peterson's calculations of what Spotify pays labels for its ad-supported services, converted to a per-play metric based on data concerning the number of plays on Spotify—amounts ranging from ███████████████. JA1262 (Determination 150).  The Board then made several adjustments to that per-play metric, carefully summarizing Dr. Peterson's reasoning and SoundExchange's arguments in opposition to that reasoning and then explaining the Board's own analysis of the competing arguments, JA1261–72 (Determination 149–60).  SoundExchange does not challenge the merits of Dr. Peterson's benchmarking analysis on appeal and does not argue that it provides an insufficient basis for setting the rates in this case.

***Effective competition adjustment.***  The expert analysis recognized that record labels have "complementary oligopoly power in the benchmark market for licensing of music services," resulting in "royalty rates set at supracompetitive levels even higher than a single monopolist

31

MATERIAL UNDER SEAL DELETED

would charge." JA446 (Determination 152). Accordingly, the Services'
experts proposed that the initial benchmark rate should be adjusted
downward to account for the supracompetitive negotiated rates. *Id.* Dr.
Peterson proposed a downward effective-competition adjustment of
between ▮▮▮▮ and ▮▮▮▮, based in part on services' ability to steer
users away from recordings with higher royalty rates. JA1264–65
(Determination 152–53).

The Board agreed that an effective-competition adjustment was
appropriate. JA453 (Determination 159); *see also Web IV Appeal*, 904
F.3d at 57 (affirming similar adjustment). The Board chose an
adjustment at the lower end of Dr. Peterson's proposed range—12%.
JA453 (Determination 159). Notably, the Board rejected the record
labels' claims that Spotify had amassed countervailing market power,
dismissing that testimony as lacking credibility. JA1158
(Determination 46). Instead, it found that other testimony from the
record label witnesses "supports the Services' characterization of
Spotify's weak pricing power and overall bargaining position, further
confirming the dubiousness of SoundExchange's claim that the Majors
did not ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████" with Spotify. JA1160 (Determination 48).

*Skips adjustment.* "Skips" are performance playback instances in which the user listens to the performance for 30 seconds or less before terminating playback or moving on to the next performance. *See* JA412 (Determination 118). The benchmark license agreements do not require interactive services to pay for skips, but the noninteractive commercial services at issue in these ratemaking proceedings do report and pay on such skips. *See* JA413 (Determination 119).

Each of the three expert analyses proposed some amount of adjustment to account for this differential regarding skips. Dr. Peterson proposed a ███████ skips adjustment based on data concerning the number of sub-30-second plays on Spotify, and an alternative adjustment of ██████ based on Pandora's data. JA1263–64 (Determination 151–52). The Board declined to adopt either of Dr. Peterson's downward adjustment values, and instead adjusted the initial rate downward to account for skips by only ██████. JA1271 (Determination 159). The Board derived that figure from data about the prevalence of skips in the relevant statutory market. JA1270–71 (Determination 158–59).

*Interactivity adjustment.* All three experts proposed an "interactivity adjustment" based on the enhanced functionality of on-demand services versus noninteractive services. Dr. Peterson proposed a downward adjustment of ███████, which reflected the difference between the rate ███████████████████████████████████ and an ████████████████████████████████████████. JA1263–64 (Determination 151–52). Peterson reasoned that labels demand and receive more money for what they see as a "greater grant of rights (including the ability to let listeners hear on[ ]demand whatever songs they want whenever they wish." JA1263 (Determination 151).

Despite the unanimity of view among the three experts recommending that an interactivity adjustment be made, the Board declined to adopt it. It reasoned that the differences in the rates in the examined benchmarks might be attributable not to interactivity but to the labels' market power—making an interactivity adjustment a double-counting of the effective competition adjustment. JA452 (Determination 158). Further, the Board noted, "[a]dvertisers, not listeners, pay the royalties"—and the record contained "insufficient evidence to establish

34

**MATERIAL UNDER SEAL DELETED**

that advertisers make payments to noninteractive ad-supported services based upon the level of interactivity of that service." *Id.*

*Marketing adjustments.* The underlying license agreements contain provisions ██████████████████████████ ████████████████████████████████████ ██████ JA1265 (Determination 153). Dr. Peterson calculated a potential valuation for this nonmonetary consideration of ███████ █████████████ per play, but also testified that the value might well be zero, and Google argued against incorporating a marketing adjustment on that basis. *Id.* In response, SoundExchange urged that the Board should adopt the marketing values Dr. Peterson proposed. JA451 (Determination 157). The Board agreed with SoundExchange and applied Dr. Peterson's proposed marketing adjustments. JA454 (Determination 160).

*Funneling adjustment.* Dr. Shapiro and Mr. Orszag testified that the benchmark rate was lower than it should otherwise have been because of ████████ ability to "funnel" listeners—converting listeners who initially join the ad-supported service into subscribers, who "pay a higher retail price and generate higher royalties." JA1257–58

MATERIAL UNDER SEAL DELETED

(Determination 145–46). Those two experts agreed that an upward adjustment of ▮▮▮▮▮▮▮▮ was appropriate to account for the discount in the benchmark rate resulting from ▮▮▮▮ funneling. JA1259 (Determination 147). During trial, Dr. Peterson argued against the need for such an upward adjustment, but the Board sided with Dr. Shapiro and Mr. Orszag, JA453 (Determination 159)—a decision that was, at a minimum, supported by substantial evidence. *E.g.*, *NextEra Energy Res., LLC v. FERC*, 898 F.3d 14, 23–24 (D.C. Cir. 2018) (FERC "relied on substantial evidence" when it considered "expert testimony that . . . described and quantified potentially severe price suppression" but nevertheless "credited competing expert testimony that predicted the price impact was more limited").

***Final calculation***. Once the Board had determined which adjustments to apply to the initial benchmark, it walked, step by step, through its calculation of the final reasonable range. JA1271–72 (Determination 159–60). It concluded that the reasonable range of rates following adjustments to the benchmark rates was $0.00197 to $0.00228. JA1272 (Determination 160). It therefore adopted the rounded midpoint

of that range, $0.0021, as a "reasonable estimate of the rate applying the Judges' modifications to Dr. Peterson's model." *Id.*

SoundExchange identifies no error with the Board's methodology. It does not contend that the underlying benchmarks were incomparable, that the Board failed to make necessary adjustments, or that the Board's benchmark selection was arbitrary.

## CONCLUSION

For these reasons, SoundExchange's objection to the Board's determination should be rejected.

Respectfully submitted,

*/s/ Kenneth L. Steinthal*

Sarang V. Damle
Blake E. Stafford
LATHAM & WATKINS LLP
555 Eleventh Street NW
Suite 1000
Washington, DC 20004
(202) 637-2200
Sy.damle@lw.com

Joseph R. Wetzel
Andrew M. Gass
Brittany N. Lovejoy
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 84111
(415) 391-0600

Samir Deger-Sen
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for Intervenor*
*National Association of*
*Broadcasters*

Kenneth L. Steinthal
KING & SPALDING LLP
50 California Street
Suite 3300
San Francisco, CA 94111
(415) 318-1200
ksteinthal@kslaw.com

Joshua N. Mitchell
David P. Mattern
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500

*Counsel for Intervenor*
*Google LLC*

Karyn K. Ablin
FLETCHER, HEALD &
HILDRETH, PLC
1300 N. 17th Street
11th Floor
Arlington, VA 22209
(703) 812-0443
ablin@fhhlaw.com

*Counsel for Intervenor*
*National Religious Broadcasters*
*Noncommercial Music License*
*Committee*

Final Brief: January 12, 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of this Court's April 28, 2022 Order, because it contains 6,543 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(a)(1).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in the proportionally spaced typeface Century Schoolbook 14-point font using Microsoft Word 365 ProPlus.

Dated: January 12, 2023

*/s/ Kenneth L. Steinthal*
Kenneth L. Steinthal

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2023, I electronically filed the public version of the foregoing corrected intervenor brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Kenneth L. Steinthal*
Kenneth L. Steinthal