**ORAL ARGUMENT SCHEDULED FOR FEBRUARY 17, 2023**

**Nos. 21-1243, 21-1244, 21-1245**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NATIONAL RELIGIOUS BROADCASTERS NONCOMMERCIAL
MUSIC LICENSE COMMITTEE; NATIONAL ASSOCIATION OF
BROADCASTERS; and SOUNDEXCHANGE, INC.,

Appellants,

v.

COPYRIGHT ROYALTY BOARD; LIBRARIAN OF CONGRESS,

Appellees,

GOOGLE LLC; PANDORA MEDIA, LLC; SIRIUS XM RADIO INC.;
SOUNDEXCHANGE, INC.; and NATIONAL RELIGIOUS
BROADCASTERS NONCOMMERCIAL MUSIC LICENSE
COMMITTEE,

Intervenors.

———————————

On Appeal from a Final Determination of the Copyright Royalty Board

———————————

## FINAL BRIEF FOR APPELLEES

———————————

> MICHAEL D. GRANSTON
> *Deputy Assistant Attorney*
> *General*
>
> DANIEL TENNY
> JENNIFER L. UTRECHT
> *Attorneys, Appellate Staff*
> *Civil Division, Room 7710*
> *U.S. Department of Justice*
> *950 Pennsylvania Avenue NW*
> *Washington, DC 20530*
> *(202) 353-9039*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici

The following parties appeared before the Copyright Royalty Judges in the administrative proceedings below:  AccuRadio, LLC; College Broadcasters, Inc.; David Powell; Educational Media Foundation; Live365 Broadcaster, LLC; La Raza Media Group, LLC; Pandora Media LLC; Radio Coalition, Inc.; Sirius XM Radio; National Religious Broadcasters Noncommercial Music License Committee; National Association of Broadcasters; Feed Media Inc.; Dash Radio Inc.; TuneIn, Inc.; National Public Radio, Inc.; Radio Paradise Inc.; iHeartMedia, Inc.; ICON Health & Fitness, Inc.; Google Inc.; and SoundExchange, Inc., which participated on the joint behalf of The American Federation of Musicians, the United States and Canada, Screen Actors Guild/American Federation of Television and Radio Artists, the American Association of Independent Music, Sony Music Entertainment, UMG Recordings, Inc., Warner Music Group Corp., and

Jagjaguwar Inc.  No amici appeared before the Judges in the proceeding below.

In Case No. 21-1243, the appellant is the National Religious Broadcasters Noncommercial Music License Committee, and the appellees are the Copyright Royalty Board and the Librarian of Congress.  The intervenors are Google LLC; Pandora Media, LLC; Sirius XM Radio Inc.; and SoundExchange, Inc.

In Case No. 21-1244, the appellant is SoundExchange, Inc., and the appellees are the Copyright Royalty Board and the Librarian of Congress.  The intervenors are the National Religious Broadcasters Noncommercial Music License Committee; Google LLC; the National Association of Broadcasters; Pandora Media, LLC; and Sirius XM Radio, Inc.

In Case No. 21-1245, the appellant is the National Association of Broadcasters, and the appellees are the Copyright Royalty Board and the Librarian of Congress.  The intervenors are Google LLC; Pandora Media, LLC; Sirius XM Radio Inc.; and SoundExchange, Inc.

## B.    Rulings Under Review

This case is a direct appeal from a final determination of the Copyright Royalty Judges.  Appellants seek review of the Judges' determination establishing royalty rates and terms for the compulsory "webcasting" license for the digital performance of copyrighted sound recordings between January 1, 2021 and December 31, 2025.  *See* Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies To Facilitate Those Performances (Web V), 86 Fed. Reg. 59,452 (Oct. 27, 2021).  This brief generally cites to the public version of the Judges' final determination (JA295-605), which was later published in the Federal Register after review by the Register of Copyrights for legal error.  Because that publication redacts certain confidential and competitively sensitive information provided to the parties to the Copyright Royalty Judges, and because it is necessary for this Court to consider that information in deciding certain issues in this appeal, this brief occasionally cites to the restricted, unredacted version of that ruling.  (JA1113-1423).

## C.    Related Cases

This case has not been reviewed previously by this Court or any other court.  Apart from the consolidated cases listed above,

undersigned counsel is not aware of any related cases within the

meaning of D.C. Circuit Rule 28(a)(1)(C).


*/s/ Jennifer Utrecht*
Jennifer Utrecht

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ................................................................. 1

STATEMENT OF JURISDICTION .................................... 3

STATEMENT OF THE ISSUES ........................................ 4

PERTINENT STATUTES AND REGULATIONS ................. 5

STATEMENT OF THE CASE ........................................... 5

I.    Statutory and Regulatory Background ........................ 5

    A.    Statutory Background ........................................ 5

    B.    The Webcasting Statutory License ..................... 7

    C.    Prior Webcasting Proceedings ......................... 11

II.    Factual and Procedural Background ......................... 12

    A.    The Administrative Proceeding ......................... 12

    B.    The Judges' Determination ............................. 13

SUMMARY OF ARGUMENT .......................................... 23

STANDARD OF REVIEW .............................................. 31

ARGUMENT ................................................................ 32

I.    The Copyright Royalty Judges Established Reasonable Rates
for Ad-Supported Commercial Webcasting Services ..................... 32

    A.    The Judges Reasonably Based the Rates for Ad-Supported Services on Rates and Terms Found in Comparable Voluntary License Agreements ........................ 33

    B.    The Judges Reasonably Rejected a Proposal to Set a Distinct Rate for Simulcasters ............................... 48

II.    The Judges Established Reasonable Rates for Non-Commercial Services ......................................................... 64

    A.    The Judges Reasonably Determined That the Religious Broadcasters' Rate Proposal Was Not Supported by Comparable License Agreements........................................... 66

    B.    The Judges Reasonably Adopted the Same Rate Structure That Has Governed Noncommercial Services Since *Web II* ............................................................ 78

    C.    The Rates Established by the Judges Do Not Violate the Religious Freedom Restoration Act or the First Amendment ...................................................... 85

III.    The Judges Reasonably Increased the Minimum Fee to Account for the Increased Administrative Costs of Administering the Statutory License............................................. 87

CONCLUSION.......................................................................... 98

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:**                                                              **Page(s)**

*Beethoven.com LLC v. Librarian of Congress*,
  394 F.3d 939 (D.C. Cir. 2005) ..........................................................11-12

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
  574 F.3d 748 (D.C. Cir. 2009) ....................................................12, 32, 75

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
  796 F.3d 111 (D.C. Cir. 2015) ....................................................12, 32, 75

*Johnson v. Copyright Royalty Bd.*,
  969 F.3d 363 (D.C. Cir. 2020) ............................................................8, 37

*Kennedy v. Bremerton Sch. Dist.*,
  142 S. Ct. 2407 (2022) ....................................................................85, 86

*Music Choice v. Copyright Royalty Bd.*,
  970 F.3d 418 (D.C. Cir. 2020) ...................................................................8

*Music Choice v. Copyright Royalty Bd.*,
  774 F.3d 1000 (D.C. Cir. 2014) ..................................................45, 75, 76

*SoundExchange, Inc. v. Copyright Royalty Bd.*,
  904 F.3d 41 (D.C. Cir. 2018) ......................................2, 9, 12, 24, 32, 33,
                                                                35, 49, 50, 64, 75
*Zevallos v. Obama*,
  793 F.3d 106 (D.C. Cir. 2015) ............................................................64


**Statutes:**

Copyright Royalty and Distribution Reform Act of 2004,
  Pub. L. No. 108-419, 118 Stat. 2341
  (codified at 17 U.S.C. § 801 *et seq.*).........................................................5

Digital Performance Right in Sound Recordings Act of 1995,
  Pub. L. No. 104-39, 109 Stat. 336.............................................................9

§ 2, 109 Stat. at 336 (codified at 17 U.S.C. § 106(6)) .......................... 9

§ 3, 109 Stat. at 338 (codified at 17 U.S.C. § 114(d)(2)) ..................... 9

Orrin G. Hatch-Bob Goodlatte Music Modernization Act,
Pub. L. No. 115-264, § 103(i), 132 Stat. 3676, 3725-26 (2018) ............. 8

5 U.S.C. § 706 ................................................................................. 46

17 U.S.C. § 101 *et seq.* ................................................................... 5

17 U.S.C. § 101 ................................................................................. 8

17 U.S.C. § 102 ................................................................................. 8

17 U.S.C. § 106 ................................................................................. 5

17 U.S.C. § 106(4) ............................................................................ 8

17 U.S.C. § 106(6) ........................................................................... 61

17 U.S.C. § 112(e)(3)-(4) ........................................................... 22, 87

17 U.S.C. § 112(e)(4) ...................................................................... 10

17 U.S.C. § 114(d)(2)(A)(i) ......................................................... 10, 34

17 U.S.C. § 114(f)(1) .................................................................. 1, 7, 10

17 U.S.C. § 114(f)(1)(B) ....................................... 1, 5, 10, 11, 18, 22,
32, 48, 55, 60, 61, 87

17 U.S.C. § 114(f)(1)(B)(i) ........................................................ 21, 66, 78

17 U.S.C. § 114(f)(1)(B)(i)-(ii) ....................................................... 10

17 U.S.C. § 114(f)(1)(B)(ii) ....................................................... 33-34, 66

17 U.S.C. § 114(f)(4)(C) .................................................................. 71

17 U.S.C. § 114(g) ................................................................ 23, 31, 88

17 U.S.C. § 114(g)(3) ................................................................. 90, 92

17 U.S.C. § 114(j)(3) ................................................................................ 7

17 U.S.C. § 114(j)(7) ..............................................................7, 15, 34, 60

17 U.S.C. § 114(j)(11) .............................................................................. 7

17 U.S.C. § 115(d)(7) ............................................................................. 92

17 U.S.C. § 115(e)(6) ............................................................................. 92

17 U.S.C. § 710 ...................................................................................... 13

17 U.S.C. § 710(a) ................................................................................. 13

17 U.S.C. § 801 ........................................................................................ 4

17 U.S.C. § 801(b)(1) ............................................................................... 1

17 U.S.C. § 801(b)(7) ............................................................................... 6

17 U.S.C. § 802(f)(1)(D) .......................................................................... 6

17 U.S.C. § 803 ........................................................................................ 6

17 U.S.C. § 803(b)(2) ............................................................................... 6

17 U.S.C. § 803(c) .................................................................................... 6

17 U.S.C. § 803(c)(1) ............................................................................. 13

17 U.S.C. § 803(c)(6) ............................................................................... 7

17 U.S.C. § 803(d)(1) .......................................................................... 4, 7

17 U.S.C. § 804(b)(3)(B) ....................................................................... 12

42 U.S.C. § 2000bb-1 ............................................................................ 86

**Regulations:**

37 C.F.R. § 301.1 ................................................................. 3

37 C.F.R. § 351.10 ............................................................ 46

37 C.F.R. § 351.10(e) ........................................................ 82

37 C.F.R. § 351.11 ............................................................ 6

37 C.F.R. § 351.14 ............................................................ 6

37 C.F.R. § 380.10 (2020) ................................................. 36

37 C.F.R. § 380.10(b) (2020) ............................................ 87

37 C.F.R. § 380.31 ..................................................... 20, 67, 72

37 C.F.R. § 380.31(b)(3) ................................................... 68

37 C.F.R. § 3802.32 (2020) ....................................... 69, 72

**Legislative Materials:**

H.R. Rep. No. 104-274 (1995) ........................................... 60

H.R. Rep. No. 105-796 (1998) ........................................... 92

**Other Authorities:**

Copyright Office, *Copyright and the Music Marketplace*,
   https://www.copyright.gov/policy/musiclicensingstudy/
   copyright-and-the-music-marketplace.pdf ............................ 60

Determination of Royalty Rates and Terms for Ephemeral
   Recording and Webcasting Digital Performance of Sound
   Recordings (Web IV),
   81 Fed. Reg. 26,316 (May 2, 2016) ................... 11, 35, 50, 51, 65, 66, 75,
                                                              76, 77, 80, 93, 94

Determination of Rates and Terms for Preexisting Subscription
   Services and Satellite Digital Audio Radio Services,
   73 Fed. Reg. 4080 (Jan. 24, 2008) ........................................... 75

Determination of Rates and Terms for Preexisting Subscription
   Services and Satellite Digital Audio Radio Services,
   78 Fed. Reg. 23,054 (Apr. 17, 2013) ....................................... 73

Determination of Royalty Rates for Digital Performance Right
   in Sound Recordings and Ephemeral Recordings,
   79 Fed. Reg. 23,102 (Apr. 25, 2014) ....................................... 94

Determination of Rates and Terms for Digital Performance
   of Sound Recordings and Making of Ephemeral Copies To
   Facilitate Those Performances (Web V),
   86 Fed. Reg. 59,452 (Oct. 27, 2021) ..................................... 3-4

Digital Performance Right in Sound Recordings and Ephemeral
   Recording,
   72 Fed. Reg. 24,084 (May 1, 2007) .................................... 11, 18, 33, 49,
                                                      64, 65, 76, 77, 80, 94
   84 Fed. Reg. 359 (Jan. 24, 2019) ........................................... 12

   85 Fed. Reg. 11,857 (Feb. 28, 2020) ..................................... 67

# GLOSSARY

| | |
|---|---|
| Judges | Copyright Royalty Judges, 17 U.S.C. § 801 *et seq.* |
| FD | Final Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies To Facilitate Those Performances (Web V), (JA295-605). |
| NAB | National Association of Broadcasters |
| Tr. | Transcript of Evidentiary Hearing |

**INTRODUCTION**

Congress entrusted to the Copyright Royalty Judges the responsibility to establish reasonable royalty rates and terms for various statutory licenses under the Copyright Act on a recurring basis. 17 U.S.C. § 801(b)(1).  This case concerns the statutory license for noninteractive "webcasting"—that is, the public performance of copyrighted sound recordings over the internet.  Congress instructed the Copyright Royalty Judges periodically to receive evidence from interested parties and, on the basis of the record before them, establish royalty rates and terms for webcasters "that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller."  *Id.* § 114(f)(1).  In approaching this task, the Copyright Act permits the Judges to "distinguish among the different types" of eligible services when various considerations lead the Judges to believe that willing buyers and willing sellers would agree to different rates for such types of services. *Id.* § 114(f)(1)(B).

After presiding over a year of adversarial proceedings—including a five-week administrative trial featuring testimony from 33 fact and

expert witnesses, and 748 exhibits spanning over 900,000 pages—the Judges issued a final determination fixing the royalty rates and terms for the years 2021 to 2025.  In that determination, as in prior ratesetting proceedings upheld by this Court, the Judges established three separate rates:  one for subscription-based commercial services, one for ad-based commercial services, and one for noncommercial services.  The distinctions among these three types of services were based upon evidence that these services occupy distinct segments of the noninteractive webcasting market and do not generally compete for listeners, which would lead willing buyers and willing sellers to agree to different rates.  *See generally SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 59 (D.C. Cir. 2018).  To the extent that noninteractive services serve the same market, the Judges have consistently concluded that a willing seller would not tolerate a difference in per-play rates, for fear that listeners of the higher-paying service would switch to the lower-paying one.

Appellants raise various arguments contending that the Judges' determination is not sufficiently generous to their conflicting interests.  SoundExchange, representing artists and copyright owners, alleges that

the Judges set the rates for ad-based commercial services (but no other type of service) too low. The National Association of Broadcasters (NAB), representing a group of ad-based commercial services, contends that the Judges should have further distinguished within the rates for ad-based commercial services and established a separate, even lower rate for a subset of that group. And the National Religious Broadcasters Noncommercial Music License Committee (Religious Broadcasters), representing a group of noncommercial services, contends that the Judges erroneously set rates for noncommercial webcasters too high.

None of the appellants identifies any sufficient basis for setting aside the Judges' determination. The Judges' resolution of the parties' conflicting proposals was reasonable, consistent with the Copyright Act, and adequately explained.

## STATEMENT OF JURISDICTION

The final determination of the Copyright Royalty Judges was published in the Federal Register on October 27, 2021.[1] Determination

---

[1] Appellants refer to the agency as the "Copyright Royalty Board," a term drawn from regulations. 37 C.F.R. § 301.1. This brief uses the

*Continued on next page.*

of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies To Facilitate Those Performances (Web V), 86 Fed. Reg. 59,452 (Oct. 27, 2021) (*Web V*). Appellants each filed timely notices of appeal on or before November 26, 2021. *See* 17 U.S.C. § 803(d)(1) (30-day time limit). This Court has jurisdiction under 17 U.S.C. § 803(d)(1).

## STATEMENT OF THE ISSUES

1. Whether the established rate for ad-supported services contradicted any "finding" by the Judges regarding the opportunity cost associated with such services.

2. Whether the Judges reasonably declined to set a separate rate for certain entities whose internet broadcasts are simultaneously broadcast over terrestrial radio.

3. Whether the Judges reasonably retained the rate structure for noncommercial broadcasters that has been in use since the Judges' first ratesetting proceeding.

---

statutory term "Copyright Royalty Judges," 17 U.S.C. § 801, following the Judges' own practice.

4

4. Whether the Judges reasonably increased the minimum fee charged to webcasters in light of evidence regarding an increase in administrative costs.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### I.    Statutory and Regulatory Background

### A.    Statutory Background

The Copyright Act, 17 U.S.C. § 101 *et seq.*, confers on the owner of a copyright a set of exclusive rights in the copyrighted work.  *See generally id.* § 106.  In some circumstances, the Act limits the exclusivity of these rights by permitting use of the copyrighted work by any person who satisfies conditions set by law, including payment of a royalty.  *See, e.g.*, *id.* § 114(f)(1)(B).  Since 2004, Congress has entrusted responsibility for setting and adjusting the rates and terms for statutory licenses to the Copyright Royalty Judges.  *See* Copyright Royalty and Distribution Reform Act of 2004, Pub. L. No. 108-419, 118 Stat. 2341 (codified at 17 U.S.C. § 801 *et seq.*).

The Copyright Act encourages copyright owners and users to negotiate mutually agreeable rates and terms for statutory licenses and empowers the Copyright Royalty Judges to adopt such negotiated settlements "as a basis for statutory terms and rates." 17 U.S.C. § 801(b)(7). Absent a settlement, however, the Judges must conduct a contested royalty ratesetting proceeding. Such proceedings take the form of a multi-party administrative trial, complete with discovery, expert witnesses, documentary evidence, and often live oral testimony. *See generally id.* § 803.

Any party with a "significant" interest in the proceeding may participate, 17 U.S.C. § 803(b)(2), and may file, among other things, written direct evidentiary statements, rebuttal statements, and proposed findings of fact and conclusions of law supporting their request for a particular rate, 37 C.F.R. §§ 351.11, 351.14. At the end of the adversarial proceeding, the Judges issue a final determination setting rates and terms for the relevant license period. *See generally* 17 U.S.C. § 803(c). Following a review for legal error by the Register of Copyrights, *id.* § 802(f)(1)(D), the Librarian of Congress then publishes the determination in the Federal Register and makes the determination

6

and administrative record available to the public, *id.* § 803(c)(6). An

aggrieved party may seek direct review in this Court of a final

determination of the Copyright Royalty Judges by filing a notice of

appeal within 30 days of that publication. *Id.* § 803(d)(1).

## B.    The Webcasting Statutory License

This case involves the royalty rates and terms set by the

Copyright Royalty Judges for the digital performance of copyrighted

sound recordings over the internet by noninteractive services—that is,

services that generally do not permit listeners to select the particular

songs that they wish to hear on demand. 17 U.S.C. § 114(f)(1); *id.*

§ 114(j)(7) (defining "interactive" services). Such services are

colloquially referred to as noninteractive "webcasting" services, in

reference to the medium for transmission, in contrast to "broadcasting"

services which transmit music through broadcast radio stations licensed

by the Federal Communications Commission. *Id.* § 114(j)(3) (defining

broadcast transmission).[2]

---

[2] The proceeding below does not concern the rates for "preexisting
subscription services"—that is, services that predate the revision of the
Copyright Act in 1998. 17 U.S.C. § 114(j)(11). Until recently,
proceedings for such services were subject to a distinct standard for
establishing reasonable rates. The last ratesetting proceeding for

*Continued on next page.*

7

As this Court has explained, recorded music—such as a song track on a compact disc—embodies two distinct copyrighted works:  a "musical work" and a "sound recording."  *See* 17 U.S.C. § 102.  *See generally Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 367-68 (D.C. Cir. 2020).  The "musical work" is the underlying musical composition— the notes and lyrics of a song.  The "sound recording," by contrast, is what results when that musical work is performed by a particular artist and the ensuing "series of musical, spoken, or other sounds" is fixed in a recording medium.  17 U.S.C. § 101.  Although both works can be embodied in a single recording of a song, "musical works" and "sound recordings" are distinct works subject to different rules under the Copyright Act.

Owners of musical works have long enjoyed the exclusive right to "perform" those works to the public, *see* 17 U.S.C. § 106(4), but historically the owner of the copyright to a sound recording did not

---

preexisting subscription services, which commenced prior to the change in law, established rates and terms for such services through the end of 2022.  *See generally Music Choice v. Copyright Royalty Bd.*, 970 F.3d 418 (D.C. Cir. 2020).  Congress extended those rates and terms through the end of 2027.  Orrin G. Hatch-Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264, § 103(i), 132 Stat. 3676, 3725-26 (2018).

enjoy an exclusive performance right under federal law.

*SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 46 (D.C. Cir. 2018). In 1995, however, Congress granted owners of copyrighted sound recordings a limited exclusive right to "perform the copyrighted work publicly by means of a digital audio transmission" subject to certain exceptions. Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39, § 2, 109 Stat. 336, 336 (codified at 17 U.S.C. § 106(6)). Congress did not extend that right to analog over-the-air radio broadcasts, however, so terrestrial radio stations can still broadcast sound recordings without licensing their use.

In the same legislation that created the digital performance right in sound recordings, Congress created a statutory license for performances by certain webcasting services. *See* Pub. L. No. 104-39, § 3, 109 Stat. at 338 (codified at 17 U.S.C. § 114(d)(2)). The statutory license applies only to noninteractive services; interactive services, which provide the ability to listen to a given song on demand, must

negotiate with copyright owners directly for the right to perform a sound recording.  17 U.S.C. § 114(d)(2)(A)(i).[3]

For webcasting services who wish to use the statutory license, the Copyright Act directs the Copyright Royalty Judges periodically to determine "reasonable rates and terms" that "most clearly represent" what "would have been negotiated in the marketplace between a willing buyer and a willing seller."  17 U.S.C. § 114(f)(1).  The Judges must base their determination on the "economic, competitive, and programming information presented by the parties."  *Id.* § 114(f)(1)(B).  *See generally id.* § 114(f)(1)(B)(i)-(ii).  As one means of deriving such rates and terms, the Act provides that the Judges "may consider the rates and terms for comparable types of audio transmission services and comparable circumstances under voluntary license agreements" submitted by the parties, *id.* § 114(f)(1)(B), which are often referred to as "benchmark" agreements.

---

[3] Congress also created a related statutory license that authorizes the generation of necessary reproductions in the process of webcasting.  *See* 17 U.S.C. § 112(e)(4).  Consistent with their past practice, the Judges here determined that a percentage of the royalties paid under the section 114 statutory license would encompass any royalties owed for these reproductions.  Final Determination (FD) 290-92 (JA584-86).  No party challenges that approach on appeal.

10

In addition, in each ratesetting cycle for the webcasting statutory license, the Act directs the Judges to "distinguish among the different types of . . . services then in operation" based on, among other factors, the "quantity and nature of the uses of sound recordings" by different types of services and the degree to which the service substitutes for or promotes purchases of music. 17 U.S.C. § 114(f)(1)(B). On this basis, the Judges have historically distinguished, for example, between commercial and non-commercial webcasting services, and between subscription-based and ad-based commercial services. *See, e.g.*, Digital Performance Right in Sound Recordings and Ephemeral Recording, 72 Fed. Reg. 24,084, 24,097 (May 1, 2007) (*Web II*); Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV), 81 Fed. Reg. 26,316, 26,346 (May 2, 2016) (*Web IV*).

## C.    Prior Webcasting Proceedings

This is the fifth contested ratesetting proceeding under the webcasting statutory license. The first, which was conducted under the auspices of the Librarian of Congress before the 2004 enactment of the current statutory scheme, was upheld by this Court in *Beethoven.com*

*LLC v. Librarian of Congress*, 394 F.3d 939 (D.C. Cir. 2005). The second determination—and the first by the Copyright Royalty Judges— was affirmed in most respects in *Intercollegiate Broadcast System, Inc. v. Copyright Royalty Board*, 574 F.3d 748 (D.C. Cir. 2009) (per curiam). The third was affirmed by this Court in *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 796 F.3d 111 (D.C. Cir. 2015). And the fourth was affirmed in *SoundExchange*, 904 F.3d 41.

## II.   Factual and Procedural Background

### A.   The Administrative Proceeding

As Congress directed, *see* 17 U.S.C. § 804(b)(3)(B), the Copyright Royalty Judges commenced this ratesetting proceeding in January 2019. 84 Fed. Reg. 359 (Jan. 24, 2019). Twenty parties filed petitions to participate, including SoundExchange, who participated on behalf of several entities representing artists and copyright owners. FD 2 (JA296). The Judges received and approved two settlements, one between SoundExchange and several public broadcasters who also transmit sound recordings over the internet, and another between SoundExchange and certain college radio stations and other noncommercial educational webcasters. FD 3 (JA297).

After extensive discovery and multiple rounds of motion practice, the Judges commenced a five-week evidentiary hearing, during which the Judges heard oral testimony from 33 fact and expert witnesses and admitted 748 exhibits into evidence, consisting of over 900,000 pages of documents.  FD 3-4 (JA297-98).  Of the non-settling licensees, only Google, iHeart Media, Pandora, Sirius XM, Appellant NAB, and Appellant Religious Broadcasters participated in the evidentiary hearing.

## B.    The Judges' Determination

The Judges issued an initial determination in June 2021.[4]  No participants filed petitions for rehearing.  After review by the Register of Copyrights for legal error, the final determination was published in the Federal Register in October 2021.

**1.** Consistent with past practice, the Judges' final determination established three separate rates:  one for subscription-based commercial

---

[4]  Pursuant to 17 U.S.C. § 803(c)(1), the Judges' initial determination was due no later than December 16, 2020.  To account for the disruption and delay caused by the COVID-19 pandemic, however, the Acting Register of Copyrights exercised her authority under 17 U.S.C. § 710 to "toll, waive, adjust, or modify" that timing provision until June 14, 2021.  FD 4 (JA298) (quoting 17 U.S.C. § 710(a)).

services, one for ad-supported commercial services, and one for noncommercial services. The distinctions among these types of services were based upon evidence that these services occupy distinct segments of the noninteractive webcasting market such that the services do not generally compete for listeners. Under such circumstances, copyright owners may be incentivized to offer lower rates to expand their total revenue.

The Judges declined other proposals to further differentiate among the rates paid by various webcasting services, including, as relevant here, a proposal by NAB that would permit simulcasters—webcasting services that transmit over the internet the same music played on broadcast radio—to pay substantially lower rates than other ad-supported services. FD 218-49 (JA512-43). In so holding, the Judges found it significant—as they have in prior proceedings—that there was evidence that "simulcasters and other commercial webcasters compete in the same submarket" for listeners. FD 249 (JA543); *see also* FD 5 (JA299) (discussing the Judges' decision regarding a similar proposal in *Web IV*). Willing sellers thus would not have an incentive to agree to a lower rate because the consequence of doing so would be to

14

risk the transfer of listeners from services that pay a higher rate per play to a lower-paying service. *See, e.g.*, FD 62 n.77 (JA356 n.77).

NAB sought to support its proposal for a separate rate through survey evidence designed to show the degree to which simulcast listeners would divert to other streaming services if simulcasting services were no longer available. FD 228-41 (JA522-35). As the Judges explained, however, that survey was fatally flawed because it omitted other services subject to the statutory license, including internet radio services, without explanation or justification. FD 245-49 (JA539-43).

The Judges also rejected NAB's contention that willing sellers would agree to a lower rate for simulcasters on the ground that simulcast transmissions have a greater promotional value than other webcast transmissions or that simulcasting services use sound recordings in a different manner than other webcasting services. To that end, NAB sought to compare simulcasting services to "custom radio" services, like Pandora, which transmit music through personalized stations that reflect individual listeners' preferences—a functionality that NAB informally describes as "interactivity." *But see*

15

17 U.S.C. § 114(j)(7) (defining an "interactive service" differently from NAB's use of the term).  As with NAB's reliance on the flawed survey evidence, the Judges found that this comparison treated internet radio—which, like simulcasts, transmit the same non-personalized music to all listeners to a particular channel—as indistinct from custom radio without adequate explanation or justification.  FD 224-27 (JA518-521).  And in any event, the Judges found that the record did not support NAB's contention that the Judges should distinguish rates between services based upon differing degrees of user functionality or that copyright owners assigned a distinct promotional value to simulcast transmissions.  FD 225-26 (JA519-20).

**2.**  Having found that the record did not support further segmentation of the rates and terms for commercial services, the Judges looked to the parties' economic, competitive, and programming information to determine appropriate rates for subscription-based and ad-based commercial services.

As relevant here, the Judges looked to the rates and terms of license agreements negotiated between record labels and interactive webcasters—that is, services that allow fee-paying listeners to select

the particular sound recordings they wish to hear on demand and that
are not entitled to rely on the webcasting statutory license—to identify
a reasonable rate for ad-based commercial services.  FD 127-60 (JA421-
454).  All parties agreed that it was necessary to adjust the rates and
terms contained in these agreements to account for the differences
between the interactive webcasting marketplace and the hypothetical
marketplace for noninteractive webcasting, but they disagreed
regarding the extent of appropriate adjustments.

After determining which adjustments were appropriate and
supported by the record, the Judges observed that the parties' models
yielded quite similar results.  After appropriate adjustment, the
benchmark analysis of SoundExchange's expert Mr. Orszag yielded a
rate of $0.0024 (rounded) per play.  FD 149 (JA443).  The analysis of
Professor Shapiro, an expert for the services, yielded a rate of $0.0023
(rounded) per play.  FD 149 (JA443).  And the analysis by Google's
expert, Dr. Peterson, produced an adjusted rate of $0.0021 (rounded)
per play.  FD 160 (JA454).  The Judges ultimately concluded that
Google's analysis was the most thorough and reliable. FD 301 (JA595);
*see also* FD 149-60 (JA443-54) (discussing the relative strengths of

Google's analysis).  The Judges thus concluded that the "reasonable" royalty rate that "most clearly represent[ed]" what "would have been negotiated in the marketplace between a willing buyer and a willing seller" was a per-performance royalty rate of $0.0021 in 2021, adjusted annually for inflation until 2025.  17 U.S.C. § 114(f)(1)(B); FD 1 (JA295).

**3.**  The Judges also considered and rejected a proposal by Appellant Religious Broadcasters to substantially reduce the rates paid by noncommercial services.  As relevant here, since the second ratesetting proceeding for webcasters (*Web II*), the Judges have set significantly lower rates for noncommercial services based upon evidence that "up to a point," noncommercial webcasters operate "in a distinct segment of the noninteractive webcasting market" and do not compete with commercial webcasters for listeners.  *Web II*, 72 Fed. Reg. at 24,097.  To that end, the vast majority of noncommercial webcasters have historically paid only a minimum flat fee for up to 159,140 aggregate hours of performances each month.  For performances above that threshold, noncommercial webcasters pay the same marginal rate as commercial services.

18

In the current proceeding, the Religious Broadcasters proposed reducing the above-threshold usage rate to one-third of the prevailing rate for commercial services.[5]  The Religious Broadcasters claimed that settlement agreements negotiated between SoundExchange and various public broadcasters to avoid litigating in the current proceeding supported this reduced rate.  As the Judges explained, however, the Religious Broadcasters' reliance on that agreement suffered from considerable deficiencies that, "[i]n aggregate," supported rejection of the settlement as a reliable benchmark for determining the rates to which willing buyers and willing sellers would agree.  FD 268 (JA562).

Most fundamentally, the rates and terms in that agreement were completely distinct from the rates proposed by the Religious Broadcasters.  *See* FD 261-67 (JA555-61).  The settlement involved an

---

[5]  The Religious Broadcasters also proposed that, in the alternative, it should be able to pay a flat fee on behalf of all its members (but no other noncommercial services), which would cover a maximum number of plays on stations designated by the Religious Broadcasters.  Because the Judges must set rates that govern *all* noncommercial services, the Judges considered this additional request for a flat fee payment to be self-contained within the Religious Broadcasters' first proposal.  FD 254, 266 (JA548, 560).  All references in this brief to the Religious Broadcasters' rate proposal accordingly refer generally to the proposal to reduce the above-threshold usage rate to one-third of the prevailing rate for commercial services.

agreement to annual lump-sum payments of $800,000 to cover a set number of hours of music by the settling broadcasters and was explicitly understood to include "[a] discount that reflects the administrative convenience to [SoundExchange] of receiving annual lump sum payments that cover a large number of separate entities, as well as the protection from bad debt that arises from being paid in advance." 37 C.F.R. § 380.31.

The Religious Broadcasters' proposal did not mirror these terms. As noted, they sought a reduction in the per-play rate above the threshold subject to the flat minimum fee and did not propose annual lump sum payments. Their expert claimed that the lump sum payment in the settlement amounted to a usage rate roughly equivalent to the Religious Broadcasters' proposal, but the Judges found that the expert's testimony was not credible in several respects, and that his analysis should be afforded "little weight." FD 261-67 (JA555-61); *see also* Restricted FD 261-67 (JA1373-79). Among other concerns, the Judges cited the fact that the expert had not even attempted to account for potential ways in which the rates and terms in the settlement agreement differed from the rates that would be negotiated in a

20

hypothetical marketplace, nor did he adjust the rate proposal to account for its omission of valuable terms in the settlement agreement.  FD 266-67 (JA560-61).

Having determined that there were no reliable benchmark agreements from which to determine reasonable rates for noncommercial services, the Judges looked to other sources of "economic, competitive, and programming information presented by the parties," 17 U.S.C. § 114(f)(1)(B)(i), including the economic theory testimony of the parties' experts.  From this testimony, the Judges concluded that the current record supported a continuation of the existing rate structure for noncommercial services.  The Judges explained that the economic reasoning underlying that rate structure for noncommercial services had been based upon findings that noncommercial services generally have lower willingness (or ability) to pay royalties and that willing sellers would agree to lower rates for services that do not meaningfully compete with commercial services.  But that rationale erodes as noncommercial broadcasters increase in size and begin to compete with commercial services for listeners.

On the current record, the Judges cited several examples of evidence showing that at least some noncommercial broadcasters seek to expand their audiences, which poses a risk of "diverting listeners who otherwise would be listening to a commercial service." FD 271-72 (JA565-66). The Judges concluded that it was therefore appropriate to continue the existing rate structure, under which noncommercial services pay only a minimum fee for the right to play up to 159,140 aggregate hours each month and pay commercial rates for usage above that threshold. FD 277-80 (JA571-74). That rate structure has governed noncommercial services since *Web II* and provides all noncommercial services sizeable discounts over the royalties paid by commercial services. *See* FD 268-70 (JA562-64).

**4.** Finally, the Judges determined that the record supported an increase in the statutorily mandated "minimum fee for each . . . type of service" covered by the statutory license. 17 U.S.C. § 114(f)(1)(B); *id.* § 112(e)(3)-(4). Since 2006, the minimum fee for all services has been the same: $500 for each station or channel, with an aggregate cap on the minimum fee paid by each commercial webcaster of $50,000, such that the minimum fee is not increased further for additional stations or

22

channels after the first 100.  *See* FD 280-81 (JA574-75).  In the current proceeding, SoundExchange proposed increasing the minimum fee to $1,000 per channel, with a commensurate increase in the cap to $100,000 per commercial webcaster.

The Judges identified a number of possible justifications in the record for an increase in the minimum fee, including the fact that the costs of administering the statutory license—which SoundExchange deducts from the royalties it collects on behalf of artists and copyright owners, *see* 17 U.S.C. § 114(g)—had more than doubled since the last ratesetting proceeding.  See FD 285-88 (JA579-82).  Taken together, the Judges determined that the evidence supported a zone of reasonable minimum fees ranging from $656.77 to $1,170 per channel.  FD 289 (JA583).  Because SoundExchange's proposal fell comfortably within that range, the Judges adopted it.

## SUMMARY OF ARGUMENT

After presiding over more than a year of adversarial litigation, the Copyright Royalty Judges issued a written determination establishing the royalty rates that noninteractive webcasting services must pay to perform copyrighted sound recordings during the 2021 to 2025 license

period.  In doing so, the Judges distinguished—as they have in prior proceedings—between the rates to be paid by three different types of noninteractive webcasting services:  subscription-based commercial services, ad-based commercial services, and noncommercial services. The distinctions among these three types of services were based upon evidence that these services occupy distinct segments of the noninteractive webcasting market and do not generally compete for listeners, which would lead willing buyers and willing sellers to agree to different rates.  *See generally SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 59 (D.C. Cir. 2018).

The rates established by the Judges for all three types of services fell within the broad range of reasonable outcomes that the record and the Copyright Act would support.  None of the appellants present any serious claim that the Judges failed to follow the statute or otherwise acted contrary to their mandate.  Although appellants couch their arguments in legal terms, at bottom, their contentions are that the Judges drew the wrong inferences from the record, which provides no basis for setting aside the decision.

24

**1.** SoundExchange's principal argument relies on the principle that a reasonable royalty rate for ad-supported services should, at a minimum, cover record companies' opportunity costs—that is, recoup any profits lost when listeners left other sources of royalty-generating activities (such as buying digital downloads of music) and instead listened to music on ad-supported services.  SoundExchange claims that the rate of $0.0021 per play cannot be reconciled with language in the Judges' decision that SoundExchange reads as "finding," Br. 2, 24, 32-33, that the opportunity cost of licensing music to ad-supported services is $0.00222 per performance.

The Judges made no such finding.  To the contrary, in the portions of the final decision relied upon by SoundExchange, the Judges analyzed a game theory model introduced by SoundExchange's expert, Professor Willig, for which opportunity costs were one relevant input. And the Judges identified at least three flaws in Professor Willig's opportunity cost calculations:  his model overestimated the opportunity cost associated with the diversion of listeners from physical copies or digital downloads of music to ad-based services; it likewise overestimated the cost that would be associated with the diversion of

listeners from interactive services in an effectively competitive market; and it failed to consider the opportunity benefits provided by ad-based services that attract listeners who would otherwise spend their time engaged in activities that would not produce royalties, such as listening to terrestrial radio or reading a book. The Judges adjusted Professor Willig's model to account for the first flaw. But as to other concerns, the Judges did not make quantitative adjustments but rather merely observed that Professor Willig's calculations were flawed and that his model should be treated only as an upper bound for reasonable rates.

Because SoundExchange's arguments all flow from its erroneous assumption that the Judges accepted $0.00222 as the correct measure of opportunity costs, it provides no basis for overturning the Judges' final decision.

**2.** NAB's argument is that the Judges should have established a separate rate for a subset of ad-supported services who transmit over the internet the same music played on over-the-air radio broadcasts. As they have in prior proceedings, the Judges approached that inquiry by looking to, among other considerations, whether there is evidence that simulcasters operate in a sufficiently distinct submarket that a willing

seller would find that agreeing to a lower rate would supplement—not detract from—revenue from other types of noninteractive webcasting services.

The available evidence showed that simulcasters compete with other ad-based commercial services for listeners.  And although NAB sought to introduce survey evidence which, in its view, showed that simulcasters nevertheless serve a distinct market, that survey was fatally flawed.  The survey sought to identify how simulcast users might spend their time if that service was no longer available, but the survey inexplicably excluded internet radio services—which are also ad-based services subject to the statutory license—from the available alternative options.  The Judges were thus unable to discern from the survey whether, *inter alia*, listeners of internet radio might divert to using simulcast services were the Judges to set a different rate for simulcasters.

NAB makes no attempt to defend its flawed survey in this Court. Instead, NAB argues that the Judges failed to appropriately consider the ways in which simulcasts differ from custom radio—another subset of ad-supported services—because custom radio provides listeners with

curated playlists that reflect the listeners' individual preferences. But that argument suffers from the same flaws to those that plagued NAB's survey evidence. In both respects, NAB acts as if all ad-supported services other than simulcasting are indistinguishable, even though internet radio is plainly distinct from custom radio in ways that NAB alleges are significant—internet radio does not provide curated playlists to its users. And NAB, whose brief does not even address the Judges' criticism of its presentation for failing to consider internet radio, fails to explain how the Judges could properly set a separate rate for simulcasting based on the incomplete evidence that it provided.

**3.** The Religious Broadcasters take issue with the Judges' rejection of their proposal to dramatically reduce the rates paid by the largest noncommercial services. Since *Web II*, the Judges have distinguished between the rates paid by commercial and noncommercial services based on evidence that only the largest noncommercial services compete for listeners with commercial services. The Judges have accordingly adopted a rate structure for noncommercial services wherein the vast majority pay only a nominal annual fee for the right to play sound recordings up to a threshold number of aggregate tuning

**MATERIAL UNDER SEAL DELETED**

hours each month.  Those few noncommercial services that exceed this amount pay the same marginal rate as commercial services for any performances above that threshold.

In the current proceeding, the Religious Broadcasters proposed that noncommercial services should pay only one-third of the prevailing commercial rate for any plays above the threshold covered by the minimum fee.  But as the Judges thoroughly explained in their final decision, the settlement agreement on which the Religious Broadcasters relied fundamentally diverged from, and did not support, their proposal.  Indeed, the Religious Broadcasters' expert did not even purport to have sufficient data to be able to precisely calculate a per-performance rate from the lump-sum payment provided for in that settlement, instead merely deeming it █████████████████████████████████ ████████████████████████████████████████████████████

Restricted FD 264 (JA1376).

The Religious Broadcasters argue that the rates set by the Judges fail to take account of "buyer-side" considerations that would lead willing buyers and willing sellers to agree to lower rates than commercial services.  But the rate set in this proceeding is entirely

consistent with these considerations; all noncommercial services pay a much lower royalty rate than commercial services, who are not entitled to play a large number of songs for a nominal fee before incurring a per-play rate. And, as the Judges explained, although the Religious Broadcasters opined generally that noncommercial services have a lower willingness to pay than commercial services or that copyright owners would be willing to accept lower royalties from noncommercial services as a form of price discrimination, they did not address whether those concerns would result in even greater discounts for noncommercial services than those under the existing rate structure.

The Judges derived the rates for noncommercial services from data and predictions by several economic experts, properly analyzing the record as a whole and drawing conclusions based on those portions of the experts' analyses that the Judges found persuasive. That the Religious Broadcasters disagree with the conclusions reached provides no basis for overturning the Judges' reasoned decision.

**4.** Both NAB and the Religious Broadcasters (collectively, the "Services") challenge the Judges' decision to increase the minimum fee paid by each webcaster to $1,000 annually for each station or channel.

30

But the Judges' reasons for doing so were amply supported by the record and adequately explained.

The former $500 minimum fee had remained unchanged since 2006. In the current proceeding, the Judges identified several justifications for an increase in this fee that together supported a zone of reasonable fees ranging from $656.77 to $1,170 per channel. In particular, the Judges noted that the costs of administering the statutory license—which SoundExchange deducts from the royalties it collects on behalf of artists and copyright owners, *see* 17 U.S.C. § 114(g), —had more than doubled since the last ratesetting proceeding. Because SoundExchange's proposed increase to $1,000 per channel fell comfortably within the zone of reasonable fees supported by the record, the Judges adopted that fee. The Services' contention that the Judges could not premise an increase in the minimum fee on this demonstrated increase in administrative costs has no support in the statute or the record.

## STANDARD OF REVIEW

This Court will uphold a final determination of the Copyright Royalty Judges unless it is "arbitrary, capricious, contrary to law, or not

31

supported by substantial evidence." *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 127 (D.C. Cir. 2015) (quoting *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 755 (D.C. Cir. 2009) (per curiam)).  This Court has emphasized that judicial "review of 'administratively determined rates is particularly deferential because of their highly technical nature.'" *SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 50 (D.C. Cir. 2018) (quoting *Intercollegiate Broad. Sys., Inc.*, 796 F.3d at 127).

## ARGUMENT

### I.    The Copyright Royalty Judges Established Reasonable Rates for Ad-Supported Commercial Webcasting Services

The Copyright Act directs the Copyright Royalty Judges to set "reasonable" rates and terms for the webcasting statutory license that "most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller," as evidenced by "economic, competitive, and programming information presented by the parties."  17 U.S.C. § 114(f)(1)(B).  In the current proceeding, as in the prior ratesetting proceeding upheld by this Court, the Judges distinguished between two types of commercial

32

services:  subscription-based commercial services and ad-based commercial services.  That distinction was based on evidence that the two types of services occupy "distinct segments of the noninteractive webcasting market."  *SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 58 (D.C. Cir. 2018) (alteration omitted) (quoting *Web II*, 72 Fed. Reg. at 24,097).  No party objects to this distinction, nor does any party object to the rates set for subscription-based commercial services. Instead, SoundExchange claims that the Judges committed an error that resulted in the rates for ad-supported commercial services being set too low.  The National Association of Broadcasters, by contrast, argues that the Judges should have even further segmented the rates paid by commercial services and established a separate, lower rate for a subset of ad-supported services.  Neither argument has merit.

## A.    The Judges Reasonably Based the Rates for Ad-Supported Services on Rates and Terms Found in Comparable Voluntary License Agreements

1.  In setting rates for the statutory license for noninteractive webcasting services, the Copyright Royalty Judges "may consider the rates and terms for comparable types of audio transmission services and comparable circumstances under voluntary license agreements."  17

U.S.C. § 114(f)(1)(B)(ii). In these proceedings, each participant agreed that the Judges should rely on voluntary license agreements, with each participant espousing its preferred benchmark and criticizing as insufficiently "comparable" those espoused by others. In particular, each participant urged the Judges to look to the rates and terms of voluntary license agreements negotiated between record companies and *interactive* webcasting services—that is, services that permit listeners to request a particular song on-demand and which are not subject to the statutory license. *See id.* § 114(d)(2)(A)(i); *id.* § 114(j)(7) (defining "interactive service").

The parties generally agreed that adjustments should be made to those benchmark agreements to reflect differences between the interactive market and the hypothetical noninteractive market that is the subject of these proceedings but disagreed about which adjustments were appropriate. *See* FD 127-29, 134-38, 145-49, 149-55 (JA421-23, 428-32, 439-43, 443-49) (detailing the experts' models). In particular, the parties disagreed regarding how to appropriately adjust for the fact that—as the Judges previously held in an analysis upheld by this Court—interactive services must obtain licenses from all major record

34

companies to continue operating, which allows record companies to extract artificially high prices from interactive webcasting services. *See Web IV*, 81 Fed. Reg. 26,404-05, 26,331-33, 26,341-44.

As in *Web IV*, the Judges determined that effectively competitive rates set in the noninteractive market should not incorporate the artificially high prices paid by interactive services, and that it was appropriate to adjust these benchmark rates to reflect the rates that would be negotiated in an effectively competitive hypothetical market. *See* FD 6-73, 145 n.199, 159 (JA300-67, 439 n.199, 453); *see also Web IV*, 81 Fed. Reg. 26,366-69; *SoundExchange*, 904 F.3d at 49-50, 53-54 (discussing similar adjustments made in prior ratesetting proceeding). After determining which adjustments were appropriate, the Judges observed that the parties' models yielded quite similar results. The adjusted benchmark analysis of SoundExchange's expert Mr. Orszag yielded a rate of $0.0024 (rounded) per play. FD 149 (JA443). The analysis of Professor Shapiro, an expert for the services, yielded a rate of $0.0023 (rounded) per play. FD 149 (JA443). And the analysis by Google's expert, Dr. Peterson, produced an adjusted rate of $0.0021 (rounded) per play. FD 160 (JA454).

35

The Judges ultimately concluded that Google's analysis was the most thorough and reliable, and selected a $0.0021 per play rate for ad-supported commercial services.  FD 301 (JA595); *see also* FD 149-54 (JA443-48) (analyzing the relative strengths of Google's analysis).[6]

**2.**  On appeal, SoundExchange does not directly claim any infirmity in Dr. Peterson's adjusted benchmarking analysis, which was used to establish reasonable rates.  Instead, SoundExchange argues that the Judges' selection of the rate derived from that model was inconsistent with the Judges' alleged "finding" (Br. 2, 24, 32-33) that the opportunity cost of licensing music to ad-supported services is $0.0022 (rounded) per performance, which is one hundredth of a cent per performance higher than the rate the Judges selected.  The Judges made no such finding.

---

[6]  In a footnote, SoundExchange criticizes the Judges for "round[ing]" the rates calculated by these models "to four decimal places."  Br. 4.  At the hearing, however, SoundExchange did not object to this practice, which has been followed in prior ratesetting proceedings.  *See, e.g.*, 37 C.F.R. § 380.10 (2020) (setting rates rounded to four decimal places and requiring that rates adjusted annually for inflation also "be rounded to the nearest fourth decimal place").  To the contrary, SoundExchange's own rate proposal contained similarly rounded rates.  *See* JA210, 212 (SoundExchange Written Direct Statement 2, 21).

**a.** As an initial matter, the Judges' final determination generally references opportunity costs only with respect to various game theory economic models submitted by the parties that are distinct from the benchmarking models discussed above. For reasons adequately explained in the Judges' final determination, these non-benchmarking game theory models served only as "limited guideposts" and were not determinative in the Judges' selection of a reasonable rate. *See* FD 301, 203 (JA595, 497).

In particular, SoundExchange's expert, Professor Willig, relied on what is known as a "Shapley Analysis" to propose a reasonable rate, which is a game theory model that "seeks to assign to each market player the average marginal value that the player contributes to the market." *Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 372 (D.C. Cir. 2020). As one component of that model, Professor Willig asserted that a reasonable royalty for copyright owners would, at a minimum, cover record companies' opportunity costs—that is, it would recoup any profits lost when listeners left other sources of royalty-generating activities (such as buying digital downloads of music) and instead

listened to music on ad-supported services. *See* FD 162-203 (JA456-97) (discussing Professor Willig's model).

Although the Judges did not dispute Professor Willig's theoretical point that a royalty rate should cover the seller's opportunity cost, they identified at least three significant flaws in his opportunity-cost calculations. The record contained evidence sufficient to support appropriate adjustments to his model to account for one of the identified issues, but as to the other concerns, the parties provided no facts sufficient for the Judges to make quantitative adjustments. *See, e.g.*, FD 164 n.221, 180-85, 197-98, 202, 203 n.279 (JA458 n.221, 474-79, 491-92, 496, 497 n.279). However, the Judges found that these concerns showed that Professor Willig's calculations were flawed and that the $0.0023 per performance rate produced by his adjusted game theory model could serve only as a "limited guidepost" as to the upper bound for reasonable rates. *See* FD 301, 203 (JA595, 497). Because that rate was higher than the $0.0021 rate that was ultimately adopted, the Judges' analysis was entirely internally consistent, and indeed, the similarity of the figures derived from two separate methodologies confirmed the reasonableness of the $0.0021 rate.

As relevant here, the Judges adjusted Professor Willig's analysis because they credited testimony by Professor Shapiro, who opined that Professor Willig "inflated the opportunity costs attributable to purchases of CDs, vinyl records (vinyl) and digital downloads." FD 190 (JA484). In his written and oral testimony, Professor Shapiro precisely calculated the extent of this overestimate, and the Judges found Professor Shapiro's corrections to be "reasonable and appropriate." FD 192, 194, 195 (JA486, 488, 489). Consistent with Professor Shapiro's calculations, the Judges concluded that his "adjustments reduce the opportunity cost for ad-supported services from $████ (Professor Willig's estimate) to $███ (Professor Shapiro's adjusted estimate)," Restricted FD 200-01 (JA1312-13) (citing JA1751, 1765 (Shapiro Written Rebuttal Testimony 50, 64)), and that this adjustment reduced the rates produced by Professor Willig's model to $0.0023 per play, *see* FD 301 (JA595); Restricted FD 202-03 (JA1314-15).

In addition to this adjustment, the Judges made two other significant criticisms of Professor Willig's model. Unlike the precise adjustments calculated by Professor Shapiro, however, the record did permit the Judges to quantify the precise extent of these flaws. The

39

Judges thus did not make any further adjustments to Professor Willig's model, and instead concluded that the rates produced by his already-adjusted game theory model could serve only as "limited guideposts" indicating the high end of reasonable rates. FD 203 n.279 (JA497 n.279); *see also* FD 203 n.278 (JA497 n.278) ("When the Judges are confronted with evidence that, standing alone, is not itself wholly sufficient, they may rely on evidence to guide the determination, *i.e.*, by using it as a guide post when considering the application of more compelling evidence.") (quotation marks and emphasis omitted).

First, the Judges criticized Professor Willig's calculation of the opportunity cost associated with diversion of listeners from the interactive market to noninteractive, ad-based commercial services. In particular, the Judges concluded that Professor Willig had not properly accounted for the record labels' coercive market power in the interactive market. FD 185 (JA479); *see also* FD 180-85, 202-03 (JA474-479, 496-497) (rejecting Professor Willig's defense of his modeling assumptions); FD 203 n.277 (JA497 n.277) (finding that there was no evidence that the adjustment applied to the parties' benchmark analyses could "logically be applied" to correct this deficiency).

40

Second, the Judges found that Professor Willig's model "overstates the opportunity costs because it does not consider the 'opportunity benefits'" of licensing music to ad-supported services. FD 197 (JA491). In so finding, the Judges credited testimony by Google's expert witness, Dr. Peterson, who testified that Professor Willig failed to account for the fact that ad-supported services attract listeners who would otherwise spend their time engaged in activities that would not produce royalties, such as listening to terrestrial radio or reading a book. FD 196-97 (JA490-91). Indeed, the same survey evidence relied upon by Professor Willig to support his calculation of opportunity costs showed that record labels would lose royalty revenue associated with some listeners of ad-supported services if those services were no longer available. FD 198 (JA492) (stating "85% of ad-supported noninteractive listeners would spend 27% of their diverted time listening to AM/FM radio over-the-air"); *see also* JA1028-29 (Zauberman Written Direct Testimony ¶¶ 24-27).

**b.** In this Court, SoundExchange does not address the substance of the Judges' findings that Professor Willig's model was flawed. Instead, its brief divorces Professor Willig's opportunity cost

41

calculations from their relevant context—as one flawed input in a model rejected by the Judges as a basis for establishing a reasonable rate—and treat the Judges as having accepted his findings at least insofar as his calculations (as adjusted by Professor Shapiro) would suggest that the opportunity cost associated with a single play would be $0.00222. *See* Br. 32-37. According to SoundExchange, because a willing seller would not agree to a rate lower than the opportunity cost, the Judges' "finding" that the opportunity cost was $0.00222 cannot be reconciled with their ultimate determination that the rate should be $0.0021.

But as discussed, the Judges did not accept that $0.00222 was the opportunity cost. Rather, in their analysis of Professor Willig's model, the Judges repeatedly criticized his opportunity cost calculations for reasons unrelated to Professor Shapiro's adjustments, including the fact that the adjusted model artificially incorporated record labels' negotiating power in the interactive market, FD 180-85, 202-03 (JA474-79, 496-97), and that the adjusted model "d[id] not reflect the 'opportunity benefit' of listeners who would substitute noninteractive listening for non-royalty bearing activities, including listening to AM/FM radio," FD 203 n.279 (JA497 n.279); *see also* FD 164 n.221, 197-

42

98 (JA458 n.221, 491-92). Although the record did not provide the Judges with a basis to quantify the further adjustment that would be needed to account for these additional flaws, the Judges plainly did not accept $0.00222 as the correct figure. To the contrary, because flaws remained in Professor Willig's opportunity cost calculations even after accounting for Professor Shapiro's adjustments, the Judges found that the rates produced by Professor Willig's adjusted game theory model could serve only as a "limited guidepost" marking the high end of reasonable rates. FD 203, 301 (JA497, 595) (emphasis omitted).

For similar reasons, SoundExchange's criticisms of the failure to make additional adjustments to Professor Willig's opportunity cost calculations are beside the point. SoundExchange urges, for example, (Br. 37-38) that Professor Shapiro's adjustments to Professor Willig's opportunity cost calculations did not account for costs associated with diversion from noninteractive, subscription-based services. But any such error would not affect the rate ultimately selected by the Judges, which was based upon Dr. Peterson's benchmarking model—a model that did not depend upon the calculation of opportunity costs and which SoundExchange does not directly challenge. *See, e.g.*, FD 107 (JA401)

43

(Professor Willig's analysis "reveals the limited applicability of the opportunity cost approach" relative to a benchmarking approach on the current record). And regardless of whether it would be appropriate to make any upward adjustment to Professor Willig's model on this basis, it would not affect the Judges' fundamental conclusion that Professor Willig's opportunity-cost calculations were flawed for unrelated reasons and that reasonable rates would generally fall below the rates produced by his model.

Furthermore, SoundExchange acknowledges that it has not provided record support for any specific adjustment. Professor Willig never mentioned the $0.00011 figure cited in SoundExchange's brief; SoundExchange instead infers that Professor Willig calculated a $0.00011 per performance opportunity cost from a footnote in his Corrected Written Direct Testimony. *See* Br. 16 & n.5, 38 n.8 (citing JA1791, 1795 (Willig Corrected Written Direct Testimony 23, 29)). But even SoundExchange does not try to defend that figure in Court, stating that it was premised on a proposed rate for subscription-based services that was ultimately not adopted and that any opportunity costs for subscription-based noninteractive services would be "somewhat lower."

44

Br. 16 & n.5. The Judges had no obligation to calculate a separate adjustment to refine an estimate that they found to be flawed for unrelated reasons, and which would not affect the Judges' fundamental point that the $0.0021 rate they derived from Dr. Peterson's benchmarking analysis was supported by the "limited guideposts" provided by Professor Willig's game theory model. FD 301 (JA595); *cf.* *Music Choice v. Copyright Royalty Bd.*, 774 F.3d 1000, 1012 (D.C. Cir. 2014) (holding that the Judges have no obligation to adjust economic models "found to have fundamental problems").

SoundExchange similarly misses the mark in objecting (Br. 38-39) to the Judges' evidentiary ruling regarding purportedly necessary upward adjustments to Professor Willig's calculations. As noted, the Judges did not adopt Professor Willig's calculations, finding instead that the opportunity costs calculated in Professor Willig's model (even as adjusted) were too high because, among other things, they did not reflect net opportunity benefits. As with SoundExchange's other arguments, this evidentiary ruling thus had no basis on the rate ultimately selected, and SoundExchange's argument can be rejected on

that basis alone. *See* 5 U.S.C. § 706 ("[D]ue account should be taken of the rule of prejudicial error.").

In any event, SoundExchange's claim that the evidence supported such an adjustment is meritless. In support of that claim, SoundExchange cites two pages of the transcript to the evidentiary proceedings, in which Professor Willig "acknowledge[d] that Professor Shapiro's approach is the correct way to calculate opportunity costs for these physical royalties." FD 192 (JA486) (citing JA614-15 (8/5/20 Tr. 504-05)). Professor Willig then began to opine that he believed that Professor Shapiro had committed an unrelated error in his calculations which "generated a higher opportunity cost" than originally calculated. FD 192 n.263 (JA486 n.263) (citing JA614-15 (8/5/20 Tr. 504-05)). But Professor Willig never got beyond the bare assertion that Professor Shapiro had erred because the services promptly objected on the ground that this "new testimony" was beyond the scope of Professor Willig's written statements and thus improper for consideration at the evidentiary hearing in the first instance. FD 192 n.263 (JA486 n.263); *see also* 37 C.F.R. § 351.10 (examination of witnesses is generally

46

limited to "testimony of the witnesses in the written statements and an oral summary of that testimony").

After a recess, then-Chief Judge Feder directed SoundExchange's counsel to move forward with questioning Professor Willig without straying into discussion that goes "beyond appropriate surrebuttal." JA1425 (8/5/20 Tr. 509). Then, at a later point in the hearing, the Judges asked whether SoundExchange's counsel intended to continue their prior line of questioning "so that the Judges could decide whether to sustain or overrule the objection," but SoundExchange's counsel declined to address the objection, instead "claiming (incorrectly) that the testimony that was the subject of the objection 'is already in the record.'" FD 192 n.263 (JA486 n.263). Thus, while SoundExchange contends (Br. 39) that the Judges never formally ruled on whether to admit Professor Willig's assertion that Professor Shapiro's adjustments needed to be corrected, the relevant point is that Professor Willig never provided any supporting analysis for that assertion. It was thus entirely proper for the Judges not to credit that assertion—even apart from the separately dispositive point that Professor Willig's flawed

47

game theory model and its underlying calculation of opportunity costs did not affect the ultimate rate.

### B. The Judges Reasonably Rejected a Proposal to Set a Distinct Rate for Simulcasters

As noted above, the Copyright Act permits the Judges to "distinguish among the different types" of eligible services when various considerations lead the Judges to believe that willing buyers and willing sellers would agree to different rates for such types of services. 17 U.S.C. § 114(f)(1)(B). In approaching that question, the Copyright Act directs the Judges to consider, among other things, non-exhaustive "criteria including the quantity and nature" of the services' use of sound recordings, and "the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers"— concerns which may, on an appropriate record, show that willing buyers and willing sellers would agree to different rates. *Id.*

In the current proceeding, as in prior proceedings, the Judges rejected a proposal that would have simulcasters—that is, webcasting services which transmit music over the internet that is simultaneously transmitted as over-the-air radio broadcasts—pay substantially lower

rates than other ad-supported commercial services. NAB has failed to identify any error in this analysis.

**1. a.** Consistent with the Copyright Act's direction, the Judges have historically distinguished among the rates paid by different services by looking to, among other things, whether services use sound recordings in such similar ways that setting a lower rate for one service will risk diverting listeners from other noninteractive webcasting services and reduce copyright owners' overall revenue. In simple terms, the Judges have found that if a service is likely to attract a significant number of *new* listeners—that is, listeners who would not spend their time listening to music on other types of noninteractive services—a record label might be prepared to offer that service at a lower rate to expand its total revenue. *See, e.g.*, *SoundExchange*, 904 F.3d at 58-59; *Web II*, 72 Fed. Reg. at 24,097-98. But in the absence of such evidence, the record label has no incentive to agree to a lower rate because doing so would risk the transfer of listeners from a more lucrative service to a less lucrative one. Market forces would thus lead the rates to converge for any services that listeners find largely interchangeable.

In *Web IV*, this analysis was applied—and upheld by this Court— to the distinction between the rates for ad-based and subscription-based commercial webcasting services. In that proceeding, the ad-based services provided "'overwhelming' 'record evidence' of a 'sharp dichotomy between listeners'" who were willing to pay for subscription services and those who were "instead willing to use only ad-based (and cost-free) services." *SoundExchange*, 904 F.3d at 57-59. Because ad-based services target "a different demographic than paid services," the royalties from performances by ad-based services are "additive" revenue for copyright owners. *Web IV*, 81 Fed. Reg. at 26,346 (quotation marks omitted). Accordingly, the Judges found that willing sellers would have market incentives to agree to a lower rate.

By contrast, in that same proceeding, the Judges declined to differentiate between simulcasters and other ad-based commercial services because the record did not contain similar evidence of market segmentation. To the contrary, the record showed that "[s]imulcasters and other commercial webcasters compete for listeners." *Web IV*, 81 Fed. Reg. at 26,323. Listeners seeking to stream music over the internet could use "Pandora, the largest commercial webcasting

50

service," or instead use iHeartRadio, which both "aggregates simulcast streams" and "provid[es] a custom streaming service." *Id.* The record evidence demonstrated that Pandora and iHeartRadio regarded themselves as competitors, and their "mutual competition" provided "a strong indication that simulcasters and other commercial webcasters operate in the same, not separate submarkets." *Id.*

**b.** In this proceeding, NAB asked the Judges to revisit their conclusion from *Web IV* and establish a rate for simulcasters different from the rate applicable to other ad-based commercial services. As discussed above, the ultimate question is whether willing buyers and willing sellers would agree to a different rate for simulcasters than for other ad-based commercial services. And that question largely comes down to whether there is evidence that simulcasters operate in a sufficiently distinct submarket that entering into a licensing agreement at a lower rate would supplement—not detract from—a record label's revenue from other types of noninteractive webcasting services.

As in *Web IV*, NAB cannot dispute that, at a basic level, simulcasters and other streaming services regard themselves as competitors. They have characterized themselves that way in

**MATERIAL UNDER SEAL DELETED**

government filings and internal documents, FD 227 (JA521), and

commercial webcasters have actively attempted to compete with both

simulcasters and terrestrial radio; for example, ███████████████

████████████████████████████████████████████████

████████████████████████████ , Restricted FD 228

(JA1340).  Substantial evidence thus supports the Judges' conclusion

that, rather than being additive, simulcasters have the potential and

incentive to entice listeners away from other ad-based commercial

services, and accordingly, willing sellers would be unlikely to provide

simulcasters with a lower rate.

NAB complains (Br. 38-39) that some of the documents relied

upon by the Judges as evidencing mutual competition with other

commercial services were too general and urges, in particular, that the

Judges may not simply assume that noninteractive webcasters subject

to the statutory license are in competition in the relevant sense,

because "[e]nding the inquiry there would . . . mean that all webcasters

would receive the same rate."  Br. 39.  But the Judges have not adopted

that approach; as noted above, the Judges have distinguished between

the rates for, *inter alia*, subscription and ad-based services based upon

evidence that these services are not in competition with one another in the relevant sense.  Even though both are "digital audio services that play music without being fully interactive," *id.*, they do not generally target the same pool of listeners and thus do not serve as substitutes for one another.  Similarly, as discussed below, the Judges have established separate rates for commercial and noncommercial services, based on a conclusion that "up to a point," noncommercial services do not complete with commercial services for listeners.  But because noncommercial services of a certain size may compete for listeners with commercial services, the Judges have determined that, above a certain threshold number of monthly plays, the marginal per-play rate for both services should be identical.  *See infra* pp. 77-84.

NAB's problem here is that it did not proffer any evidence sufficient to demonstrate that, despite the fact that simulcasts offer essentially the same content using the same technology to the same listeners as other ad-supported commercial streaming services, they serve a distinct market from other ad-supported noninteractive webcasting services.  In seeking to make this showing in the administrative proceedings, NAB relied heavily on a survey designed

"to determine the degree to which listening to simulcasts substitutes for various alternative activities."  FD 228 (JA522).

As the Judges explained, the survey was fatally flawed.  The survey asked simulcast respondents to predict what they would do with the time spent listening to simulcasts if that service was no longer available but inexplicably excluded "internet radio" services from the available alternative options.  Such services are often included in "relied-upon industry studies," FD 249 (JA543), and have much of the same functionality as simulcasts.  Both simulcasts and internet radio play music on channels that do not vary from listener to listener; the only notable difference is that the music played on simulcasts is simultaneously transmitted in an over-the-air broadcast, and internet radio is not.  Despite these similarities, the surveying expert did not "explain or justify" his "troubling—and ultimately unreasonable" choice to omit internet radio from the survey responses.  FD 247-48 (JA541-42).  NAB does not attempt to defend its survey evidence or address the Judges' criticisms of it on appeal.  *See* Br. 14 (referring to "extensive survey evidence" without addressing the Judges' criticisms); *id.* at 22-40 (criticizing Judges' decision without mentioning survey).

54

**2.**  NAB's primary contention in this Court is that it was entitled to a different rate because the Judges are required to "distinguish among the different types of services," 17 U.S.C. § 114(f)(1)(B), and, according to NAB, simulcasts are different from at least some ad-supported commercial services.  This contention is flawed in multiple respects.

**a.**  As an initial matter, as discussed above, the ultimate question before the Judges is what rate a willing buyer and a willing seller would agree to in the absence of a licensing scheme, and the assessment of whether services are "different" must be made in that context.  That is why the Judges have consistently, with this Court's approval, assessed whether a service seeking a separate rate serves a sufficiently separate market that willing sellers would be prepared to offer a lower rate rather than concluding that a lower rate could jeopardize the royalties they receive from other, higher-paying services.  NAB does not explain why this approach is improper or, indeed, really address that rationale in its brief.

Further, NAB is mistaken to insist that the Judges did not make clear what degree of difference between services would warrant a

separate rate or which services must be compared.  *See* Br. 31-34.  To

the contrary, NAB's reliance on the already-discussed survey in the

administrative proceedings demonstrates that there was no lack of

clarity or consistency in the standard the Judges applied or the type of

evidence that could be marshaled to satisfy that standard.  NAB

understood that the Judges' ultimate inquiry is to determine whether

willing buyers and sellers will agree to different rates, that the Judges

have historically found that willing sellers are incentivized to agree to

different rates in segmented markets, and that the Judges have

historically credited evidence of market segmentation akin to the

survey NAB provided.  The Judges merely found NAB's evidence

lacking on the merits, a conclusion that—as already noted—NAB does

not address on appeal.

NAB's argument that the Judges failed to appropriately consider

the ways in which simulcasts differ from custom radio in terms of

promotional value or use of sound recordings (Br. 23-26) suffers from

similar flaws to those that plagued the survey evidence that it

presented to the Judges and has now largely abandoned.  In both

respects, NAB's comparison "treat[s] Internet radio, without adequate

justification, as indistinct from custom radio," FD 224 (JA518), even

though the two are plainly distinct in ways that NAB asserts are

significant.  Indeed, the entire premise of NAB's argument is that,

unlike simulcasts, custom radio provides listeners with curated

playlists that reflect the listeners' individual preferences.  But internet

radio likewise does not provide that functionality.

The Judges noted that NAB's expert witness, Dr. Leonard,

speculated that internet radio stations more closely resemble custom

radio stations than they do simulcasts because internet radio stations

"often feature greater user functionality than is possible with a linear

simulcast stream," such as the ability to pause a song.  FD 248 (JA542)

(emphasis omitted); *see also* FD 219 (JA513) (citing JA1583 (Leonard

Written Direct Testimony ¶¶ 34-35)).  But Dr. Leonard did not provide

any "persuasive evidence of how widely available such features are" on

internet radio stations or to what degree the availability of such

features would influence the rates to which willing buyers and willing

sellers would agree.  FD 249 (JA543).  In the absence of such evidence,

the Judges found that NAB's "conflating of Internet radio and custom

radio services was not adequately supported by the record evidence."

FD 224 (JA518).

In this Court, NAB insists (Br. 26-28) that it should not be
compelled to account for internet radio so long as it can establish that
simulcasts are different from custom radio. In so doing, NAB does not
address the Judges' concern that "[t]he statutory license is available to
services that offer a continuum of features, including various levels of
interactivity, which are offered in a manner consistent with the license."
FD 226 (JA520). Merely identifying a difference in these features does
not necessarily show that willing buyers and sellers would agree to
different rates. And here, the record provided "insufficient basis for
parsing the interactivity across statutory services as proposed, or to set
a customized rate structure among categories of commercial webcasters
based on statutorily permissible levels of interactivity." FD 226
(JA520).

NAB also does not explain how the Judges could properly set a
separate rate for simulcasting based on the incomplete evidence that it
provided. For one thing, the record would not support distinguishing
between the rates for internet radio and simulcasting, as the evidence

suggested that willing sellers would have no incentive to offer lower rates to simulcasters if doing so would jeopardize revenues earned from plays on internet radio.  Furthermore, no party proposed separate rates for internet radio and custom radio or even suggested how a line would be drawn between the two.  While NAB can assume away these complexities in attempting to present a single comparison between services at different points in the continuum, the Judges do not have that luxury in setting rates for all noninteractive services.

**b.**  In any event, NAB's effort to compare custom radio and simulcasts, even apart from neglecting internet radio, is flawed on its own terms.

As an initial matter, although NAB quotes (Br. 24 (quoting FD 225 (JA519)) the final determination for the proposition that "interactivity is a good proxy" for the promotional value of a service and its ability to substitute for the purchase of records, the Judges actually merely recited NAB's own view on the subject, stating that "*[t]he NAB suggests that* this legislative history indicates Congress's recognition that a service's interactivity is a good proxy for its ability to substitute or interfere with other streams of revenue," FD 225 (JA519) (emphasis

59

added).  And the cited legislative history used the term "interactivity" in a different sense than NAB's informal use of the term:  to refer only to services whose listeners may select the particular sound recordings that they wish to hear on demand.  *See* H.R. Rep. No. 104-274, at 13-14 (1995).  Such services are the only "interactive" services within the meaning of the Copyright Act, 17 U.S.C. § 114(j)(7) (defining "interactive service"), and they are not the subject of these proceedings at all.  Instead, these proceedings involve a continuum of what could informally be described as "interactivity" (that is, differing levels of functionality) among legally noninteractive services, and the Judges retain discretion to determine whether various discrepancies warrant separate rates.  *See id.* § 114(f)(1)(B); *see also* Copyright Office, *Copyright and the Music Marketplace*, at 178 (noting that the Judges have "the discretion to set different rate tiers" based upon differing functionality "when the record supports such an outcome").[7]

NAB fares no better in critiquing the Judges' assessment of "the degree to which use of the service may substitute for or may promote

---

[7] https://www.copyright.gov/policy/musiclicensingstudy/copyright-and-the-music-marketplace.pdf

the purchase of phonorecords by consumers." 17 U.S.C. § 114(f)(1)(B).
This argument (Br. 24-25) is premised on the long-recognized
promotional value of over-the-air transmissions on terrestrial radio.
Terrestrial radio occupies a distinct space in the copyright world
because United States "copyright law confers no exclusive right of
public performance by means of terrestrial radio transmissions for
sound recording copyright owners." FD 224 (JA518). Accordingly, no
license is required to broadcast sound recordings over terrestrial radio.
*See* 17 U.S.C. § 106(6) (creating exclusive right only for "digital audio
transmission[s]"). Evidence in this proceeding showed that record
labels regard terrestrial radio not as an opportunity to make money
from licensing fees—which they could not do, since no license is
required—but rather as a promotional opportunity. In particular,
listeners who hear songs on the radio may be enticed to purchase those
songs. FD 226 (JA520).

NAB argues (Br. 24-25) that record labels should similarly treat
simulcasts as promotional opportunities rather than as opportunities to
earn licensing revenue—even though simulcasts are broadcast using
different technology and are not exempt from the exclusive public-

61

performance right in copyright law—because simulcasts transmit the same content as over-the-air broadcasts.  But the Judges concluded that the record did not support that inference.  In particular, although the record showed that copyright owners affirmatively seek plays over terrestrial radio, there was no evidence that copyright owners "similarly, affirmatively, seek plays over simulcast for purposes of promotion."  FD 226 (JA520).  Because labels' behavior regarding terrestrial radio did not appear to assign a separate promotional value to simulcasting, the Judges concluded that "labels simply do not consider the promotional value of simulcasts (which reaches a relatively small number of listeners) in their pursuit of the promotional value of terrestrial radio plays."  FD 226 (JA520).

Finally, NAB briefly suggests (Br. 34-35) that the Judges should have given more weight to "testimony from record label and radio executives, as well as analogous licensing agreements," that supported a lower rate.  In each case, the Judges provided an adequate basis to conclude that the evidence was unpersuasive.

As to licensing agreements, NAB sought to rely on two types of voluntary agreements:  direct licensee agreements between several

62

**MATERIAL UNDER SEAL DELETED**

independent record labels and one webcaster that covered both

simulcast transmission and other forms of webcasting, and agreements

between performance rights organizations and webcasters for the right

to perform musical works, not sound recordings (that is, licenses for the

copyright in the music composer's work, not the performer's work).  But

neither type of agreement was "sufficiently probative of the relevant

market" to serve as a "meaningful or persuasive benchmark[]."  FD 224

(JA518).  NAB does not explain why the Judges erred in this respect.

And the testimony by a record company executive discussed his

view that "directly licensed *interactive* services"—that is, services that

allow users to select each individual song they wish to hear— ███████

████████████████████████████████████████████████

██████████████████████ those services are more "likely to

displace sales of sound recordings."  Restricted FD 226 (JA1338).  But

this testimony was of "limited" value in "determining whether a

differential rate is justified for simulcasters," because the executive was

opining on his experience with services that are *not* subject to the

statutory license, and because the executive did not address any

63

"specific negotiations or transactions" that could support his view.  FD 226 (JA520).

That NAB would prefer the Judges to have drawn different conclusions about this evidence or afford it greater evidentiary weight does not establish that the Judges' decision was contrary to law. Rather, all that the "highly deferential" standard that the Administrative Procedure Act requires is that the Judges "examine the relevant data and articulate a satisfactory explanation for its action." *Zevallos v. Obama*, 793 F.3d 106, 112 (D.C. Cir. 2015) (internal quotations omitted).  That standard was readily satisfied here.

## II. The Judges Established Reasonable Rates for Non-Commercial Services

As noted above, the Judges have historically set separate rates for commercial and noncommercial webcasting services based on evidence that "up to a point," noncommercial webcasters operate in a "distinct segment of the non-interactive webcasting market" and do not compete with commercial webcasters for listeners.  *Web II*, 72 Fed. Reg. at 24,097-98 (noting that "price discrimination" is a "feature" of segmented markets); *see also SoundExchange*, 904 F.3d at 59.  However, in that proceeding the Judges also found that, "as webcasting has evolved,"

some noncommercial services had grown so considerably in size that there was a genuine risk that noncommercial services would begin to "compet[e] for audience" with commercial webcasters, which "obviate[s] the need for a separate lower royalty rate." *Web II*, 72 Fed. Reg. at 24,098.

To address this unique situation, in *Web II*, the Judges established a rate structure wherein the vast majority of noncommercial webcasters pay only a nominal annual fee for the right to play sound recordings up to a threshold number of aggregate tuning hours. For any performances above that threshold, noncommercial webcasters pay the same marginal rate as commercial services. The Judges have adopted that same rate structure in every subsequent adversarial proceeding. *See, e.g.*, *Web IV*, 81 Fed. Reg. at 26,319-20 ("[I]n accordance with the Judges' reasoning from *Web II* and *Web III*, the Judges adopt a separate rate structure for noncommercial webcasters than the one applicable to commercial webcasters.").[8]

---

[8] In *Web III* and *Web IV*, as in this proceeding, SoundExchange negotiated a settlement with certain public broadcasters, including National Public Radio, and with certain educational webcasters. Because the Judges approved those settlements, the rates paid by those

*Continued on next page.*

In the current proceeding, an entity representing several large noncommercial webcasting services, the National Religious Broadcasters Noncommercial Music License Committee, proposed that noncommercial services should pay only one-third of the prevailing commercial rate for any plays above the threshold covered by the minimum fee.  But as the Judges thoroughly explained in their final decision, the Religious Broadcasters' proposal was not supported by comparable voluntary license agreements, 17 U.S.C. § 114(f)(1)(B)(ii), nor by the "economic, competitive, and programming information presented by the parties," *id.* § 114(f)(1)(B)(i).  The Judges thus reasonably rejected the Religious Broadcasters' proposal for dramatically reduced rates.

### A.   The Judges Reasonably Determined That the Religious Broadcasters' Rate Proposal Was Not Supported by Comparable License Agreements

In support of their argument for dramatically lower rates, the Religious Broadcasters sought to rely on the settlement agreement

---

services were governed by the terms of the settlements, rather than the rates established at the conclusion of the adversarial proceeding.  *See* FD 3 (JA297); *see also Web IV*, 81 Fed. Reg. at 26,318-20.

reached between SoundExchange and other several noncommercial broadcasters during the current ratesetting proceeding. In that agreement, the parties agreed to a discounted, flat annual royalty for all settling services, in exchange for the settling services' agreement to make advanced payments and submit consolidated usage reports. *See* 37 C.F.R. § 380.31; 85 Fed. Reg. 11,857 (Feb. 28, 2020) (adopting that settlement as a reasonable fee for the settling services). The Judges reasonably concluded that the Religious Broadcasters' reliance on this agreement suffered from several considerable deficiencies that, "in aggregate," supported rejection of the settlement as a reliable benchmark for determining reasonable rates. FD 268 (JA562).

Most fundamentally, the Religious Broadcasters did not propose that the Judges adopt the terms of the cited settlement agreement. That agreement involved a lump-sum payment of $800,000 annually for the right to play up to a maximum number of hours of music by the settling public broadcasters and was explicitly understood to include "[a] discount that reflects the administrative convenience to [SoundExchange] of receiving annual lump sum payments that cover a large number of separate entities, as well as the protection from bad

67

debt that arises from being paid in advance." 37 C.F.R. § 380.31(b)(3).
By contrast, the Religious Broadcasters proposed a minimum fee of
$500 for up to 1,909,680 hours of music annually, with the excess paid
at a rate of one-third of the applicable rate for commercial webcasters.
FD 254 (JA548).

Given that all the terms are substantially different, it is far from
clear why the settlement agreement constitutes a benchmark to support
the Religious Broadcasters' proposal in any meaningful sense. The
Religious Broadcasters attempted to bridge the gap through testimony
from an expert witness who purported to derive a per-play rate from the
settlement agreement and then apply it to the Religious Broadcasters'
situation (without accounting for the features that were explicitly cited
in the agreement as the basis for discounts). The Judges reasonably
rejected this testimony for several reasons.

**1.** As an initial matter, the expert's analysis did not begin by
analyzing the *Web V* settlement itself but rather, by looking to a
*different* settlement—one not proposed as a benchmark—that had been
negotiated during the *Web IV* ratesetting period. *See* FD 255-56
(JA549-50); *see also* FD 255 n.317 (JA549 n.317) (finding that reliance

on the *Web IV* settlement as a benchmark had been "abandoned by [the

Religious Broadcasters] in favor of reliance" on the more recent

settlement agreement).

That agreement, like the proffered benchmark, also did not

involve a per-play rate and instead involved a flat royalty rate with no

additional usage fees in exchange for the settling services' agreement to

make advanced payments and submit consolidated usage reports.  37

C.F.R. § 3802.32 (2020).  Although the agreement was silent as to the

extent of the discount or the usage rate covered by the flat fee, the

Religious Broadcasters' expert, Professor Steinberg, claimed that he

could nevertheless derive a reasonable per-play rate by analyzing a

document in the parties' possession that, according to the expert,

████████ ████████████████████████ Restricted FD 261 (JA1373);

JA1616-21 (Trial Ex. 3022).

The expert's analysis required a chain of inferences that the

Judges found "may be plausible individually but are unconvincing in

aggregate."  FD 263 (JA557).  The expert had to conclude that the

document in question ████████ ████████████████ ██████ ███████████;

that his analysis of the *Web IV* settlement also accurately characterized

69

MATERIAL UNDER SEAL DELETED

the more recent settlement; and that no additional adjustments to his calculations were necessary to account for the discount for administrative convenience described in the more recent settlement. The first inference was "plausible but weakly supported by the evidence." FD 263 (JA557). And the other two were on even shakier ground.

The expert did not even purport to be able to calculate a per-performance rate for the more recent agreement, instead merely deeming it ███████████████████████████████████████ ███████████████████████████████████████ Restricted FD 264 (JA1376) (quoting Steinberg Written Rebuttal Testimony ¶ 10 (JA1732-33)). Even on its own terms, that hardly forms a reliable benchmark (or, really, any benchmark at all). And it provides no basis to upset the rates adopted by the Judges, which were consistent with the expert's conclusion that noncommercial services should pay ███████████████████████████████; under the governing rate structure, all noncommercial services pay *no* usage royalties for plays up to a 159,140 monthly threshold of aggregate tuning hours.

70

To make matters worse, the expert assumed that the discount that was explicitly referenced in the agreement was "separate from the minimum fee and the usage fee that the agreement recites," *i.e.*, that it was a discount calculated *after* the parties had agreed to a total annual royalty. FD 264 (JA558). He apparently did not even "consider the possibility that the discount is reflected in either or both of the minimum fee and usage fee that are included in the flat annual payment," and that these discounted fees were themselves used to calculate the total annual royalty. FD 264 (JA558). Such circumstances would fundamentally undermine the assumptions supporting the expert's already weak analysis. The Judges reasonably concluded that these deficiencies, too, made it appropriate to give little weight to the expert's opinions.

Finally, the Judges observed that the valuations in the document relied upon by the expert were premised on the rates set in the Webcaster Settlement Act, which by statute may not be considered in rate proceedings. 17 U.S.C. § 114(f)(4)(C). The Religious Broadcasters protest (Br. 34-36) that they were asking for consideration not of the Webcaster Settlement Act rates themselves but rather subsequent rates

71

that were based on those rates.  But the Judges concluded that the

expert's analysis was premised not on a separate agreement that was

copied from the Webcaster Settlement Act agreement but rather on an

assessment of what would have been paid under the Webcaster

Settlement Act agreement itself.  FD 265 (JA559).  At bottom, the

Judges had multiple independent, though mutually reinforcing, reasons

to give the expert's benchmarking analysis "little weight."  FD 264

(JA558).

2.  For similar reasons, on its own terms the expert's analysis does

not support the proposal the Religious Broadcasters were advocating.

The total royalties paid according to the terms of both the *Web IV* and

the *Web V* settlements reflected a "discount" for the "administrative

convenience" and "protection from bad debt" of receiving advance, lump

sum payments.  37 C.F.R. § 380.31; *id.* § 3802.32 (2020).  In addition,

the settling parties agreed to continue their established practice of

submitting consolidated reporting to SoundExchange of usage data to

further streaming the administrative process.  FD 266-67 (JA560-61).

But the Religious Broadcasters' proposal did not contain similar terms

to provide SoundExchange and copyright owners with the benefit of

reduced risk of nonpayment, protection against large numbers of

uncompensated performances, or reduced processing costs. And the

Religious Broadcasters made no attempt to adjust for the omission of

these attendant tradeoffs or explain why such adjustments were

unnecessary.

The Religious Broadcasters contend that they were not obliged to

account for these factors because the Judges have previously accepted

benchmarks without adjusting the rates or terms based on potential

differences in administrative costs. Br. 32 (citing Determination of

Rates and Terms for Preexisting Subscription Services and Satellite

Digital Audio Radio Services, 78 Fed. Reg. 23,054, 23,068-69 (Apr. 17,

2013)). But unlike in the current proceeding, there was no indication in

the cited proceeding that the terms providing for administrative

convenience were economically significant. There was no evidence, in

particular, that those features affected the negotiations regarding the

rate, much less that the parties expressly labeled them as grounds for a

discount. Here, however, the advance payment requirement was

plainly a material term with value, and the Religious Broadcasters do

not seriously suggest otherwise. And as the Judges noted, witnesses for

73

both SoundExchange and the Religious Broadcasters testified that the consolidated reporting requirement reduces SoundExchange's overall costs, a fact that also demonstrates that the term had value. FD 267 (JA561) (citing JA855, 874 (9/9/20 Tr. 5803, 5822); JA664 (8/17/20 Tr. 2232); JA804 (8/26/20 Tr. 4068)).

**3.** These concerns were more than sufficient reason to place little weight on the proposed benchmark, but there were others as well. Among other things, the Judges noted that the Religious Broadcasters had failed to introduce expert testimony regarding the extent to which the rates and terms had been negotiated under circumstances comparable to the hypothetical market. There was thus a paucity of evidence regarding whether, *inter alia*, the rates and terms in the agreement had been influenced by the fact that the agreement had been negotiated by agents who might advance their own interests rather than merely mirroring what would be done by willing buyers and willing sellers acting alone in the hypothetical marketplace, or whether the parties agreed to lower rates than would be agreed to in a hypothetical market because of a desire to avoid the costs of litigation before the Judges. *See* FD 260-61 (JA554-55).

74

The Religious Broadcasters' argument that these considerations have not been dispositive in prior proceedings (Br. 26-31) ignores that the Copyright Act provides the Judges with "broad discretion" in making highly fact-bound determinations about "'whether to look to [an agreement's] rates and terms for guidance,'" and whether to "adjust[] benchmarks to 'render them useful.'" *SoundExchange*, 904 F.3d at 50-51 (first quoting *Music Choice*, 774 F.3d at 1009; and then quoting *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 755 (D.C. Cir. 2009) (per curiam)); *see also Intercollegiate Broad. Sys.*, 574 F.3d at 759; *Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 796 F.3d 111, 130 (D.C. Cir. 2015).  Such determinations are based on the evidence presented in each case, and a consideration that may not have been dispositive on one record can become far more significant in a different context.  *See, e.g.*, *Web IV*, 81 Fed. Reg. at 26,329-31 (accepting benchmark only after considerable evidence about the extent to which the rates and terms of the benchmark had been the "shadow" of the Judges' ratesetting); Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 73 Fed. Reg. 4080, 4089 (Jan. 24, 2008) (rejecting an agreement as a

benchmark because the circumstances were not comparable and the

"adjustments" proposed by the proponent "d[id] not remedy this

shortcoming"); *Web II*, 72 Fed. Reg. at 24,090 n.13 (rejecting proposed

benchmarks because the benchmarks' proponents failed to show that

the agreements were negotiated "in the context of comparable

circumstances").

    In any event, the precedents on which the Religious Broadcasters

rely do not support their assertion that the Judges are obligated to

accept a benchmark that suffers from such considerable deficiencies as

to render it an unreliable proxy for the rate to which a willing buyer

and willing seller would agree.  As this Court has recognized, the

Judges have no obligation "to salvage benchmarks they found to have

fundamental problems." *Music Choice*, 774 F.3d at 1012.  And indeed,

in *Web IV*, on which the Religious Broadcasters rely (Br. 28), the Judges

expressly rejected the use of two settlements agreements involving

certain noncommercial services for substantially the same reasons as

they did in the current proceedings.  *See Web IV*, 81 Fed. Reg. at 26,394

("[T]here are a number of elements of the SoundExchange/[National

Public Radio] agreement that render it a poor benchmark for setting

noncommercial rates generally."); ("On the whole, the terms of the
SoundExchange/[National Public Radio] agreement provide
SoundExchange with significant benefits . . . that the [Religious
Broadcasters'] proposal does not.").

In other cases in which benchmarks have been accepted, the
Judges have concluded that the evidence provided by the benchmark's
proponent was sufficient to justify the use of the benchmark.  In those
circumstances, a separate question might arise about whether
adjustments are necessary.  *See, e.g.*, *Web IV*, 81 Fed. Reg. at 26,383,
26,387 (addressing whether it was appropriate to make minor
adjustments to a benchmark already determined to be reasonable "to
account for other items of potential value"); *Web II*, 72 Fed. Reg. at
24,095 (finding that evidence provided by benchmark's proponent was
sufficient to justify use of the benchmark and that the "further
adjustment[s]" urged by the benchmark's opponent were not supported
by the record).  But here, for all the reasons discussed above, the
Religious Broadcasters failed to support their use of the benchmark,
and there was thus no occasion to consider appropriate adjustments to
account for "other items" of value.

**B.    The Judges Reasonably Adopted the Same Rate Structure That Has Governed Noncommercial Services Since *Web II***

Having determined that the *Web IV* and *Web V* settlement agreements could not reliably be used to determine the rates to which willing buyers and willing sellers would agree in the hypothetical marketplace, the Judges next looked to other sources of "economic, competitive, and programming information presented by the parties," including the economic theory testimony of the parties' experts.  17 U.S.C. § 114(f)(1)(B)(i).  From this testimony, the Judges concluded, as they have in prior proceedings, that willing buyers and willing sellers in a hypothetical marketplace would agree to lower rates for noncommercial services but only up until the point at which noncommercial services grew so large as to risk cannibalizing the listeners of commercial services paying higher rates.

**1.**  As they had in earlier proceedings, the Judges determined that the economic and competitive evidence submitted by the parties supported a rate structure under which noncommercial services paid substantially lower rates than commercial services.  As noted above, under the then-existing rate structure, noncommercial services paid

*substantially* lower rates than commercial services because they paid only a flat fee of $500 per channel for all performances under the 159,140 aggregate tuning hour threshold. The marginal rates paid for above-threshold plays reflects the Judges' view that willing sellers would be hesitant to offer a lower marginal rate for large noncommercial services seeking to expand their audiences, as doing so might cause listeners to switch from more lucrative commercial services. FD 271 (JA565).

The Judges found that the prior economic reasoning on which the noncommercial rate structure is based was supported on the current record. SoundExchange's expert, Mr. Orszag, opined that there was "no reason based in economic theory" to believe that willing buyers and willing sellers would agree to fractional rates for large noncommercial webcasters "that compete meaningfully with commercial services." FD 251 (JA545) (quoting Orszag Written Direct Testimony ¶¶ 185-87 (JA1814)). In addition, the Judges noted that "[t]he record shows that at least some noncommercial broadcasters seek to expand their audiences," even if only to further advance their non-profit mission. FD 271 (JA565). That attempt to increase listenership poses a risk of

"diverting listeners who would otherwise be listening to a commercial service."  FD 272 (JA566); *see also* JA702-03 (8/20/20 Tr. 3275-76) (witness acknowledging that that a noncommercial webcaster may inadvertently compete with commercial webcasters "simply by growing large because of its popularity").  As the Judges explained, the absence of quantifiable evidence about the extent of such listener diversion could easily be attributable to the success of the established rate structure, which has been in place for some time.  *See* FD 278-79 (JA572-73); *see, e.g.*, *Web IV*, 81 Fed. Reg. at 26,392 ("[T]here must be limits to the differential treatment for noncommercials to avoid 'the chance that small noncommercial stations will cannibalize the webcasting market more generally and thereby adversely affect the value of the digital performance right in sound recordings."); *Web II*, 72 Fed. Reg. at 24,097.

The Judges also cited several examples in the record of noncommercial webcasters that are in "direct competition" with commercial webcasters for listeners.  Both Sirius XM, a commercial service, and Prazor, a large noncommercial webcaster, have multiple channels of Christian-themed music on their internet services.  FD 272

(JA566) (citing JA1824 (Orszag Written Rebuttal Testimony ¶ 159)).
This evidence, "albeit anecdotal," cast doubt on the Religious
Broadcasters' contrary claim that noncommercial broadcasters have
such categorically distinct programming that listener diversion is
unlikely.  FD 272 (JA566).

In addition, the Judges noted the existence of a study introduced
by SoundExchange that compared playlist information on commercial
and noncommercial radio stations to estimate likely diversion of
listeners.  FD 272-77 (JA566-71).  Due to several limitations in the
study enumerated in the Judges' final decision, the Judges concluded
that the study could not "support any conclusion as to the specific
degree of overlap or whether the overlap actually results in audience
diversion."  FD 277-78 (JA571-72).  However, the Judges found that
they could rely upon the "third-party commercial data" underlying the
study—a download from Mediabase, a commercial database service that
monitors the airplay of commercial and noncommercial radio stations—
which itself showed that there was "substantial overlap in the music
played" by the stations examined in the study.  FD 273 n.336, 277-78
(JA567 n.336, 571-72).  That fact also supported a finding that listener

"diversion [is] a realistic possibility," even if the risk of such diversion could not be precisely quantified. FD 277-78 (JA571-72).

The Religious Broadcasters take issue (Br. 46-50) with the Judges' reliance upon this study, claiming that it was inadmissible under the Judges' established rules of evidence. But the Judges' evidentiary order admitting the study expressly addressed the Religious Broadcasters' concerns, *see* JA224 (Mediabase Order 3), as did the Judges' final decision, FD 273 n.336, 277 (JA567 n.336, 571). The Religious Broadcasters have not shown that the Judges' decision to admit the evidence was arbitrary or constituted an abuse of discretion.

As the Religious Broadcasters note, 37 C.F.R. § 351.10(e) requires that studies admitted into evidence must "state clearly the study plan, the principles and methods underlying the study," as well as the techniques used "in a format commonly accepted within the relevant field of expertise implicated by the study." The study in question included this information. That the Religious Broadcasters "raised legitimate questions concerning alleged deficiencies" in the methodology for selecting the subset of data analyzed by the study concerned only the weight—not the admissibility—of the study. FD 273 n.336 (JA567

**MATERIAL UNDER SEAL DELETED**

n.336); JA224 (Mediabase Order 3).  Moreover, the Judges did not rely

upon the study's findings to draw conclusions about the statistical

degree of programming overlap or the extent of listener diversion.

Instead, the Judges looked only to the third-party commercial data

analyzed by the study and drew their own conclusions from that data.

*See* FD 273 n.336 (JA567 n.336) (noting that the Judges have relied

upon similar commercial data "in past proceedings," even when

"presented by lay witnesses") (quoting JA224 (Mediabase Order 3)).

Finally, there is no merit to the Religious Broadcasters' insistence

(Br. 40-51) that the Judges ignored "buyer-side" considerations.  As

discussed, the Judges' rate structure reflects a steep discount for all

noncommercial broadcasters.  The vast majority of noncommercial

webcasters are too small to pay any royalties above the minimum fee.

And even the largest noncommercial services received sizable discounts

compared to commercial webcasters.  For example, "2018 Family Radio,

█████ ████████████ religious noncommercial webcasters, received an

effective ████% discount from commercial webcasting rates and EMF,

the noncommercial webcaster ████ █████████████████████ received

an effective ████% discount."  FD 269 (JA1381).

83

The Judges also acknowledged that the marginal rate for plays above the monthly threshold would be a factor in a willing buyer's decision making but nevertheless found that the record did not support the dramatic reduction in above-threshold rates proposed by the Religious Broadcasters. *See* FD 270 (JA564) (noting that the Religious Broadcasters' expert testimony did "not address the question of the appropriate role of marginal rates versus average rates in determining whether" the existing "rate structure exceeds noncommercial webcasters' willingness to pay"). Instead, the Judges found only that the Religious Broadcasters' experts had shown that noncommercial webcasters had lower willingness to pay and that copyright owners would be willing to accept lower royalties as a form of price discrimination; the testimony did not address whether these concerns "would result in discounts for noncommercial webcasters that would be greater than, less than, or the same as the discount under the current" rates. FD 270-71 (JA564-65).

84

### C.     The Rates Established by the Judges Do Not Violate the Religious Freedom Restoration Act or the First Amendment

The Religious Broadcasters are also wrong to argue (Br. 52-55) that the rates set by the Judges charge religious organizations more than nonreligious organizations for the use of sound recordings in a manner that violates the Religious Freedom Restoration Act or the First Amendment.  The Judges' rates apply equally to *all* noncommercial services who were unable or unwilling to settle in advance of the final decision, without regard to religious orientation or programming content.  And those rates are substantially less than the rates governing commercial services.  The cases cited in the Religious Broadcasters' brief make clear that a Free Exercise claim cannot be marshaled against a "neutral" or "generally applicable" policy like the one at issue here.  *See* Br. 53 (quoting *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022)).

That the rates established by the Judges were higher than the rates agreed to by the settling noncommercial services does not show that the Judges' determination was discriminatory.  Instead, it reflects the Judges' reasoned conclusion that the rates agreed to by the settling

85

parties are different than the rates that willing buyers and willing sellers would agree to in an unregulated marketplace. That rationale is not "specifically directed at . . . religious practice," and thus does not violate the First Amendment. *Kennedy*, 142 S. Ct. at 2422 (alteration in original) (internal quotations omitted).

The Religious Broadcasters' reliance on the Religious Freedom Restoration Act adds little to their argument. To establish such a claim, they would need to demonstrate a "substantial[] burden" on their religious practices. 42 U.S.C. § 2000bb-1. But they do not even attempt to show how the rates established by the Judges—rates that permit Religious Broadcasters and other noncommercial services to pay *substantially* less than secular, commercial services for the same performance rights—interferes with Religious Broadcasters' religious practices. And they likewise do not demonstrate that religious broadcasts are more expensive than secular ones: any noncommercial broadcast that is not covered by the settlement agreement, whether religious or secular, pays the same rate.

86

### III. The Judges Reasonably Increased the Minimum Fee to Account for the Increased Administrative Costs of Administering the Statutory License

The Copyright Act requires the Judges, in addition to setting reasonable royalty rates, to establish a "minimum fee for each . . . type of service" covered by the statutory license. 17 U.S.C. § 114(f)(1)(B); *id.* § 112(e)(3)-(4). Since 2006, the minimum fee for all services has been the same: $500 annually for each station or channel, with an aggregate cap of $50,000 on the minimum fee paid by each commercial webcaster, such that the minimum fee is not increased further for additional stations or channels after the first 100. *See* 37 C.F.R. § 380.10(b) (2020). In the current proceeding, the Judges identified several justifications for an increase in this minimum fee that together supported a zone of reasonable minimum fees ranging from $656.77 to $1,170 per channel. FD 287-90 (JA581-84). SoundExchange's proposed increase to $1,000 per channel, with a commensurate increase on the cap to $100,000 per commercial webcaster, fell comfortably within that range. FD 290 (JA584). The Judges accordingly adopted that minimum fee.

On appeal, NAB and the Religious Broadcasters (collectively, the Services) take issue with one of the justifications given by the Judges for increasing the minimum fee. In particular, the Judges noted that the costs of administering the statutory license—which SoundExchange deducts from the royalties it collects on behalf of artists and copyright owners, *see* 17 U.S.C. § 114(g),—had more than doubled since the last ratesetting proceeding. The Services claim that consideration of this increase in average administrative costs was improper. In their view, the minimum fee should reflect only the "incremental" cost associated with administering the statutory license to each additional service, rather than the average cost of administering the license to all services. That argument fails for several reasons.

**A. 1.** Although the Copyright Act's text does not disclose a rationale for the minimum fee or the proper mechanism for calculating it, it appears to be common ground that the minimum fee is designed to ensure that small licensees with very low royalty payments do not unduly burden the system. The Judges accomplished that goal by ensuring that each licensee contributes to the system's administrative

88

costs, pegging the size of the minimum fee to increases in the average administrative cost per license.

The Judges concluded, in particular, that the average administrative cost per channel or station had "increased from approximately $1,900 to approximately $4,448 between 2013 and 2018, an increase of 2.34 times." FD 287-88 (JA581-82). The Judges did not increase the minimum fee to $4,448, however, but rather used the percentage increase as an upper bound on the reasonable fee, concluding that the minimum fee should not exceed $1,170 per channel or station (that is, 2.34 times the existing $500 minimum fee). As a lower bound, the Judges noted that a pure inflation-based increase would yield a minimum fee of $656.77. FD 289 (JA583). SoundExchange's proposal of $1,000 per channel fell within this range of reasonableness and was therefore accepted.

**2.** The Services contend that they should not be compelled to contribute to the overall costs of administering the licensing scheme but instead that they should only be required to pay the incremental costs of adding an additional license. *See* NAB Br. 40-45. The Judges reasonably rejected that view, which would mean that the minimum fee

89

would ensure only that a service did not impose a net cost on the licensing scheme but would not prevent the service from free-riding on the payments of all the other licensees insofar as each contributes to the fixed costs associated with the licensing scheme. As record testimony in this proceeding explained, charging each additional licensee only the incremental cost associated with its license would not "ensure that the pricing covers costs" because "if everyone got marginal cost pricing, then it could be the situation where everyone is getting a low price but they're not actually covering the cost to administer the service." FD 286 (JA580) (quoting JA1450-51 (8/12/20 Tr. 1760-61)).

The Services do not even attempt to ground their position in the minimum-fee provision's text, which, as noted, provides no guidance regarding the proper mechanism for calculating the minimum fee. Instead, they rely on a separate provision of the statute, 17 U.S.C. § 114(g)(3), which authorizes SoundExchange to deduct the "reasonable costs" of administering the statutory license before distributing licensing revenues to copyright owners. NAB Br. 41. According to the Services, the minimum fee should cover only the incremental cost of an additional license, because the alternative would purportedly require

90

licensees to contribute to costs having "nothing to do" with administering the webcasting license. *Id.* at 42 (emphasis omitted).

That is a non sequitur. As an initial matter, although NAB quotes (Br. 41-42) the final determination for the proposition that requiring services to contribute to SoundExchange's fixed costs requires them to contribute to costs "unrelated to license administration," the quoted portion of the Judges' decision merely recited NAB's own view on the subject. *See* FD 287 (JA581). The Judges did not find that SoundExchange's average administrative costs were "unrelated" to license administration, nor is there any principled reason to assume that beneficiaries of the licensing scheme should be excused from shouldering any of the fixed costs associated with that scheme. To the contrary, it is unclear why a willing seller would agree to provide a license at cost, rather than expecting each buyer to contribute to the fixed costs of the enterprise (even if it is not insisting on a net profit).

The Services also erroneously suggest (NAB Br. 42) that it is significant that, unlike the statutory scheme for the mechanical license, SoundExchange's funding mechanism does not expressly require that the "collective total costs" of SoundExchange's operation be covered by

91

the licensees.  *Compare* 17 U.S.C. § 114(g)(3), *with id.* § 115(d)(7); *see also* 17 U.S.C. § 115(e)(6) (defining collective total costs).  But that comparison is inapt.  The minimum fee established by the Judges is far less than SoundExchange's estimated average costs, and unlike the special assessment in the mechanical license regime, the minimum fee is not an assessment paid in addition to established royalties.  *See* FD 286 (JA580).  Services whose usage exceeds the amount covered by the minimum fee merely make payments based on usage, without any extra assessment.  And services that pay the minimum fee can use that payment to eliminate their obligation to pay royalties.  "While there are webcasters whose usage falls below the amount that is covered by the minimum fee, that is simply inherent in the nature of any minimum fee."  FD 286 (JA580).

The Services fare no better in their reliance on the legislative history of the minimum fee provision, which suggests that a reasonable minimum fee "should ensure that copyright owners are fairly compensated in the event that other methodologies for setting rates might deny copyright owners an adequate royalty."  H.R. Rep. No. 105-796, at 85 (1998).  As discussed above, the costs of administering the

statutory license are deducted from the overall royalties paid. And the remaining royalties would not be "adequate" if some licensees did not contribute to the fixed costs of a system from which they benefit.

Nor do the Services advance their position by contending that "[b]inding precedent from the agency" requires their preferred approach. NAB Br. 42. Although the Services have consistently argued "that the minimum fee . . . exists solely to cover SoundExchange's incremental administrative costs . . ., the Judges and their predecessors have never embraced it." FD 285 (JA579).

In *Web IV*, for example, the Judges stated that "commercial and noncommercial webcasters alike should have to pay a minimum fee that at least defrays a portion of SoundExchange's costs to administer the statutory licenses." *Web IV*, 81 Fed. Reg. at 26,396. There, the record established that in 2013, SoundExchange's average administrative costs were $11,778 per licensee, *id.*, or $1,900 per channel, FD 287-88 (JA581-82). However, no party proposed a minimum fee higher than $500. Thus, although "a higher minimum fee could be justified on this record," the Judges determined that it was reasonable to adopt the proposed minimum fee of $500 because it was "substantially" less than

"SoundExchange's average administrative cost per licensee." *Web IV*, 81 Fed. Reg. at 26,396-97; *see also id.* at 26,397 ("The current $500 annual minimum fee . . . constitutes a small (but nontrivial) fraction of the costs that SoundExchange incurs in administering the statutory license.").

Similarly, on remand in the third webcasting proceeding, the Judges determined that a $500 minimum fee was reasonable because SoundExchange's "average administrative cost[s] exceed[] $800." Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, 79 Fed. Reg. 23,102, 23,124 (Apr. 25, 2014). And in *Web II*, although the proposed $500 minimum fee was "substantially smaller" than the minimum fees reflected in benchmark marketplace agreements, the Judges determined that it was nevertheless reasonable because it had been proposed by SoundExchange, who had the best knowledge of its own operating costs. *Web II*, 72 Fed. Reg. at 24,096. As the Judges explained, SoundExchange would not have proposed such a low minimum fee unless it "anticipate[d] that [the fee] will cover its administrative costs even in the absence of royalties." *Id.*

94

The Services do not attempt to reconcile their contrary position with these prior decisions.  Instead, the Services argue (Br. 42-43) that the Judges' consideration of average administrative costs conflicts with the decision in *Web I* reached by the Judges' predecessor, the Copyright Arbitration Royalty Panel.  But that decision did not suggest, much less hold, that it would be improper to consider the average cost of administering the statutory license when setting a minimum rate.  Instead, as relevant here, the Copyright Arbitration Royalty Panel simply noted that "one purpose" of the minimum fee was to "protect against a situation in which the licensee's performances are such that it costs the license administrator more to administer the license than it would receive in royalties."  FD 285 (JA579) (internal quotations omitted).  And as the Judges here explained, regardless of whether this language refers to incremental (rather than average) costs, it is clear that the Panel believed covering such costs was only "one purpose" of the minimum fee.  FD 285-86 (JA579-80).  That decision is thus entirely consistent with the Judges' finding here that the minimum fee must, at a "bare minimum," cover the incremental costs of adding a new service to the statutory license.  FD 285-86 (JA579-80).

**B.**  Finally, the Services do not identify any error in the methodology for updating the minimum fee.  SoundExchange calculated its average administrative costs by "dividing its total administrative costs by its total number of licensees (webcasting and non-webcasting), then dividing that quotient by the estimated number of channels or stations per licensee."  FD 287 (JA581).  The Services misunderstand this calculation as somehow requiring webcasting licensees to subsidize operational costs unrelated to webcasting.  This complaint ignores that the relevant figure is the average administrative cost, not the total.

Because some of SoundExchange's administrative costs may not be easily allocated as between webcasting and other licenses, SoundExchange calculated the average cost per license across all licenses, rather than attempting to isolate webcasting licenses.  Adding other licenses to both the numerator and denominator of the average would not inherently tend to increase the average but rather would only do so if the non-webcasting licenses as a general matter imposed more administrative costs than the webcasting licenses.  The Services make no effort to make such a showing.

96

In addition, the Judges did not set the minimum fee based on the estimated average cost—which would have resulted in a substantially higher fee—but instead used these figures to calculate the degree to which administrative costs had increased.  The Services do not attempt to demonstrate that administrative costs associated with other types of licenses have grown faster than administrative costs associated with webcasting licenses (to the extent that the two can be disaggregated).

The Services also renew their argument that SoundExchange impermissibly included the costs of items that the Services characterized as "unrelated to license administration."  FD 287 (JA581).  As the Judges explained, this argument "follows from the Service's position that the function of the minimum fee is to cover SoundExchange's incremental cost of licensing," which the Judges rejected.  FD 287 (JA581).  The Services present no argument that these items are irrelevant to SoundExchange's average administrative costs.

# CONCLUSION

For the foregoing reasons, the final determination of the

Copyright Royalty Judges should be affirmed.

Respectfully submitted,

MICHAEL D. GRANSTON
*Deputy Assistant Attorney*
*General*

DANIEL TENNY

 */s/ Jennifer L. Utrecht*
JENNIFER L. UTRECHT
*Attorneys, Appellate Staff*
*Civil Division, Room 7710*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-9039*
*Jennifer.l.utrecht@usdoj.gov*

January 2023

98

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit specified in this Court's April 28, 2022 Order because it contains 18,031 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2023, I electronically filed the public version of the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  If further certify that the confidential version of the foregoing brief was also served on counsel for all parties by electronic transfer.

*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

**ADDENDUM**

# TABLE OF CONTENTS

17 U.S.C. § 114 ....................................................................... A1

17 U.S.C. § 801 ..................................................................... A16

17 U.S.C. § 803 ..................................................................... A18

**17 U.S.C. § 114 (excerpts)**

**§ 114. Scope of exclusive rights in sound recordings**

**(a)** The exclusive rights of the owner of copyright in a sound recording are limited to the rights specified by clauses (1), (2), (3) and (6) of section 106, and do not include any right of performance under section 106(4).

\* \* \*

**(d) Limitations on exclusive right.**--Notwithstanding the provisions of section 106(6)—

\* \* \*

**(2) Statutory licensing of certain transmissions.**--The performance of a sound recording publicly by means of a subscription digital audio transmission not exempt under paragraph (1), an eligible nonsubscription transmission, or a transmission not exempt under paragraph (1) that is made by a preexisting satellite digital audio radio service shall be subject to statutory licensing, in accordance with subsection (f) if—

    **(A)(i)** the transmission is not part of an interactive service;

    **(ii)** except in the case of a transmission to a business establishment, the transmitting entity does not automatically and intentionally cause any device receiving the transmission to switch from one program channel to another; and

    **(iii)** except as provided in section 1002(e), the transmission of the sound recording is accompanied, if technically feasible, by the information encoded in that sound recording, if any, by or under the authority of the copyright owner of that sound recording, that identifies the title of the sound recording, the featured recording artist who performs on the sound recording, and related information, including information concerning the underlying musical work and its writer;

    **(B)** in the case of a subscription transmission not exempt under paragraph (1) that is made by a preexisting subscription service

in the same transmission medium used by such service on July 31, 1998, or in the case of a transmission not exempt under paragraph (1) that is made by a preexisting satellite digital audio radio service--

> **(i)** the transmission does not exceed the sound recording performance complement; and

> **(ii)** the transmitting entity does not cause to be published by means of an advance program schedule or prior announcement the titles of the specific sound recordings or phonorecords embodying such sound recordings to be transmitted; and

**(C)** in the case of an eligible nonsubscription transmission or a subscription transmission not exempt under paragraph (1) that is made by a new subscription service or by a preexisting subscription service other than in the same transmission medium used by such service on July 31, 1998--

> **(i)** the transmission does not exceed the sound recording performance complement, except that this requirement shall not apply in the case of a retransmission of a broadcast transmission if the retransmission is made by a transmitting entity that does not have the right or ability to control the programming of the broadcast station making the broadcast transmission, unless--

>> **(I)** the broadcast station makes broadcast transmissions--

>>> **(aa)** in digital format that regularly exceed the sound recording performance complement; or

>>> **(bb)** in analog format, a substantial portion of which, on a weekly basis, exceed the sound recording performance complement; and

>> **(II)** the sound recording copyright owner or its representative has notified the transmitting entity in writing that broadcast transmissions of the copyright owner's sound recordings exceed the sound recording performance complement as provided in this clause;

A2

**(ii)** the transmitting entity does not cause to be published, or induce or facilitate the publication, by means of an advance program schedule or prior announcement, the titles of the specific sound recordings to be transmitted, the phonorecords embodying such sound recordings, or, other than for illustrative purposes, the names of the featured recording artists, except that this clause does not disqualify a transmitting entity that makes a prior announcement that a particular artist will be featured within an unspecified future time period, and in the case of a retransmission of a broadcast transmission by a transmitting entity that does not have the right or ability to control the programming of the broadcast transmission, the requirement of this clause shall not apply to a prior oral announcement by the broadcast station, or to an advance program schedule published, induced, or facilitated by the broadcast station, if the transmitting entity does not have actual knowledge and has not received written notice from the copyright owner or its representative that the broadcast station publishes or induces or facilitates the publication of such advance program schedule, or if such advance program schedule is a schedule of classical music programming published by the broadcast station in the same manner as published by that broadcast station on or before September 30, 1998;

**(iii)** the transmission--

**(I)** is not part of an archived program of less than 5 hours duration;

**(II)** is not part of an archived program of 5 hours or greater in duration that is made available for a period exceeding 2 weeks;

**(III)** is not part of a continuous program which is of less than 3 hours duration; or

**(IV)** is not part of an identifiable program in which performances of sound recordings are rendered in a predetermined order, other than an archived or continuous program, that is transmitted at--

A3

**(aa)** more than 3 times in any 2-week period that have been publicly announced in advance, in the case of a program of less than 1 hour in duration, or

**(bb)** more than 4 times in any 2-week period that have been publicly announced in advance, in the case of a program of 1 hour or more in duration,

except that the requirement of this subclause shall not apply in the case of a retransmission of a broadcast transmission by a transmitting entity that does not have the right or ability to control the programming of the broadcast transmission, unless the transmitting entity is given notice in writing by the copyright owner of the sound recording that the broadcast station makes broadcast transmissions that regularly violate such requirement;

**(iv)** the transmitting entity does not knowingly perform the sound recording, as part of a service that offers transmissions of visual images contemporaneously with transmissions of sound recordings, in a manner that is likely to cause confusion, to cause mistake, or to deceive, as to the affiliation, connection, or association of the copyright owner or featured recording artist with the transmitting entity or a particular product or service advertised by the transmitting entity, or as to the origin, sponsorship, or approval by the copyright owner or featured recording artist of the activities of the transmitting entity other than the performance of the sound recording itself;

**(v)** the transmitting entity cooperates to prevent, to the extent feasible without imposing substantial costs or burdens, a transmission recipient or any other person or entity from automatically scanning the transmitting entity's transmissions alone or together with transmissions by other transmitting entities in order to select a particular sound recording to be transmitted to the transmission recipient, except that the requirement of this clause shall not apply to a satellite digital audio service that is in operation, or that is

A4

licensed by the Federal Communications Commission, on or before July 31, 1998;

**(vi)** the transmitting entity takes no affirmative steps to cause or induce the making of a phonorecord by the transmission recipient, and if the technology used by the transmitting entity enables the transmitting entity to limit the making by the transmission recipient of phonorecords of the transmission directly in a digital format, the transmitting entity sets such technology to limit such making of phonorecords to the extent permitted by such technology;

**(vii)** phonorecords of the sound recording have been distributed to the public under the authority of the copyright owner or the copyright owner authorizes the transmitting entity to transmit the sound recording, and the transmitting entity makes the transmission from a phonorecord lawfully made under the authority of the copyright owner, except that the requirement of this clause shall not apply to a retransmission of a broadcast transmission by a transmitting entity that does not have the right or ability to control the programming of the broadcast transmission, unless the transmitting entity is given notice in writing by the copyright owner of the sound recording that the broadcast station makes broadcast transmissions that regularly violate such requirement;

**(viii)** the transmitting entity accommodates and does not interfere with the transmission of technical measures that are widely used by sound recording copyright owners to identify or protect copyrighted works, and that are technically feasible of being transmitted by the transmitting entity without imposing substantial costs on the transmitting entity or resulting in perceptible aural or visual degradation of the digital signal, except that the requirement of this clause shall not apply to a satellite digital audio service that is in operation, or that is licensed under the authority of the Federal Communications Commission, on or before July 31, 1998, to the extent that such service has designed, developed, or made commitments to procure equipment or technology

A5

that is not compatible with such technical measures before such technical measures are widely adopted by sound recording copyright owners; and

**(ix)** the transmitting entity identifies in textual data the sound recording during, but not before, the time it is performed, including the title of the sound recording, the title of the phonorecord embodying such sound recording, if any, and the featured recording artist, in a manner to permit it to be displayed to the transmission recipient by the device or technology intended for receiving the service provided by the transmitting entity, except that the obligation in this clause shall not take effect until 1 year after the date of the enactment of the Digital Millennium Copyright Act and shall not apply in the case of a retransmission of a broadcast transmission by a transmitting entity that does not have the right or ability to control the programming of the broadcast transmission, or in the case in which devices or technology intended for receiving the service provided by the transmitting entity that have the capability to display such textual data are not common in the marketplace.

\* \* \*

## (e) Authority for Negotiations.--

**(1)** Notwithstanding any provision of the antitrust laws, in negotiating statutory licenses in accordance with subsection (f), any copyright owners of sound recordings and any entities performing sound recordings affected by this section may negotiate and agree upon the royalty rates and license terms and conditions for the performance of such sound recordings and the proportionate division of fees paid among copyright owners, and may designate common agents on a nonexclusive basis to negotiate, agree to, pay, or receive payments.

**(2)** For licenses granted under section 106(6), other than statutory licenses, such as for performances by interactive services or performances that exceed the sound recording performance complement--

A6

**(A)** copyright owners of sound recordings affected by this section may designate common agents to act on their behalf to grant licenses and receive and remit royalty payments: *Provided*, That each copyright owner shall establish the royalty rates and material license terms and conditions unilaterally, that is, not in agreement, combination, or concert with other copyright owners of sound recordings; and

**(B)** entities performing sound recordings affected by this section may designate common agents to act on their behalf to obtain licenses and collect and pay royalty fees: *Provided*, That each entity performing sound recordings shall determine the royalty rates and material license terms and conditions unilaterally, that is, not in agreement, combination, or concert with other entities performing sound recordings.

**(f) Licenses for certain nonexempt transmissions.--**

**(1)(A)** Proceedings under chapter 8 shall determine reasonable rates and terms of royalty payments for transmissions subject to statutory licensing under subsection (d)(2) during the 5-year period beginning on January 1 of the second year following the year in which the proceedings are to be commenced pursuant to subparagraph (A) or (B) of section 804(b)(3), as the case may be, or such other period as the parties may agree. The parties to each proceeding shall bear their own costs.

**(B)** The schedule of reasonable rates and terms determined by the Copyright Royalty Judges shall, subject to paragraph (2), be binding on all copyright owners of sound recordings and entities performing sound recordings affected by this paragraph during the 5-year period specified in subparagraph (A), or such other period as the parties may agree. Such rates and terms shall distinguish among the different types of services then in operation and shall include a minimum fee for each such type of service, such differences to be based on criteria including the quantity and nature of the use of sound recordings and the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers. The Copyright Royalty Judges shall establish rates and terms that most clearly represent the rates

and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller. In determining such rates and terms, the Copyright Royalty Judges--

**(i)** shall base their decision on economic, competitive, and programming information presented by the parties, including--

**(I)** whether use of the service may substitute for or may promote the sales of phonorecords or otherwise may interfere with or may enhance the sound recording copyright owner's other streams of revenue from the copyright owner's sound recordings; and

**(II)** the relative roles of the copyright owner and the transmitting entity in the copyrighted work and the service made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, and risk; and

**(ii)** may consider the rates and terms for comparable types of audio transmission services and comparable circumstances under voluntary license agreements.

**(C)** The procedures under subparagraphs (A) and (B) shall also be initiated pursuant to a petition filed by any sound recording copyright owner or any transmitting entity indicating that a new type of service on which sound recordings are performed is or is about to become operational, for the purpose of determining reasonable terms and rates of royalty payments with respect to such new type of service for the period beginning with the inception of such new type of service and ending on the date on which the royalty rates and terms for eligible nonsubscription services and new subscription services, or preexisting subscription services and preexisting satellite digital audio radio services, as the case may be, most recently determined under subparagraph (A) or (B) and chapter 8 expire, or such other period as the parties may agree.

**(2)** License agreements voluntarily negotiated at any time between 1 or more copyright owners of sound recordings and 1 or more entities performing sound recordings shall be given effect in lieu of any

decision by the Librarian of Congress or determination by the Copyright Royalty Judges.

**(3)(A)** The Copyright Royalty Judges shall also establish requirements by which copyright owners may receive reasonable notice of the use of their sound recordings under this section, and under which records of such use shall be kept and made available by entities performing sound recordings. The notice and recordkeeping rules in effect on the day before the effective date of the Copyright Royalty and Distribution Reform Act of 2004 shall remain in effect unless and until new regulations are promulgated by the Copyright Royalty Judges. If new regulations are promulgated under this subparagraph, the Copyright Royalty Judges shall take into account the substance and effect of the rules in effect on the day before the effective date of the Copyright Royalty and Distribution Reform Act of 2004 and shall, to the extent practicable, avoid significant disruption of the functions of any designated agent authorized to collect and distribute royalty fees.

**(B)** Any person who wishes to perform a sound recording publicly by means of a transmission eligible for statutory licensing under this subsection may do so without infringing the exclusive right of the copyright owner of the sound recording--

**(i)** by complying with such notice requirements as the Copyright Royalty Judges shall prescribe by regulation and by paying royalty fees in accordance with this subsection; or

**(ii)** if such royalty fees have not been set, by agreeing to pay such royalty fees as shall be determined in accordance with this subsection.

**(C)** Any royalty payments in arrears shall be made on or before the twentieth day of the month next succeeding the month in which the royalty fees are set.

**(4)(A)** Notwithstanding section 112(e) and the other provisions of this subsection, the receiving agent may enter into agreements for the reproduction and performance of sound recordings under section 112(e) and this section by any 1 or more commercial webcasters or noncommercial webcasters for a period of not more than 11 years beginning on January 1, 2005, that, once published in the Federal

A9

Register pursuant to subparagraph (B), shall be binding on all copyright owners of sound recordings and other persons entitled to payment under this section, in lieu of any determination by the Copyright Royalty Judges. Any such agreement for commercial webcasters may include provisions for payment of royalties on the basis of a percentage of revenue or expenses, or both, and include a minimum fee. Any such agreement may include other terms and conditions, including requirements by which copyright owners may receive notice of the use of their sound recordings and under which records of such use shall be kept and made available by commercial webcasters or noncommercial webcasters. The receiving agent shall be under no obligation to negotiate any such agreement. The receiving agent shall have no obligation to any copyright owner of sound recordings or any other person entitled to payment under this section in negotiating any such agreement, and no liability to any copyright owner of sound recordings or any other person entitled to payment under this section for having entered into such agreement.

**(B)** The Copyright Office shall cause to be published in the Federal Register any agreement entered into pursuant to subparagraph (A). Such publication shall include a statement containing the substance of subparagraph (C). Such agreements shall not be included in the Code of Federal Regulations. Thereafter, the terms of such agreement shall be available, as an option, to any commercial webcaster or noncommercial webcaster meeting the eligibility conditions of such agreement.

**(C)** Neither subparagraph (A) nor any provisions of any agreement entered into pursuant to subparagraph (A), including any rate structure, fees, terms, conditions, or notice and recordkeeping requirements set forth therein, shall be admissible as evidence or otherwise taken into account in any administrative, judicial, or other government proceeding involving the setting or adjustment of the royalties payable for the public performance or reproduction in ephemeral phonorecords or copies of sound recordings, the determination of terms or conditions related thereto, or the establishment of notice or recordkeeping requirements by the Copyright Royalty Judges under paragraph (3) or section 112(e)(4). It is the intent of Congress that any

royalty rates, rate structure, definitions, terms, conditions, or notice and recordkeeping requirements, included in such agreements shall be considered as a compromise motivated by the unique business, economic and political circumstances of webcasters, copyright owners, and performers rather than as matters that would have been negotiated in the marketplace between a willing buyer and a willing seller, or otherwise meet the objectives set forth in section 801(b). This subparagraph shall not apply to the extent that the receiving agent and a webcaster that is party to an agreement entered into pursuant to subparagraph (A) expressly authorize the submission of the agreement in a proceeding under this subsection.

**(D)** Nothing in the Webcaster Settlement Act of 2008, the Webcaster Settlement Act of 2009, or any agreement entered into pursuant to subparagraph (A) shall be taken into account by the United States Court of Appeals for the District of Columbia Circuit in its review of the determination by the Copyright Royalty Judges of May 1, 2007, of rates and terms for the digital performance of sound recordings and ephemeral recordings, pursuant to sections 112 and 114.1

**(E)** As used in this paragraph--

**(i)** the term "noncommercial webcaster" means a webcaster that--

**(I)** is exempt from taxation under section 501 of the Internal Revenue Code of 1986 (26 U.S.C. 501);

**(II)** has applied in good faith to the Internal Revenue Service for exemption from taxation under section 501 of the Internal Revenue Code and has a commercially reasonable expectation that such exemption shall be granted; or

**(III)** is operated by a State or possession or any governmental entity or subordinate thereof, or by the United States or District of Columbia, for exclusively public purposes;

**(ii)** the term "receiving agent" shall have the meaning given that term in section 261.2 of title 37, Code of Federal Regulations, as published in the Federal Register on July 8, 2002; and

A11

**(iii)** the term "webcaster" means a person or entity that has obtained a compulsory license under section 112 or 1142 and the implementing regulations therefor.

**(F)** The authority to make settlements pursuant to subparagraph (A) shall expire at 11:59 p.m. Eastern time on the 30th day after the date of the enactment of the Webcaster Settlement Act of 2009.

[**(5)** Redesignated (4)]

\* \* \*

**(g) Proceeds from licensing of transmissions.--**

\* \* \*

**(2)** Except as provided for in paragraph (6), a nonprofit collective designated by the Copyright Royalty Judges to distribute receipts from the licensing of transmissions in accordance with subsection (f) shall distribute such receipts as follows:

**(A)** 50 percent of the receipts shall be paid to the copyright owner of the exclusive right under section 106(6) of this title to publicly perform a sound recording by means of a digital audio transmission.

**(B)** 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Musicians (or any successor entity) to be distributed to nonfeatured musicians (whether or not members of the American Federation of Musicians) who have performed on sound recordings.

**(C)** 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Television and Radio Artists (or any successor entity) to be distributed to nonfeatured vocalists (whether or not members of the American Federation of Television and Radio Artists) who have performed on sound recordings.

**(D)** 45 percent of the receipts shall be paid, on a per sound recording basis, to the recording artist or artists featured on such sound recording (or the persons conveying rights in the artists' performance in the sound recordings).

**(3)** A nonprofit collective designated by the Copyright Royalty Judges to distribute receipts from the licensing of transmissions in accordance with subsection (f) may deduct from any of its receipts, prior to the distribution of such receipts to any person or entity entitled thereto other than copyright owners and performers who have elected to receive royalties from another designated nonprofit collective and have notified such nonprofit collective in writing of such election, the reasonable costs of such collective incurred after November 1, 1995, in--

**(A)** the administration of the collection, distribution, and calculation of the royalties;

**(B)** the settlement of disputes relating to the collection and calculation of the royalties; and

**(C)** the licensing and enforcement of rights with respect to the making of ephemeral recordings and performances subject to licensing under section 112 and this section, including those incurred in participating in negotiations or arbitration proceedings under section 112 and this section, except that all costs incurred relating to the section 112 ephemeral recordings right may only be deducted from the royalties received pursuant to section 112.

**(4)** Notwithstanding paragraph (3), any nonprofit collective designated to distribute receipts from the licensing of transmissions in accordance with subsection (f) may deduct from any of its receipts, prior to the distribution of such receipts, the reasonable costs identified in paragraph (3) of such collective incurred after November 1, 1995, with respect to such copyright owners and performers who have entered with such collective a contractual relationship that specifies that such costs may be deducted from such royalty receipts.

* * *

A13

**(j) Definitions.**--As used in this section, the following terms have the following meanings:

**(1)** An "affiliated entity" is an entity engaging in digital audio transmissions covered by section 106(6), other than an interactive service, in which the licensor has any direct or indirect partnership or any ownership interest amounting to 5 percent or more of the outstanding voting or non-voting stock.

**(2)** An "archived program" is a predetermined program that is available repeatedly on the demand of the transmission recipient and that is performed in the same order from the beginning, except that an archived program shall not include a recorded event or broadcast transmission that makes no more than an incidental use of sound recordings, as long as such recorded event or broadcast transmission does not contain an entire sound recording or feature a particular sound recording.

**(3)** A "broadcast" transmission is a transmission made by a terrestrial broadcast station licensed as such by the Federal Communications Commission.

**(4)** A "continuous program" is a predetermined program that is continuously performed in the same order and that is accessed at a point in the program that is beyond the control of the transmission recipient.

**(5)** A "digital audio transmission" is a digital transmission as defined in section 101, that embodies the transmission of a sound recording. This term does not include the transmission of any audiovisual work.

**(6)** An "eligible nonsubscription transmission" is a noninteractive nonsubscription digital audio transmission not exempt under subsection (d)(1) that is made as part of a service that provides audio programming consisting, in whole or in part, of performances of sound recordings, including retransmissions of broadcast transmissions, if the primary purpose of the service is to provide to the public such audio or other entertainment programming, and the primary purpose of the service is not to sell, advertise, or promote particular products or services other than sound recordings, live concerts, or other music-related events.

A14

**(7)** An "interactive service" is one that enables a member of the public to receive a transmission of a program specially created for the recipient, or on request, a transmission of a particular sound recording, whether or not as part of a program, which is selected by or on behalf of the recipient. The ability of individuals to request that particular sound recordings be performed for reception by the public at large, or in the case of a subscription service, by all subscribers of the service, does not make a service interactive, if the programming on each channel of the service does not substantially consist of sound recordings that are performed within 1 hour of the request or at a time designated by either the transmitting entity or the individual making such request. If an entity offers both interactive and noninteractive services (either concurrently or at different times), the noninteractive component shall not be treated as part of an interactive service.

**(8)** A "new subscription service" is a service that performs sound recordings by means of noninteractive subscription digital audio transmissions and that is not a preexisting subscription service or a preexisting satellite digital audio radio service.

* * *

A15

**17 U.S.C. § 801**

**§ 801. Copyright Royalty Judges; appointments and functions**

**(a) Appointment.**--The Librarian of Congress shall appoint 3 full-time Copyright Royalty Judges, and shall appoint 1 of the 3 as the Chief Copyright Royalty Judge. The Librarian shall make appointments to such positions after consultation with the Register of Copyrights.

**(b) Functions.**--Subject to the provisions of this chapter, the functions of the Copyright Royalty Judges shall be as follows:

**(1)** To make determinations and adjustments of reasonable terms and rates of royalty payments as provided in sections 112(e), 114, 115, 116, 118, 119, and 1004.

\* \* \*

**(7)(A)** To adopt as a basis for statutory terms and rates or as a basis for the distribution of statutory royalty payments, an agreement concerning such matters reached among some or all of the participants in a proceeding at any time during the proceeding, except that--

**(i)** the Copyright Royalty Judges shall provide to those that would be bound by the terms, rates, or other determination set by any agreement in a proceeding to determine royalty rates an opportunity to comment on the agreement and shall provide to participants in the proceeding under section 803(b)(2) that would be bound by the terms, rates, or other determination set by the agreement an opportunity to comment on the agreement and object to its adoption as a basis for statutory terms and rates; and

**(ii)** the Copyright Royalty Judges may decline to adopt the agreement as a basis for statutory terms and rates for participants that are not parties to the agreement, if any participant described in clause (i) objects to the agreement and the Copyright Royalty Judges conclude, based on the record

A16

before them if one exists, that the agreement does not provide a reasonable basis for setting statutory terms or rates.

**(B)** License agreements voluntarily negotiated pursuant to section 112(e)(5), 114(f)(2), 115(c)(3)(E)(i), 116(c), or 118(b)(2) that do not result in statutory terms and rates shall not be subject to clauses (i) and (ii) of subparagraph (A).

**(C)** Interested parties may negotiate and agree to, and the Copyright Royalty Judges may adopt, an agreement that specifies as terms notice and recordkeeping requirements that apply in lieu of those that would otherwise apply under regulations.

\* \* \*

**(c) Rulings.**--The Copyright Royalty Judges may make any necessary procedural or evidentiary rulings in any proceeding under this chapter and may, before commencing a proceeding under this chapter, make any such rulings that would apply to the proceedings conducted by the Copyright Royalty Judges.

**(d) Administrative support.**--The Librarian of Congress shall provide the Copyright Royalty Judges with the necessary administrative services related to proceedings under this chapter.

**(e) Location in Library of Congress.**--The offices of the Copyright Royalty Judges and staff shall be in the Library of Congress.

**(f) Effective date of actions.**--On and after the date of the enactment of the Copyright Royalty and Distribution Reform Act of 2004, in any case in which time limits are prescribed under this title for performance of an action with or by the Copyright Royalty Judges, and in which the last day of the prescribed period falls on a Saturday, Sunday, holiday, or other nonbusiness day within the District of Columbia or the Federal Government, the action may be taken on the next succeeding business day, and is effective as of the date when the period expired.

A17

**17 U.S.C. § 803**

**§ 803. Proceedings of the Copyright Royalty Judges**

**(a) Proceedings.--**

**(1) In general.**--The Copyright Royalty Judges shall act in accordance with this title, and to the extent not inconsistent with this title, in accordance with subchapter II of chapter 5 of title 5, in carrying out the purposes set forth in section 801. The Copyright Royalty Judges shall act in accordance with regulations issued by the Copyright Royalty Judges and the Librarian of Congress, and on the basis of a written record, prior determinations and interpretations of the Copyright Royalty Tribunal, Librarian of Congress, the Register of Copyrights, copyright arbitration royalty panels (to the extent those determinations are not inconsistent with a decision of the Librarian of Congress or the Register of Copyrights), and the Copyright Royalty Judges (to the extent those determinations are not inconsistent with a decision of the Register of Copyrights that was timely delivered to the Copyright Royalty Judges pursuant to section 802(f)(1)(A) or (B), or with a decision of the Register of Copyrights pursuant to section 802(f)(1)(D)), under this chapter, and decisions of the court of appeals under this chapter before, on, or after the effective date of the Copyright Royalty and Distribution Reform Act of 2004.

**(2) Judges acting as panel and individually.**--The Copyright Royalty Judges shall preside over hearings in proceedings under this chapter en banc. The Chief Copyright Royalty Judge may designate a Copyright Royalty Judge to preside individually over such collateral and administrative proceedings, and over such proceedings under paragraphs (1) through (5) of subsection (b), as the Chief Judge considers appropriate.

**(3) Determinations.**--Final determinations of the Copyright Royalty Judges in proceedings under this chapter shall be made by majority vote. A Copyright Royalty Judge dissenting from the majority on any determination under this chapter may issue his or her dissenting opinion, which shall be included with the determination.

A18

**(b) Procedures.--**

    **(1) Initiation.--**

        **(A) Call for petitions to participate.--(i)** The Copyright Royalty Judges shall cause to be published in the Federal Register notice of commencement of proceedings under this chapter, calling for the filing of petitions to participate in a proceeding under this chapter for the purpose of making the relevant determination under section 111, 112, 114, 115, 116, 118, 119, 1004, or 1007, as the case may be--

* * *

        **(B) Petitions to participate.**--Each petition to participate in a proceeding shall describe the petitioner's interest in the subject matter of the proceeding. Parties with similar interests may file a single petition to participate.

    **(2) Participation in general.**--Subject to paragraph (4), a person may participate in a proceeding under this chapter, including through the submission of briefs or other information, only if--

    **(A)** that person has filed a petition to participate in accordance with paragraph (1) (either individually or as a group under paragraph (1)(B));

    **(B)** the Copyright Royalty Judges have not determined that the petition to participate is facially invalid;

    **(C)** the Copyright Royalty Judges have not determined, sua sponte or on the motion of another participant in the proceeding, that the person lacks a significant interest in the proceeding; and

    **(D)** the petition to participate is accompanied by either--

        **(i)** in a proceeding to determine royalty rates, a filing fee of $150; or

        **(ii)** in a proceeding to determine distribution of royalty fees--

            **(I)** a filing fee of $150; or

            **(II)** a statement that the petitioner (individually or as a group) will not seek a distribution of more than $1000, in

A19

which case the amount distributed to the petitioner shall not exceed $1000.

**(3) Voluntary negotiation period.--**

**(A) Commencement of proceedings.--**

**(i) Rate adjustment proceeding.**--Promptly after the date for filing of petitions to participate in a proceeding, the Copyright Royalty Judges shall make available to all participants in the proceeding a list of such participants and shall initiate a voluntary negotiation period among the participants.

**(ii) Distribution proceeding.**--Promptly after the date for filing of petitions to participate in a proceeding to determine the distribution of royalties, the Copyright Royalty Judges shall make available to all participants in the proceeding a list of such participants. The initiation of a voluntary negotiation period among the participants shall be set at a time determined by the Copyright Royalty Judges.

**(B) Length of proceedings.**--The voluntary negotiation period initiated under subparagraph (A) shall be 3 months.

**(C) Determination of subsequent proceedings.**--At the close of the voluntary negotiation proceedings, the Copyright Royalty Judges shall, if further proceedings under this chapter are necessary, determine whether and to what extent paragraphs (4) and (5) will apply to the parties.

\* \* \*

**(6) Regulations.--**

**(A) In general.**--The Copyright Royalty Judges may issue regulations to carry out their functions under this title. All regulations issued by the Copyright Royalty Judges are subject to the approval of the Librarian of Congress and are subject to judicial review pursuant to chapter 7 of title 5, except as set forth in subsection (d). Not later than 120 days after Copyright Royalty Judges or interim Copyright Royalty Judges, as the case may be, are first appointed after the enactment of the Copyright Royalty and

Distribution Reform Act of 2004, such judges shall issue regulations to govern proceedings under this chapter.

\* \* \*

**(c) Determination of Copyright Royalty Judges.--**

**(1) Timing.**--The Copyright Royalty Judges shall issue their determination in a proceeding not later than 11 months after the conclusion of the 21-day settlement conference period under subsection (b)(6)(C)(x), but, in the case of a proceeding to determine successors to rates or terms that expire on a specified date, in no event later than 15 days before the expiration of the then current statutory rates and terms.

**(2) Rehearings.--**

**(A) In general.**--The Copyright Royalty Judges may, in exceptional cases, upon motion of a participant in a proceeding under subsection (b)(2), order a rehearing, after the determination in the proceeding is issued under paragraph (1), on such matters as the Copyright Royalty Judges determine to be appropriate.

**(B) Timing for filing motion.**--Any motion for a rehearing under subparagraph (A) may only be filed within 15 days after the date on which the Copyright Royalty Judges deliver to the participants in the proceeding their initial determination.

**(C) Participation by opposing party not required.**--In any case in which a rehearing is ordered, any opposing party shall not be required to participate in the rehearing, except that nonparticipation may give rise to the limitations with respect to judicial review provided for in subsection (d)(1).

**(D) No negative inference.**--No negative inference shall be drawn from lack of participation in a rehearing.

\* \* \*

**(3) Contents of determination.**--A determination of the Copyright Royalty Judges shall be supported by the written record and shall set forth the findings of fact relied on by the Copyright Royalty Judges. Among other terms adopted in a determination, the Copyright Royalty Judges may specify notice and recordkeeping

A21

requirements of users of the copyrights at issue that apply in lieu of those that would otherwise apply under regulations.

**(4) Continuing jurisdiction.**--The Copyright Royalty Judges may issue an amendment to a written determination to correct any technical or clerical errors in the determination or to modify the terms, but not the rates, of royalty payments in response to unforeseen circumstances that would frustrate the proper implementation of such determination. Such amendment shall be set forth in a written addendum to the determination that shall be distributed to the participants of the proceeding and shall be published in the Federal Register.

**(5) Protective order.**--The Copyright Royalty Judges may issue such orders as may be appropriate to protect confidential information, including orders excluding confidential information from the record of the determination that is published or made available to the public, except that any terms or rates of royalty payments or distributions may not be excluded.

**(6) Publication of determination.**--By no later than the end of the 60-day period provided in section 802(f)(1)(D), the Librarian of Congress shall cause the determination, and any corrections thereto, to be published in the Federal Register. The Librarian of Congress shall also publicize the determination and corrections in such other manner as the Librarian considers appropriate, including, but not limited to, publication on the Internet. The Librarian of Congress shall also make the determination, corrections, and the accompanying record available for public inspection and copying.

**(7) Late payment.**--A determination of the Copyright Royalty Judges may include terms with respect to late payment, but in no way shall such terms prevent the copyright holder from asserting other rights or remedies provided under this title.

**(d) Judicial review.--**

**(1) Appeal.**--Any determination of the Copyright Royalty Judges under subsection (c) may, within 30 days after the publication of the determination in the Federal Register, be appealed, to the United States Court of Appeals for the District of Columbia Circuit, by any aggrieved participant in the proceeding under subsection (b)(2) who

fully participated in the proceeding and who would be bound by the determination. Any participant that did not participate in a rehearing may not raise any issue that was the subject of that rehearing at any stage of judicial review of the hearing determination. If no appeal is brought within that 30-day period, the determination of the Copyright Royalty Judges shall be final, and the royalty fee or determination with respect to the distribution of fees, as the case may be, shall take effect as set forth in paragraph (2).

* * *