<u>**PUBLIC COPY – SEALED MATERIAL DELETED**</u>

ORAL ARGUMENT SCHEDULED FOR FEBRUARY 17, 2023

No. 21-1243
Consolidated with Nos. 21-1244, 21-1245

═══════════════════════════════════════════════════

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL RELIGIOUS BROADCASTERS
NONCOMMERCIAL MUSIC LICENSE COMMITTEE
Appellant,

v.

COPYRIGHT ROYALTY BOARD AND LIBRARIAN OF CONGRESS,
Appellees,

GOOGLE INC, PANDORA MEDIA LLC, AND SIRIUS XM RADIO INC.,
Intervenors.

─────────────────────────────────────────────────

APPEAL FROM A FINAL DETERMINATION OF
THE COPYRIGHT ROYALTY BOARD

─────────────────────────────────────────────────

# FINAL REPLY BRIEF FOR APPELLANT NATIONAL RELIGIOUS BROADCASTERS NONCOMMERCIAL MUSIC LICENSE COMMITTEE

─────────────────────────────────────────────────

Karyn K. Ablin
FLETCHER, HEALD & HILDRETH, PLC
1300 N. 17th Street
11th Floor
Arlington, VA  22209
ablin@fhhlaw.com
(703) 812-0443

*Counsel for National Religious Broadcasters Noncommercial Music License Committee*

January 12, 2023

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS................................................................ i

TABLE OF AUTHORITIES ....................................................... iii

GLOSSARY.............................................................................. vii

SUMMARY OF ARGUMENT .................................................... 1

STATUTES AND REGULATIONS........................................... 2

ARGUMENT ............................................................................. 3

I.      THE DETERMINATION VIOLATES RFRA AND THE FIRST
        AMENDMENT. ............................................................... 3

        A.      The Government Failed To Show that Its Noncommercial Rates
                Are Neutral and Generally Applicable.................................. 4

        B.      The Determination Substantially Burdens Religious
                Broadcasters' Religious Practices. ....................................... 7

        C.      RFRA and the First Amendment Apply Regardless of Whether
                the NPR Rates Reflect Willing-Buyer-Willing-Seller Rates. ............. 8

II.     THE GOVERNMENT FAILS TO JUSTIFY THE BOARD'S
        ARBITRARY REJECTION OF THE NPR BENCHMARKS. ..................... 9

        A.      The Government's Claim that the Board's Determinations Are
                Fact-Bound and Warrant Deference Does Not Excuse the
                Board's Arbitrary Departure from Precedent in Rejecting the
                NPR Benchmarks. ............................................................. 9

        B.      The Government Mischaracterizes the Record in Arguing that
                the NPR Agreements Do Not Support NRBNMLC's Rate
                Proposal. ......................................................................... 12

C.  The Government Has Not Justified the Board's Arbitrary Departure from Precedent in Handling Potential Adjustments to the NPR Benchmarks. ........................................................................ 15

III.  THE GOVERNMENT FAILED TO IDENTIFY SUBSTANTIAL EVIDENCE SUPPORTING THE DETERMINATION. ........................... 18

A.  The Board's Prior Adoption of a Similar Noncommercial Structure Is Not Substantial Evidence.................................................. 18

B.  The Economic, Competitive, and Programming Information Identified by the Government Is Not Substantial Evidence.............. 21

IV.  THE GOVERNMENT FAILED TO JUSTIFY THE MINIMUM FEE. ...... 26

CONCLUSION ................................................................................... 26

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ........................................................................ 28

CERTIFICATE OF SERVICE ............................................................. 29

- ii -

# TABLE OF AUTHORITIES

**Page(s)**

**Constitutional Provisions**

*U.S. Const. amend. I ............................................................... 3

**Federal Cases**

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014)............................................................ 3, 7

*Carson ex rel. O.C. v. Makin*,
   142 S. Ct. 1987 (2022).......................................................... 3

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993).............................................................. 5

*Enloe Medical Center v. NLRB*,
   433 F.3d 834 (D.C. Cir. 2005)................................................ 24

*Genuine Parts Co. v. EPA*,
   890 F.3d 304 (D.C. Cir. 2018)....................................... 13-14, 23

*Intercollegiate Broadcast System, Inc. v. Copyright Royalty Board*,
   571 F.3d 69 (D.C. Cir. 2009).................................................. 18

*Kennedy v. Bremerton School District*,
   142 S. Ct. 2407 (2022).......................................................... 3, 4

*N.Y. Cross Harbor Railroad v. Surface Transportation Board*,
   374 F.3d 1177 (D.C. Cir. 2004).............................................. 10, 11

*National Environmental Development Association's Clean Air Project v. EPA*,
   752 F.3d 999 (D.C. Cir. 2014)................................................ 26

*Authorities upon which we chiefly rely are marked with asterisks.

- iii -

*Office of the Consumers' Counsel v. FERC*,
    914 F.2d 290 (D.C. Cir. 1990)....................................................... 24

\*Palmore v. Sidoti*,
    466 U.S. 429 (1984)........................................................................ 6

\*Ramaprakash v. FAA*,
    346 F.3d 1121 (D.C. Cir. 2003)................................................... 11

*Roman Catholic Diocese v. Cuomo*,
    141 S. Ct. 63 (2020)........................................................................ 6

*Sea Robin Pipeline Co. v. FERC*,
    795 F.2d 182 (D.C. Cir. 1986)..................................................... 22

*SoundExchange, Inc. v. Librarian of Congress*,
    571 F.3d 1220 (D.C. Cir. 2009)................................................... 19

\*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021)................................................................ 5, 8

*Verizon Telephone Companies v. FCC*,
    570 F.3d 294 (D.C. Cir. 2009)..................................................... 11

## Federal Statutes

17 U.S.C. §112 ................................................................................... 9

17 U.S.C. §114 ................................................................................... 9

*17 U.S.C. §114(f)(1) ...................................................................... 19

17 U.S.C. §801 ................................................................................... 9

17 U.S.C. §801(b)(1) (2017) ......................................................... 19

*17 U.S.C. §803(a)(1) ..................................................................... 11

17 U.S.C. §803 ................................................................................... 9

17 U.S.C. §804(b) ........................................................................... 19

*42 U.S.C. §2000bb ............................................................................ 4

*42 U.S.C. §2000bb-1 ......................................................................... 4

*42 U.S.C. §2000bb-3 ................................................................. 3, 8, 9


**Federal Regulations**

*37 C.F.R. §351.10(e) ......................................................................... 24

37 C.F.R. §380.31(a) ........................................................................... 4


**Board and Agency Decisions and Publications**

*Adjustment of Cable Statutory License Royalty Rates*,
    82 Fed. Reg. 24611 (May 30, 2017) ........................................... 20

*Cost of Living Adjustment to Royalty Rates for Webcaster Statutory License*,
    87 Fed. Reg. 73940 (Dec. 2, 2022) .............................................. 4

*Determination of Rates and Terms for Preexisting Subscription Services and
    Satellite Digital Audio Radio Services (SDARS I)*,
    73 Fed. Reg. 4080 (Jan. 24, 2008) ............................................ 11

*Determination of Rates and Terms for Preexisting Subscription Services and
    Satellite Digital Audio Radio Services (SDARS II)*,
    78 Fed. Reg. 23054 (Apr. 17, 2013) .......................................... 16

*Determination of Royalty Rates and Terms for Ephemeral Recording and
    Digital Performance of Sound Recordings (Web V)*,
    85 Fed. Reg. 11857 (Feb. 28, 2020) ........................................... 6

*Determination of Royalty Rates and Terms for Ephemeral Recording and
    Webcasting Digital Performance of Sound Recordings (Web IV)*,
    81 Fed. Reg. 26316 (May 2, 2016) ......................... 10, 11, 12, 14, 18, 20, 21

*Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services (SDARS III)*,
    83 Fed. Reg. 65210 (Dec. 19, 2018)............................................................ 9

*Digital Performance Right in Sound Recordings and Ephemeral Recordings (Web II)*,
    72 Fed. Reg. 24084 (May 1, 2007)........................................................ 12, 18

# GLOSSARY

The following abbreviations or terms are used in this brief.

| | |
|---|---|
| **ATH** | Aggregate Tuning Hours, or "listener hours," as defined in 37 C.F.R. §380.7. |
| **Board** | The Copyright Royalty Board, the body of three Copyright Royalty Judges authorized by Congress in 17 U.S.C. §801 to, *inter alia*, set rates and terms under various statutory licenses. |
| **CBI** | Collegiate Broadcasters, Inc. |
| **CPB** | Corporation for Public Broadcasting. |
| **Determination** | The Final Determination of the Board in the proceeding below, issued on September 20, 2021 (JA295-605 (public); JA1113-423 (sealed)) and published at *Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Those Performances*, 86 Fed. Reg. 59452 (Oct. 27, 2021). |
| **Music ATH** | ATH of Website Performances of sound recordings of musical works, as defined in the NPR Agreement (TX3020.6-7 (JA930-31)). |
| **NAB** | National Association of Broadcasters. |
| **NPR** | National Public Radio, Inc. |
| **NPR Agreement** | The September 23, 2019 agreement between NPR and SoundExchange setting fees under the Statutory Licenses for 2021-2025 (TX3020 (JA925-34)). |

| **NPR Agreements** | The February 23, 2015 agreement between NPR and SoundExchange setting fees under the Statutory Licenses for 2016-2020 (TX3021 (JA935-48) and the September 23, 2019 agreement between NPR and SoundExchange setting fees under the Statutory Licenses for 2021-2025 (TX3020 (JA925-34)). |
|---|---|
| **NRBNMLC** | National Religious Broadcasters Noncommercial Music License Committee. |
| **Performance** | As defined in 37 C.F.R. §380.7, "each instance in which any portion of a sound recording is publicly performed to a listener by means of a digital audio transmission," excluding certain transmissions identified in that section. |
| **RFRA** | The Religious Freedom Restoration Act, codified as amended at 42 U.S.C. §2000bb *et seq.* |
| ***SDARS I*** | The determination of the Board of rates and terms under the Statutory Licenses for preexisting subscription services and satellite digital audio radio services, published at *Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services*, 73 Fed. Reg. 4080 (Jan. 24, 2008). |
| ***SDARS II*** | The determination of the Board of rates and terms under the Statutory Licenses for preexisting subscription services and satellite digital audio radio services, published at *Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services*, 78 Fed. Reg. 23054 (Apr. 17, 2013). |
| ***SDARS III*** | The determination of the Board of rates and terms under the Statutory Licenses for preexisting subscription services and satellite digital audio radio services, published at *Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services (SDARS III)*, 83 Fed. Reg. 65210 (Dec. 19, 2018). |

| | |
|---|---|
| **Statutory Licenses** | The Section 112 and Section 114 Statutory Licenses. |
| **Tr.** | The transcript of the hearings below. |
| **TX** | A trial exhibit admitted in the case under review. |
| *Web I* | The determination of the Librarian of Congress reviewing the CARP Report, found at *Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings*, 67 Fed. Reg. 45240 (July 8, 2002). |
| *Web II* | The determination of the Board of rates and terms under the Statutory Licenses for 2006-2010, published at *Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 72 Fed. Reg. 24084 (May 1, 2007). |
| *Web III Remand* | The determination of the Board of rates and terms under the Statutory Licenses for 2011-2015 following remand of the case by this Court, published at *Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23102 (Apr. 25, 2014). |
| *Web IV* | The determination of the Board of rates and terms under the Statutory Licenses for 2016-2020, published at *Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV)*, 81 Fed. Reg. 26316 (May 2, 2016). |

## SUMMARY OF ARGUMENT

The Government failed to defend the Board's noncommercial Determination under the Religious Freedom Restoration Act ("RFRA"), the First Amendment, or its prior precedent and identified no substantial evidence supporting it.

The Government does not dispute that the Determination must comply with RFRA and the First Amendment. But while it admits that the Determination's noncommercial rates are higher than those the Board adopted for NPR, it defends that disparity by dismissing NPR rates as "settlement" rates. NPR rates, however, are **not** private settlement rates but statutory rates that the Board, under congressional authorization, applied to non-parties. Even if NPR rates bound only settling parties, the Board cannot effectuate private rate biases by charging religious broadcasters more.

The Determination's even higher commercial rates cannot salvage it. If some entities are treated better than religious broadcasters, it is irrelevant that others are treated worse. It also is irrelevant whether NPR rates reflect willing-buyer-willing-seller rates; RFRA and the First Amendment control regardless. The Board unlawfully burdened broadcasters' religious expression by charging them more to communicate religious content than secular-formatted NPR stations are charged. *Infra* Part I.

<u>**PUBLIC COPY – SEALED MATERIAL DELETED**</u>

The Government also failed to justify the Board's arbitrary departure from precedent in assessing benchmark comparability and potential adjustments. While the Government argues that determinations are fact-bound and discretionary, the Board nonetheless must follow its precedent or persuasively distinguish it, which it did not do. The Government further claims a disconnect between the NPR Agreements and NRBNMLC's proposals, but that claim ignores: NRBNMLC's lump sum proposal, which mirrors those agreements; the agreements themselves, which explicitly link their lump sums to NRBNMLC's proposed minimum-plus-usage-fee threshold structure; and a SoundExchange analysis, which [[ ██████████ ████████████████████████████ ]]. *Infra* Part II.

Finally, the Government did not overcome NRBNMLC's showing that the Determination lacks substantial evidence. The Government-cited prior rates are not substantial evidence; rather, willing-buyer-willing-seller rates must be determined anew, and supported by evidence, in each five-year term. The other Government-cited items also are not substantial evidence but conclusory statements, speculation, and irrelevant or unhelpful documents. *Infra* Part III.

The Determination must be vacated.

<u>**STATUTES AND REGULATIONS**</u>

Pertinent statutes and regulations not in NRBNMLC's statutory addendum are appended.

## ARGUMENT

### I. THE DETERMINATION VIOLATES RFRA AND THE FIRST AMENDMENT.

The Government does not dispute that the Determination must comply with the First Amendment and RFRA. RFRA "provide[s] very broad protection for religious liberty," *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014), and "applies to all Federal law, and the implementation of that law, whether statutory or otherwise," 42 U.S.C. §2000bb-3(a). Similarly, "[t]he Free Exercise Clause of the First Amendment protects against indirect coercion or penalties on the free exercise of religion." *Carson ex rel. O.C. v. Makin*, 142 S. Ct. 1987, 1996 (2022) (quotation omitted). "Where the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities. ... That the First Amendment doubly protects religious speech is no accident." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022); U.S. Const. amend. I.[1]

The Government also does not dispute that "the [noncommercial] rates … were higher than the rates agreed to by the settling noncommercial services" – *i.e.*, secular NPR broadcasters. Gov't Br. 85; NRBNMLC Br. 9-10. That disparity increases over time: per-Music Aggregate Tuning Hour ("ATH") NPR fees

---

[1] The Government did not address NRBNMLC's Free Speech Clause claim that the Determination effectuates content-based discrimination, so NRBNMLC's arguments stand unrebutted. Gov't Br. 84-86; NRBNMLC Br. 54-55.

**decrease** annually, whereas religious broadcasters' fees **increase**. 37 C.F.R. §380.31(a) (annually increasing NPR Music ATH but not fee); *Cost of Living Adjustment to Royalty Rates for Webcaster Statutory License*, 87 Fed. Reg. 73940, 73940-41 (Dec. 2, 2022). Yet despite the fee disparity's burdening of religious expression, the Government denies that the rates violate the Constitution or RFRA. The Government is incorrect.

### A. The Government Failed To Show that Its Noncommercial Rates Are Neutral and Generally Applicable.

The Government claims that the rates are "neutral" and "generally applicable" because they allegedly "apply equally to **all** noncommercial services who were unable or unwilling to settle." Gov't Br. 84-85. But in RFRA, Congress found that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise." 42 U.S.C. §2000bb(a)(2). Under RFRA, the Government cannot "substantially burden a person's exercise of religion **even if the burden results from a rule of general applicability**" unless it "demonstrates that application of the burden" furthers "a compelling governmental interest" and "is the least restrictive means of furthering" that interest. *Id.* §2000bb-1 (emphasis added). The Government does not make these showings.

Nor are the rates neutral and generally applicable under the Free Exercise Clause, where "[f]ailing either the neutrality or general applicability test is sufficient to trigger strict scrutiny." *Kennedy*, 142 S. Ct. at 2422. "[G]overnment

regulations are not neutral and generally applicable" where "they treat **any** comparable secular activity more favorably than religious exercise.  It is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (citation omitted).  "Facial neutrality is not determinative." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).  Rather, the Free Exercise Clause "extends beyond facial discrimination" and "forbids subtle departures from neutrality." *Id.* (quotation omitted).  "The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Id.*[2]

As NRBNMLC demonstrated, the Board's noncommercial statutory rates are neither neutral nor generally applicable because they charge secular NPR stations less but webcasters above 159,140 monthly ATH – who are almost exclusively religious – much more.  NRBNMLC Br. 9-10, 53-54; TX5625.27-28, 117 (JA1846-47, 1851) (religious broadcasters paid [[ ██ ]]% of 2018 above-threshold fees and constituted 95% of above-threshold entities).  As such, the Board's rates "single out

---

[2] The Government also incorrectly argues that its rate-setting "rationale is not 'specifically directed at … religious practice.'"  Gov't Br. 85 (quoting *Kennedy*, 142 S. Ct. at 2422 (alteration in original)).  Specific targeting of religious practice is merely one of many ways that the Government can violate the Free Exercise Clause.

[religious broadcasters] for especially harsh treatment." *See Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 66 (2020).

The Government downplays this discrimination by calling the NPR rates a "settlement," thus distinguishing them from "[t]he Judges' rates."  Gov't Br. 84-86. Even if the settlements were "private," the Board would have burdened religious expression by adopting higher rates for religious broadcasters than rates that SoundExchange – itself a Government-appointed entity – proposed for secular broadcasters; the Board cannot, "directly or indirectly," give effect to "[p]rivate biases."  *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984).  But the NPR rates are **not** private settlements binding only the parties.  Rather, they were submitted to the Board "for adoption as a statutory rate and terms only so that it will be binding on all artists and copyright owners" – *i.e.*, non-parties.  TX3020.3 (JA927); TX3021.3 (JA937).  The adoption of statutory rates binding non-parties cannot be accomplished via private settlement; it requires government action.

Under congressional authorization, the Board adopted the NPR rates as statutory rates binding non-parties.  *Determination of Royalty Rates and Terms for Ephemeral Recording and Digital Performance of Sound Recordings (Web V)*, 85 Fed. Reg. 11857 (Feb. 28, 2020).  The Board, having adopted those rates, was required under the First Amendment and RFRA not to set discriminatory rates for religious broadcasters.  Nonetheless, the Board adopted much higher rates whose

discriminatory effect perversely increases in correlation with the effectiveness of religious broadcasters in reaching above-threshold listeners, thus unlawfully burdening broadcasters' religious exercise. The effect is even starker given that NPR stations: (a) do not even pay the fees to communicate secular content – the Corporation for Public Broadcasting ("CPB") does; and (b) receive other Government subsidies through CPB. TX3020.2-3 (JA926-27). This is precisely the discrimination that the First Amendment and RFRA forbid.

### B. The Determination Substantially Burdens Religious Broadcasters' Religious Practices.

The Government's claim that the Board's rates do not substantially burden broadcasters' religious practices (Gov't Br. 85-86) is similarly misguided. The Government does not deny, nor could it, that the higher financial burden imposed on noncommercial religious broadcasters than on Government-subsidized secular NPR broadcasters constitutes a substantial burden under RFRA. *Burwell*, 573 U.S. at 710 ("[A] law that 'operates so as to make the practice of … religious beliefs more expensive' in the context of business activities imposes a burden on the exercise of religion." (quoting *Braunfeld v. Brown*, 366 U.S. 599, 605 (1961)) (second alteration in original)). Instead, it argues that the rates do not substantially burden religious broadcasters because they are lower than **commercial** rates. Gov't Br. 86. But "[i]t is no answer that a [governmental entity] treats some comparable secular businesses or other activities as poorly as or even less favorably than the

- 7 -

religious exercise at issue." *Tandon*, 141 S. Ct. at 1296 (citation omitted).
Moreover, that is not the relevant comparison, as "noncommercial webcasters
occupy a distinct submarket within the webcasting market." *Determination* 269
(JA1381). Where, as here, secular NPR broadcasters are charged significantly less
than religious broadcasters, religious broadcasters' religious exercise is
substantially burdened – regardless of whether commercial webcasters pay even
more.

### C.    RFRA and the First Amendment Apply Regardless of Whether the NPR Rates Reflect Willing-Buyer-Willing-Seller Rates.

The Government also claims that the discrimination "reflects the Judges'
reasoned conclusion that the [NPR] rates" differ from willing-buyer-willing-seller
rates. Gov't Br. 85. But the Government cites no evidence supporting that claim,
and SoundExchange disagrees. Br. of Intervenor SoundExchange Supp. Appellees
17 (Nov. 9, 2022) ("SoundExchange Br.").

Even if the Board had determined that NPR rates differed from willing-
buyer-willing-seller rates, that would not exempt it from RFRA or the First
Amendment. Short of satisfying strict scrutiny, which the Board has not done, the
First Amendment does not excuse disparately burdening religious broadcasters'
expression. NRBNMLC Br. 52-55. Similarly, RFRA "applies to all Federal law,
and the implementation of that law, whether statutory or otherwise, and whether
adopted before or after November 16, 1993." 42 U.S.C. §2000bb-3(a). Only where

a post-November 16, 1993 law "explicitly excludes such application" is RFRA compliance excused.  *Id.* §2000bb-3(b).  Thus, as between: (a) setting rates that comply with the willing-buyer-willing-seller standard under 17 U.S.C. §114(f)(1)(B); and (b) ensuring that those rates do not substantially burden religious exercise under RFRA, RFRA controls.[3]

Here, no relevant laws exclude RFRA's application.  *See* 17 U.S.C. §§112, 114, 801, 803.  Thus, whether the NPR rates reflect willing-buyer-willing-seller rates is irrelevant to the Board's obligation to comply with RFRA, which it has not done.

## II.    THE GOVERNMENT FAILS TO JUSTIFY THE BOARD'S ARBITRARY REJECTION OF THE NPR BENCHMARKS.

### A.    The Government's Claim that the Board's Determinations Are Fact-Bound and Warrant Deference Does Not Excuse the Board's Arbitrary Departure from Precedent in Rejecting the NPR Benchmarks.

NRBNMLC previously discussed the Board's long-used benchmark comparability test, examining whether a benchmark "has the same buyers and sellers as the target market and whether they are negotiating for the same rights." *SDARS III*, 83 Fed. Reg. 65210, 65214 (Dec. 19, 2018); NRBNMLC Br. 19-20. NRBNMLC also demonstrated that the NPR Agreements satisfied that test and that

---

[3] SoundExchange's contrary argument that RFRA does "not require that [religious broadcasters] be entitled to pay below-market rates for sound recordings" is thus incorrect.  SoundExchange Br. 16.  Moreover, SoundExchange has not demonstrated that NPR rates are "below-market."

the Board arbitrarily departed from this precedent in rejecting these benchmarks. *Id.* 21-26.

The Government does not even acknowledge this test, much less the Board's arbitrary departure from precedent in applying it.  Instead, it misapplies a single component in arguing that the Agreements' comparability is undermined because they were "negotiated by agents who might advance their own interests rather than merely mirroring" a willing-buyer-willing-seller negotiation.  Gov't Br. 74. Nowhere, however, does the Government explain why agent negotiations are now a concern when the Board uniformly has accepted agent-negotiated agreements as benchmarks.  NRBNMLC Br. 23-24; *accord Web IV*, 81 Fed. Reg. 26316, 26370-71 (May 2, 2016); *id.* 26320 n.28 (SoundExchange's NPR/CPB and CBI agreements reflect rates that "willing sellers are prepared to accept").

The Government's broad-brush answer is that the Board has leeway "in making highly fact-bound determinations" regarding benchmarks.  Gov't Br. 74. But while the Board has discretion, it may not act arbitrarily by "revers[ing] its position in the face of a precedent it has not persuasively distinguished."  *N.Y. Cross Harbor R.R. v. Surface Transp. Bd.*, 374 F.3d 1177, 1181 (D.C. Cir. 2004) (quotation omitted).  Such a "brief, generalized statement fails to provide an 'adequate explanation' to allow the [Board] to ignore factors and reasoning it has previously – and consistently – found controlling" and is "itself arbitrary and

capricious." *Id.* at 1183 (citations omitted); *accord Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003) ("An agency's failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision making." (quotation omitted)); *Verizon Tel. Cos. v. FCC*, 570 F.3d 294, 304 (D.C. Cir. 2009) (remanding where agency applied "new approaches without providing a satisfactory explanation when it has not followed such approaches in the past").

The Government defends these departures by claiming that the Board may pick and choose how to treat a particular consideration because its "determinations are based on the evidence presented in each case." Gov't Br. 75. The Board, however, must act on the basis of not only case evidence but its own "prior determinations." 17 U.S.C. §803(a)(1). Where it has articulated criteria for assessing benchmark comparability and potential adjustments, it cannot deviate from those standards without providing reasons for doing so, which it has not done.

The Government cites three determinations to support its case-by-case claim (Gov't Br. 75), but those determinations involve different considerations and do not justify the Board's departures from precedent. *See Web IV*, 81 Fed. Reg. at 26329-31 (discussing potential "shadow" cast on benchmark by statutory rates); *SDARS I*, 73 Fed. Reg. 4080, 4089 (Jan. 24, 2008) (rejecting benchmark where buyer provided music channels bundled with "primarily audiovisually oriented services"

for cable television, whereas target market buyer was satellite radio company offering music channels as "part of purely audio services provided to subscribers over devices designed … to compete with terrestrial radio"); *Web II,* 72 Fed. Reg. 24084, 24090 n.13 (May 1, 2007) (discussing unidentified agreements not as rate benchmark but for single structural component of proposal). Here, by contrast: there is no shadow because NPR rates are lower than the default noncommercial rates (*Web IV*, 81 Fed. Reg. at 26331; NRBNMLC Br. 9-10); the benchmark and target market buyers are highly similar; and other benchmark comparability factors (same sellers and rights) are easily met.

### B.     The Government Mischaracterizes the Record in Arguing that the NPR Agreements Do Not Support NRBNMLC's Rate Proposal.

The Government also claims that the NPR Agreements do not support NRBNMLC's rate proposal, but it mischaracterizes the record in doing so. Gov't Br. 66-68. First, it argues that NRBNMLC did not propose adoption of the NPR Agreements' terms (Gov't Br. 67), including the lump sum, but that is incorrect. NRBNMLC proposed a lump sum that simply scaled up by 1.5 the NPR covered stations, fee, and Music ATH – yielding an identical per-Music ATH fee. *Determination* 254, 257-58 (JA1366, 1369-70). While NRBNMLC also proposed a threshold structure to cover services not covered by the lump sum, the lump sum alone would resolve the fee disparity for NRBNMLC-represented broadcasters

<u>PUBLIC COPY – SEALED MATERIAL DELETED</u>

regardless of the rates applied to others.  The Government simply ignores

NRBNMLC's lump sum proposal in claiming a disconnect.

The Government further mischaracterizes evidence in addressing the alleged

disconnect between NRBNMLC's threshold structure proposal and the NPR

Agreements.  Gov't Br. 67-70.  First, nowhere does the Government acknowledge

that the NPR Agreements themselves express the lump sum as a threshold structure,

including annual minimum fees and usage fees.  TX3020.8 (JA932); TX3021.9

(JA943).

The Government also repeats the Board's legal error in refusing to consider a

SoundExchange analysis enabling [[███████████████████████████

███████████████████]], calling it "an assessment of what would have

been paid under" nonprecedential statutory rates.  Gov't Br. 71-72.  This claim,

however, ignores clear evidence that it was a **forward-looking** SoundExchange

"analysis of potential value" of [[█████████████]], labeled a

"[[███████████████████████]]" prepared "[[███████████████

███████████]]," and legally admissible.  NRBNMLC Br. 34-37; TX2057.21-

22 (JA1568-69); TX3022-Estimations.1 (JA1616).  The Government's contrary

claim that the evidence only "'weakly support[s]'" the conclusion that the document

"[[███████████████]]" the 2016-2020 NPR Agreement is arbitrary.  Gov't

Br. 69-70 (quoting *Determination* 263); NRBNMLC Br. 36-37; *Genuine Parts Co.*

PUBLIC COPY – SEALED MATERIAL DELETED

*v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) ("an agency cannot ignore evidence contradicting its position" (quotation omitted)).

The Government faults NRBNMLC's expert for looking initially to the 2016-2020 NPR Agreement rather than the 2021-2025 NPR Agreement. Gov't Br. 68. But the expert appropriately relied on both. TX3064.3-7 (JA1729-33).[4]   The analysis produced in discovery (which the expert cannot dictate) concerned the [[███████████████████████]].  TX2057.21-22 (JA1568-69); TX3022-Estimations.1 (JA1616).  The Board has relied on current-term agreements to set upcoming rates. *See Web IV*, 81 Fed. Reg. at 26356, 26365-66 (using 2014-2015 agreement as 2016-2020 benchmark).

The expert used the analysis to [[████████████████████████████████████████████████]], compared that agreement with the 2021-2025 agreement, and found that "the implicit economics underlying" the two agreements are highly similar.  TX3064.3-7 (JA1729-33) (2016-2020: $0.0020/Music ATH; 2021-2025: $0.0021/Music ATH).  From this, he concluded that the [[███████████████]] were similarly valued and that both "NPR agreements support … a threshold where a minimum fee covers usage below a certain threshold" and "usage fees equal to one-third the commercial broadcaster rate on excess usage." Tr. 3995:15-20



---

[4] NRBNMLC never abandoned reliance on the 2016-2020 NPR Agreement.  Gov't Br. 68 (citing *Determination* 255 n.317).  The Government-cited footnote discusses **Web I**, not *Web IV*.

(JA767); *id.* 4039:19-4040:5 (JA796-97); *id.* 4044:6-12 (JA801).  Given the near-identity of the NPR Agreements' per-Music ATH metrics, it was hardly a weak inference, as the Government claims (Gov't Br. 69-70), for the expert to conclude that the NPR agreements reasonably supported NRBNMLC's threshold structure.

### C.    The Government Has Not Justified the Board's Arbitrary Departure from Precedent in Handling Potential Adjustments to the NPR Benchmarks.

The Government also cites various adjustments the Board claimed NRBNMLC should have made, including for litigation cost savings, consolidated reporting, and the administrative convenience of an advance lump sum structure. Gov't Br. 72-74.  NRBNMLC previously demonstrated that extensive Board precedent provides that if a party challenges a comparable benchmark for not adjusting for a particular attribute but fails to quantify that adjustment, the Board will accept the benchmark unadjusted.  NRBNMLC Br. 27-34.

The Government attempts to distinguish only one NRBNMLC-cited case by arguing that there was "no indication" that the adjustment factors "were economically significant."  Gov't Br. 73 (discussing *SDARS II*, 78 Fed. Reg. 23054 23068-69 (Apr. 17, 2013)).  But parties would not seek an adjustment unless they believed it to be economically significant, which was true in the Government-discussed case.  There, SoundExchange argued that "defrayed administrative costs" supported setting "a lower effective royalty rate" – *i.e.*, the term was economically

significant. *SDARS II*, 78 Fed. Reg. at 23068. Moreover, "economic[]

significan[ce]" has not previously been dispositive – the challenger's quantification

of the proposed adjustment has been determinative. NRBNMLC Br. 28-34.

The Government makes much of the NPR Agreements' recitation of an

"'administrative convenience'" discount and "'protection from bad debt'" of

receiving advance payment as a fee component that warranted adjustment or

explanation. Gov't Br. 72. But this argument ignores that NRBNMLC's lump sum

proposal directly embodies these factors. *Determination* 254 (JA1366).

More fundamentally, while there is evidence of [[          

        ]] the minimum and usage fee components recited in the

Agreements, there is no evidence of [[                                

                    ]] even though NRBNMLC specifically sought such

evidence. Instead, SoundExchange replied that it had "undertaken a reasonable and

diligent search to identify efforts (if any) that were made to quantify the value of

minimum fees, additional usage fees, and administrative convenience

discounts/protection from bad debt" under the NPR Agreements. TX2057.22-23

(JA1569-70). SoundExchange produced only two additional documents, one of

which (TX3022-Estimations.1 (JA1616)) [[                            ]]

and neither of which even [[                            

            ]]. TX2057.22-23 (JA1569-70). SoundExchange



**PUBLIC COPY – SEALED MATERIAL DELETED**

[[██████████████████████████████████████████

████████████████████████████████████████████

███████████████████]]. *Id.* (emphasis added).  Where SoundExchange itself –

the NPR benchmarks' challenger and only party who could have provided

quantification evidence – [[████████████████████]], the Board arbitrarily

contravened its precedent in rejecting NRBNMLC's rate proposal for not separately

adjusting for this factor.  NRBNMLC Br. 26-34.

The Government's additional speculation that an administrative convenience

discount may have been "'reflected in either or both of the minimum fee and usage

fee'" inputs to the lump sum is contradicted by the evidence.  Gov't Br. 71 (quoting

*Determination* 264).  The 2016-2020 NPR Agreement explicitly states that "the

License Fee includes: (i) an annual [per-station] minimum fee of $500."  TX3021.9

(JA943).  Moreover, the analysis [[███████████████████████████

████████████████████████████████████████████

███████████████████████]].  TX3022-Estimations.1

(JA1616).  There is no evidence whatsoever that SoundExchange [[███████████

████████████████████████████████████████████]],

and SoundExchange explicitly admitted that it [[███████████]] administrative

convenience.  *Id.*; TX2057.22-23 (JA1569-70).

PUBLIC COPY – SEALED MATERIAL DELETED

The Government's reference to *Web IV*'s NPR Agreement treatment (Gov't Br. 76) adds nothing to its arguments against use of the NPR Agreements in *Web V*. In *Web IV*, NRBNMLC neither relied on that agreement as a rate benchmark nor replicated its terms but merely invoked its flat fee structure. *Web IV*, 81 Fed. Reg. at 26391, 26393-94. Moreover, there was no evidence enabling expression of the lump sum as a threshold structure. Here, by contrast, NRBNMLC's proposals both mirror the NPR Agreements, and [[███████████████████████]] the threshold elements from which the lump sum was derived.[5]

## III. THE GOVERNMENT FAILED TO IDENTIFY SUBSTANTIAL EVIDENCE SUPPORTING THE DETERMINATION.

The Government also failed to support the Determination with substantial evidence.

### A. The Board's Prior Adoption of a Similar Noncommercial Structure Is Not Substantial Evidence.

The Government defends the Determination by citing the Board's prior adoption of similar structures (Gov't Br. 65), but prior rates are not substantial evidence. Rather, the Determination must be supported by substantial evidence in the current record. *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 571 F.3d 69, 87 (D.C. Cir. 2009) ("[R]ational decisionmaking … requires substantial

---

[5] SoundExchange cites the Board's rejection of another NPR agreement implicated in *Web II*. SoundExchange Br. 15. But unlike here, that agreement included a single multi-station fee for a seventy-four-month term and no information regarding listenership or annual payment attribution. *Web II*, 72 Fed. Reg. at 24098.

evidence to support a decision.").  It must be vacated "if the facts relied upon by the agency have no basis in the record."  *SoundExchange, Inc. v. Librarian of Cong.*, 571 F.3d 1220, 1223 (D.C. Cir. 2009).

Congress established a statutory license with defined five-year rate periods, not continuing rates subject to adjustment.  17 U.S.C. §114(f)(1)(B) (rates are binding "during the 5-year period specified in subparagraph (A)").  Section 114 requires the Board to "determine" rates anew for each five-year period.  *Id.* §114(f)(1)(A); *accord id.* §804(b)(3)(A).  In each proceeding, the Board must "establish" rates that, for that period, "most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller," *id.* §114(f)(1)(A)-(B), not assess whether prior rates should be adjusted up or down.[6]

By contrast, the statutory license in section 111 governing certain cable transmissions authorizes the Board "to initiate proceedings … concerning the **adjustment** of royalty rates."  *Id.* §804(b)(1)(A) (emphasis added).  The respective titles of these proceedings reflect this difference.  *Compare **Determination*** 1

---

[6]  This case is thus unlike prior cases under the now-obsolete standard that required the Board to set reasonable rates designed to achieve policy objectives, including "minimiz[ing] the disruptive impact on the structure of the industries," thus necessarily rendering prior determinations more relevant.  17 U.S.C. §801(b)(1) (2017).  In those cases, the Board was not bound to "a market-based approach" but could consider other indicia of reasonable rates.  *SoundExchange*, 571 F.3d at 1224.

(JA1113) (emphasis added), *with **Adjustment** of Cable Statutory License Royalty Rates*, 82 Fed. Reg. 24611 (May 30, 2017) (emphasis added). Thus, the substantial evidence requirement is not relaxed merely because new rates resemble prior rates.

Moreover, the Board's noncommercial structure is not as continuous in practice as the Government suggests. While the Government asserts that the structure dates from *Web II* (2006) (Gov't Br. 65), noncommercial webcasters were not required to pay under it until 2016 because far lower rates were available from 2006-2015, resulting in *Web III* rates uncontested by larger webcasters. NRBNMLC Br. 8-9. Further, for 2016-2020 and 2021-2025, not a single noncommercial agreement showing noncommercial buyer buy-in to the Board's rate structure was presented. *See Determination* 251 (JA1363) (SoundExchange's noncommercial proposal not based "on a benchmark analysis"); *Web IV*, 81 Fed. Reg. at 26395 (above-threshold commercial-level rate was adopted based on so-called "economic logic," "not because it was observed in benchmark agreements").

The Government's reliance on fact findings from *Web II* to support the Determination in *Web V* (Gov't Br. 64) is arbitrary in another respect. The evidence relied on in *Web II* to support those findings was overwhelmingly NPR-specific. NRBNMLC Br. 7-8. But NPR stations have never paid under the current structure, instead negotiating the very rates that NRBNMLC proposed as a benchmark. TX3020-TX3021 (JA925-48). Relying on fifteen-year-old NPR

evidence while rejecting much more recent willing-buyer-willing-seller NPR evidence lacks reasoned decisionmaking.

**B.    The Economic, Competitive, and Programming Information Identified by the Government Is Not Substantial Evidence.**

The Government also claims that the Board relied on "'economic, competitive, and programming information presented by the parties'" (Gov't Br. 78), but none of its identified items constitutes substantial evidence.

It first recites that "willing sellers would be hesitant to offer a lower marginal rate" for larger noncommercial services due to potential listener diversion. Gov't Br. 78-79. But this solely seller-side statement does not account for buyer-side considerations, as it must. The Board previously found rates to be "fatal[ly] flaw[ed]" if they are "unsupported by any marketplace evidence and any evidence of **sellers** who would be willing to accept the NRBNMLC's proposed structure." *Web IV*, 81 Fed. Reg. at 26394 (emphasis added). It is arbitrary for the Board now to rely on solely a seller-side view, with no **buyer-side** evidence – to support the Determination.

The Government asserts that the Board did account for the buyer-side perspective but supports that assertion solely by arguing that the rates are allegedly "a steep discount" from commercial rates. Gov't Br. 83. Merely because noncommercial rates are lower than commercial rates says nothing about whether willing buyers would negotiate them.

- 21 -

The Government also cites *ipse dixit* by SoundExchange's expert that there is "'no reason based in economic theory' to believe that willing buyers and willing sellers would agree to fractional rates for large noncommercial webcasters 'that compete meaningfully with commercial services.'"  Gov't Br. 79 (quoting *Determination* 251).  But "inordinate faith in the conclusory assertions of an expert … cannot satisfy the requirement that [an agency] act only upon substantial evidence."  *Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 188 (D.C. Cir. 1986); NRBNMLC Br. 44.

The Government cites an array of other factors to defend charging noncommercial webcasters commercial-level marginal rates to combat potential listener diversion, but none are substantial evidence.  For example, the Government recites that "'at least some noncommercial broadcasters seek to expand their audiences,' even if only to further advance their non-profit mission."  Gov't Br. 79 (quoting *Determination* 271).  But the sole Board-cited support for this statement was a *Web IV* noncommercial broadcaster making the **opposite** point that he had "encountered multiple noncommercial broadcasters who were so concerned with SoundExchange royalties that they chose not to stream" or "do stream, but" capped their listenership to avoid above-threshold fees.  TX3063.13 (JA1007).  He testified that webcasters did so **even though** "it works against our mission of reaching as many people as we can with our message of hope and inspiration" because it was

- 22 -

preferable to "pay[ing] unpredictable and very expensive usage fees to SoundExchange that become even more unaffordable as listenership grows." *Id.* 13-14 (JA1007-08).  Moreover, aiming to provide listeners "hope and inspiration" says nothing about the types of listeners that religious broadcasters seek to, and do, reach or whether those listeners would be diverted from commercial webcast listening or another activity.

The Government also cites alleged "direct competition" between Sirius XM and Prazor – an allegedly "large noncommercial webcaster" – as "'anecdotal'" evidence that "cast[s] doubt on" the claim "that listener diversion is unlikely." Gov't Br. 80 (quoting *Determination* 272).  But that example does not support listener diversion and "runs counter to the evidence." *Genuine Parts*, 890 F.3d at 312 (quotation omitted).

Prazor is "a Christian music streaming service," whereas Sirius XM is overwhelmingly secular, operating only three Christian music channels out of over 100.  TX5625.6 n.2 (JA1840); TX4000.2-4 (JA1013-15); TX4093.4-5 (JA1736-37). Moreover, Prazor's listenership is [[ ▮ ]], averaging only [[ ▮ ]] ATH/month/channel – just [[ ▮ ]]% of the threshold and under [[ ▮▮▮ ]] – where it even reported [[ ▮ ]].  TX3038 rows 15,008-17,935 (JA1632-707).  This evidence contradicts any claim that Prazor is a competitive

PUBLIC COPY – SEALED MATERIAL DELETED

threat to Sirius XM, with nearly [[⬛⬛⬛⬛]] performances and $[[⬛⬛⬛⬛⬛]] in payments in 2018.  TX3030 row 1591 (JA1623).

Ironically, the Government even cites a **lack** of evidence of listener diversion to support the rates, surmising that it "could easily be attributable to the success of the established rate structure."  Gov't Br. 80.  But this is circular reasoning and sheer speculation, not substantial evidence.  *E.g.*, *Enloe Med. Ctr. v. NLRB*, 433 F.3d 834, 840 (D.C. Cir. 2005) (agency finding "is based only on sheer speculation and therefore lacks substantial evidence"); *Office of the Consumers' Counsel v. FERC*, 914 F.2d 290, 296 (D.C. Cir. 1990) (same).  Moreover, the Government identified no evidence of 2006-2015 listener diversion, when noncommercial services paid less.  *Supra* p. 20.

Finally, the Government cites Mediabase radio playlist information from two ten-station groups.  Gov't Br. 81.  As a study, the information is not even admissible evidence, much less substantial evidence.  Nor is the underlying information substantial evidence.

NRBNMLC demonstrated that the study lacked information required for admissibility under 37 C.F.R. §351.10(e).  NRBNMLC Br. 46-47.  The Government does not argue that the study identified "all relevant assumptions" or "all variables considered."  37 C.F.R. §351.10(e).  While it asserts that the study included information regarding "the study plan, the principles and methods

underlying the study," and "the techniques used," it does not support that assertion with evidence or argument.  Gov't Br. 82.  Indeed, given the study's deficiencies under section 351.10(e), the Government concedes that the study "could not 'support any conclusion as to the specific degree of overlap or whether the overlap actually results in audience diversion.'"  Gov't Br. 81 (quoting *Determination* 277-78).

The Government instead claims that the Board "looked only to the third-party commercial data analyzed by the study."  Gov't Br. 81-82.  But the underlying commercial data constituted a three-month mish-mash of sound recordings played by aggregate ten-station commercial/noncommercial groups broadcasting a single format.  *Determination* 273 (JA1385).  It included no programming other than sound recordings and compared no stations head-to-head.  Tr. 2020:5-2022:5, 2029:19-2030:10 (JA642-44, 649-50).  Aggregated playlist information from a tiny sliver of identically formatted broadcast stations – with no information about other programming – says nothing about the likelihood of listener diversion among the thousands of commercial and noncommercial webcasters.  *See* TX5625.72 (JA1849).

The Government nonetheless claims that the data show that "listener 'diversion [is] a realistic possibility,'" asserting that the Board "drew [its] own conclusions from that data."  Gov't Br. 81-82 (quoting *Determination* 277-78

(JA1389-90) (first alteration in original)).  But the Government cannot have it both ways.  If the Board only considered aggregate playlist information from two ten-station groups, that information does not support the speculation that listener diversion is "a realistic possibility," much less the inference that listener diversion is likely.  Rather, it only shows that two identically formatted ten-station commercial/noncommercial groups play some overlapping songs over a three-month period without regard to the timing or frequency of those performances or other programming transmitted.  And if the Board treated the data as a study from which to draw universal conclusions, it violated its regulations in admitting it.  *Nat'l Envtl. Dev't Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("[A]n agency is bound by its own regulations."  (quotation omitted)).

## IV.   THE GOVERNMENT FAILED TO JUSTIFY THE MINIMUM FEE.

NRBNMLC joins Part II of NAB's reply brief.

## CONCLUSION

The Determination must be vacated.

Respectfully submitted,

*/s/ Karyn K. Ablin*
Karyn K. Ablin
FLETCHER, HEALD & HILDRETH, PLC
1300 N. 17th Street
11th Floor
Arlington, VA 22209
(703) 812-0443

*Counsel for the National Religious*
*Broadcasters Noncommercial Music*
*License Committee*
January 12, 2023                    *(Appellant in No. 21-1243)*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned certifies the following:

1.     The foregoing document complies with the word limit specified in the Court's April 28, 2022 Order because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), this document contains 5,470 words.

2.     This document complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman.

*/s/ Karyn K. Ablin*
Karyn K. Ablin

January 12, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2023, I electronically filed the public version of the foregoing brief with the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system.  All parties are represented by registered CM/ECF users and will be served by the CM/ECF system. I further certify that the sealed version of the foregoing brief was also served on counsel for all parties by electronic transfer on January 12, 2023.


*/s/ Karyn K. Ablin*
Karyn K. Ablin

**SUPPLEMENTAL ADDENDUM OF STATUTES AND REGULATIONS**

# TABLE OF CONTENTS

**Statutes**                                                                                              **Page**

17 U.S.C. §801 (2017 Ed.)................................................................................ SA-78

42 U.S.C. §2000bb-3....................................................................................SA-78


**Regulations**

37 C.F.R. §380.31 ...........................................................................................SA-79

**17 U.S.C. §801. Copyright Royalty Judges; appointment and functions (2017 Ed.)**

(a) Appointment.—The Librarian of Congress shall appoint 3 full-time Copyright Royalty Judges, and shall appoint 1 of the 3 as the Chief Copyright Royalty Judge. The Librarian shall make appointments to such positions after consultation with the Register of Copyrights.

(b) Functions.—Subject to the provisions of this chapter, the functions of the Copyright Royalty Judges shall be as follows:

(1) To make determinations and adjustments of reasonable terms and rates of royalty payments as provided in sections 112(e), 114, 115, 116, 118, 119, and 1004. The rates applicable under sections 114(f)(1)(B), 115, and 116 shall be calculated to achieve the following objectives:

(A) To maximize the availability of creative works to the public.

(B) To afford the copyright owner a fair return for his or her creative work and the copyright user a fair income under existing economic conditions.

(C) To reflect the relative roles of the copyright owner and the copyright user in the product made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, risk, and contribution to the opening of new markets for creative expression and media for their communication.

(D) To minimize any disruptive impact on the structure of the industries involved and on generally prevailing industry practices.

\* \* \*

**42 U.S.C. §2000bb–3. Applicability**

(a) In general

This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.

(b) Rule of construction

Federal statutory law adopted after November 16, 1993, is subject to this chapter unless such law explicitly excludes such application by reference to this chapter.

(c) Religious belief unaffected
Nothing in this chapter shall be construed to authorize any government to burden any religious belief.


### 37 C.F.R. §380.31 Royalty fees for the public performance of sound recordings and for ephemeral recordings.

(a) *Royalty rates.* The total license fee for all website Performances by Public Broadcasters during each year of the Term, up to the total Music ATH set forth in paragraphs (a)(1) through (5) of this section for the relevant calendar year, and Ephemeral Recordings made by Public Broadcasters solely to facilitate such website Performances, shall be $800,000 (the "License Fee"), unless additional payments are required as described in paragraph (c) of this section. The total Music ATH limits are:

(1) 2021: 360,000,000;
(2) 2022: 370,000,000;
(3) 2023: 380,000,000;
(4) 2024: 390,000,000; and
(5) 2025: 400,000,000.

(b) *Calculation of License Fee.* It is understood that the License Fee includes:

(1) An annual minimum fee for each Public Broadcaster for each year during the Term;

(2) Additional usage fees for certain Public Broadcasters; and

(3) A discount that reflects the administrative convenience to the Collective (for purposes of this subpart, the term "Collective" refers to SoundExchange, Inc.) of receiving annual lump sum payments that cover a large number of separate entities, as well as the protection from bad debt that arises from being paid in advance.

(c) *Increase in Public Broadcasters.* If the total number of Originating Public Radio Stations that wish to make website Performances in any calendar year exceeds

the number of such Originating Public Radio Stations considered Public Broadcasters in the relevant year, and the excess Originating Public Radio Stations do not wish to pay royalties for such website Performances apart from this subpart, CPB may elect by written notice to the Collective to increase the number of Originating Public Radio Stations considered Public Broadcasters in the relevant year effective as of the date of the notice. To the extent of any such elections, CPB shall make an additional payment to the Collective for each calendar year or part thereof it elects to have an additional Originating Public Radio Station considered a Public Broadcaster, in the amount of the annual minimum fee applicable to Noncommercial Webcasters under subpart B of this part for each additional Originating Public Radio Station per year. Such payment shall accompany the notice electing to have an additional Originating Public Radio Station considered a Public Broadcaster.

(d) *Allocation between ephemeral recordings and performance royalty fees.* The Collective must credit 5% of all royalty payments as payment for Ephemeral Recordings and credit the remaining 95% to section 114 royalties. All Ephemeral Recordings that a Licensee makes which are necessary and commercially reasonable for making noninteractive digital transmissions are included in the 5%.

(e) *Effect of non-performance by any Public Broadcaster.* In the event that any Public Broadcaster violates any of the material provisions of 17 U.S.C. 112(e) or 114 or this subpart that it is required to perform, the remedies of the Collective shall be specific to that Public Broadcaster only, and shall include, without limitation, termination of that Public Broadcaster's right to be treated as a Public Broadcaster per this paragraph (e) upon written notice to CPB. The Collective and Copyright Owners also shall have whatever rights may be available to them against that Public Broadcaster under applicable law. The Collective's remedies for such a breach or failure by an individual Public Broadcaster shall not include termination of the rights of other Public Broadcasters to be treated as Public Broadcasters per this paragraph (e), except that if CPB fails to pay the License Fee or otherwise fails to perform any of the material provisions of this subpart, or such a breach or failure by a Public Broadcaster results from CPB's inducement, and CPB does not cure such breach or failure within 30 days after receiving notice thereof from the Collective, then the Collective may terminate the right of all Public Broadcasters to be treated as Public Broadcasters per this paragraph (e) upon written notice to CPB. In such a case, a prorated portion of the License Fee for the remainder of the Term (to the extent paid by CPB) shall, after deduction of any damages payable to the Collective by virtue of the breach or failure, be

credited to statutory royalty obligations of Public Broadcasters to the Collective for the Term as specified by CPB.

(f) *Use of contractors.* The right to rely on this subpart is limited to Public Broadcasters, except that a Public Broadcaster may employ the services of a third Person to provide the technical services and equipment necessary to deliver website Performances on behalf of such Public Broadcaster, but only through an Authorized website. Any agreement between a Public Broadcaster and any third Person for such services shall:

   (1) Obligate such third Person to provide all such services in accordance with all applicable provisions of the statutory licenses and this subpart;

   (2) Specify that such third Person shall have no right to make website Performances or any other performances or Ephemeral Recordings on its own behalf or on behalf of any Person or entity other than a Public Broadcaster through the Public Broadcaster's Authorized website by virtue of its services for the Public Broadcaster, including in the case of Ephemeral Recordings, pre-encoding or otherwise establishing a library of sound recordings that it offers to a Public Broadcaster or others for purposes of making performances, but instead must obtain all necessary licenses from the Collective, the copyright owner or another duly authorized Person, as the case may be;

   (3) Specify that such third Person shall have no right to grant any sublicenses under the statutory licenses; and

   (4) Provide that the Collective is an intended third-party beneficiary of all such obligations with the right to enforce a breach thereof against such third Person.